## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL BARHAM, JOHN CRAWFORD, FREDDIE MOULTRIE, MONICA SMITH, MARK SPRADLEY, PAUL WATKINS, and SEAN WINTZ <br><br> Plaintiffs, <br><br> v. <br><br> UBS FINANCIAL SERVICES INC., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) **Civil No. 07-CV-00853-RMU** ) ) ) ) ) ) |

## DEFENDANT'S MOTION TO TRANSFER
## <u>CASE TO THE DISTRICT OF MARYLAND</u>

Pursuant to 28 U.S.C. § 1404(a), defendant UBS Financial Services Inc. ("UBSFS") respectfully moves to transfer this case to the United States District Court for the District of Maryland (Greenbelt Division).

The grounds for this motion are as follows:

1. The seven plaintiffs in this action all worked in defendant's office in Largo, Maryland, and the only claim that five of them assert is that UBSFS unlawfully discriminated against them on the basis of race while they worked in Largo;

2. A "closely related" case filed against UBSFS by two of plaintiffs' co-workers in the Largo office has been pending before Judge Messitte in the District of the Maryland since early 2006. The Maryland case was brought by the same eleven lawyers/four law firms that

represent plaintiffs in this action, and familiarity with the issues in the Maryland case will be

necessary for the resolution of many of the issues that will arise in this case; and

       3.  This suit has only a tenuous connection to the District of Columbia.  Five of

the seven plaintiffs make *no* claim that they were subjected to any racial discrimination while

working in the District of Columbia, and only two of the plaintiffs live in the District of

Columbia.  Therefore, it would serve the interests of justice and avoid a wasteful duplication of

judicial resources if this case were transferred to the District of Maryland.

      In support of this motion, Defendant UBSFS submits a memorandum and the

Declaration of Jeffrey G. Huvelle.

      Defendant requests oral argument on its motion.

      Respectfully Submitted,


/s/  Jeffrey G. Huvelle

Of Counsel:

Claudia Cohen, Esq.
Executive Director and Senior Associate General
Counsel
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086-6791

Dated:  June 7, 2007

Eric H. Holder, Jr. (303115)
Jeffrey G. Huvelle (227769)
Thomas S. Williamson, Jr. (217729)
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000

*Attorneys for Defendant*
  *UBS Financial Services Inc.*

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **MICHAEL BARHAM, JOHN CRAWFORD, FREDDIE MOULTRIE, MONICA SMITH, MARK SPRADLEY, PAUL WATKINS, and SEAN WINTZ**<br><br>Plaintiffs,<br><br>v.<br><br>**UBS FINANCIAL SERVICES INC.,**<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) **Civil No. 07-CV-00853-RMU**<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION OF JEFFREY G. HUVELLE</u>

I, Jeffrey G. Huvelle, hereby declare under penalty of perjury under the laws of the United States:

1.      I am a partner with the law firm of Covington & Burling LLP, counsel for defendant UBS Financial Services Inc. ("UBSFS"), in this matter.

2.      Attached hereto as Exhibit A is a true and correct copy of the Second Amended Complaint, entered on March 30, 2007, in *Cook, et al. v. UBS Financial Services, Inc.*, No. 8:06-cv-803-PJM (D. Md) (the "Maryland action"). Covington & Burling LLP also represents UBSFS in the Maryland action.

3.      All of the managers identified by name in the *Barham* action as allegedly responsible for the discrimination claimed in *Barham* have already been deposed in the

Maryland action.  These are Coe Magruder, Brad Carson and William Kennedy.  At least one other manager implicated by the allegations in *Barham* has already been deposed in the Maryland action.

4.      Each of the plaintiffs in this action, except for plaintiff Spradley, has been deposed by UBSFS in the course of the Maryland action.  Mr. Spradley failed to appear for his depositon despite the fact Mr. Whinston, his attorney in both the Maryland action and this case, had accepted service of a subpoena on his behalf.

5.      UBSFS has produced over 110,000 pages of documents to plaintiffs in the Maryland case.  UBSFS expects that a large number of those documents will also be subject to discovery in the *Barham* case.  A court order in *Cook* requires plaintiffs' counsel to return some of the documents produced in that action.  (*See* Docket No. 80 (April 23, 2007 Order.))  They have, however, not yet done so.

6.      UBSFS filed a motion for partial summary judgment as to the claims of plaintiffs Cook and Fleming in the Maryland action.  That motion is fully briefed an has been set for oral argument on June 18, 2007.  UBSFS anticipates filing additional summary judgment motions in the Maryland action shortly.

7.      Attached hereto as Exhibit B is a true and correct copy of the Protective Order entered by the Court in the Maryland action on August 7, 2006.

8.      Attached hereto as Exhibit C is a true and correct copy of the Memorandum of Law In Support Of Plaintiffs' Motion To Sever Claims And Transfer Cases, filed on May 24, 2007, in the Maryland action.

9.      Attached hereto as Exhibit D are true and correct copies of the most recent scheduling order entered in the Maryland action and the stipulation of the parties extending the

deadlines in that scheduling order for 75 days.  On December 21, 2006, Judge Messitte signed a

paperless order (Docket No. 66) approving the parties stipulation, which stated in relevant part:

"Fact Discovery Deadline April 18, 2007."

10.     Attached hereto as Exhibit E are true and correct excerpts from the April

17, 2007 deposition of Brad Carson in the Maryland action.

11.     Attached hereto as Exhibit F are true and correct excerpts from the March

22, 2007 deposition of Coe Magruder in the Maryland action.

12.     Attached hereto as Exhibit G are true and correct excerpts from the April

5, 2007 deposition of Freddie Moultrie in the Maryland action.

13.     Attached hereto as Exhibit H are true and correct excerpts from the April

9, 2007 deposition of John Crawford in the Maryland action.

14.     Attached hereto as Exhibit I are true and correct excerpts from the April 9,

2007 deposition of Monica Smith in the Maryland action.

15.     Attached hereto as Exhibit J are true and correct excerpts from the April

10, 2007 deposition of Michael Barham in the Maryland action.

16.     Attached hereto as Exhibit K is a true and correct copy of Defendant's

Response To Plaintiffs' First Set of Interrogatories from the Maryland action, dated September 6,

2006.

/s/_____
Jeffrey G. Huvelle

Dated: June 7, 2007

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| **FREDDIE H. COOK, et al.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | **Civil No. 8:06-cv00803-PJM** |
| **v.** ) | |
| ) | |
| **UBS FINANCIAL SERVICES, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## SECOND AMENDED COMPLAINT

Plaintiffs, Freddie H. Cook, Sylvester L. Fleming, Jr. and Timothy J. Gandy ("Plaintiffs"),

by and through their counsel of record, bring this Second Amended Complaint (the "Complaint"),

against Defendant UBS Financial Services, Inc. ("UBSFS"), and allege upon personal knowledge

as to themselves and their own acts, and as to all other matters upon information and belief, based

upon the investigation made by and through their attorneys, as follows:

### I.   NATURE OF THE ACTION

1.     Plaintiffs bring this action individually for injunctive relief, compensatory

damages, and punitive damages, arising from the terms and conditions of their employment by

UBSFS, under the Civil Rights Act of 1866, 42 U.S.C. § 1981.  In addition, Plaintiffs Sylvester L.

Fleming, Jr., and Freddie H. Cook, who have each received a Right To Sue Letter from the United

States Equal Employment Opportunity Commission (the "EEOC"), also assert claims against

UBSFS for injunctive relief, compensatory damages and punitive damages under Title VII of the

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane   •   Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

–1–

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981(a).

      2.     UBSFS engaged in racial discrimination against Plaintiffs, including the following practices, as more fully set forth below:

      a.     *Segregation and Discrimination in Job Assignments and Compensation.* When UBSFS hired Plaintiffs, the company assigned them to either racially segregated branch offices consisting almost entirely of African-American Financial Advisors or to lower ranking positions, with lower compensation, than similarly situated Caucasian employees;

      b.     *Discrimination in Promotion.* Plaintiff Gandy was denied promotion in favor of less qualified Caucasian employees and entirely denied promotion to certain positions, such as Branch Office Manager ("BOM"), except in a small, non-autonomous satellite office controlled and managed by a Caucasian BOM. ; and

      c.     *Discrimination in Provision of Resources, Support and Professional Opportunities.* Plaintiffs Cook and Fleming were provided with fewer resources, support and professional opportunities compared with their Caucasian co-workers. This includes, without limitation: training, allocation of accounts and administrative support services. This form of discrimination handicapped Plaintiffs Cook and Fleming in their efforts to advance within the UBSFS system.

## II.  PARTIES

      3.     Plaintiff Freddie H. Cook is an African-American male citizen and resident of the

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

State of Maryland, who has been injured by the acts and practices described herein. Mr. Cook was employed by UBSFS as a Financial Advisor from June 4, 2001 through July 23, 2004, when he was constructively discharged.

4.    Plaintiff Sylvester L. Fleming, Jr. is an African-American male citizen and resident of the State of Maryland, who has been injured by the acts and practices described herein. Mr. Fleming was employed by UBSFS as a Financial Advisor from May 6, 2002 through June 24, 2004, when he was constructively discharged.

5.    Plaintiff Timothy J. Gandy is an African-American male citizen and resident of the State of California, who has been injured by the acts and practices described herein. Mr. Gandy was employed by UBSFS as a Financial Advisor from August 1, 1994 through November 7, 2003, when he resigned.

6.    Defendant UBS Financial Services, Inc. ("UBSFS"), is a corporation formed under the laws of the State of Delaware, with its corporate headquarters and principal place of business located in this District at 1285 Avenue of the Americas, New York, New York. UBSFS is a financial services and investment services firm that employs approximately 27,000 individuals in the United States. For purposes of this Complaint, the term "UBSFS" includes UBS Financial Services, Inc., and its predecessors, including Paine Webber, Inc.

### III.    JURISDICTION AND VENUE

7.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5.

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and ©, in that Defendant's corporate headquarters and principal place of business is located in this District, and certain of the acts and omissions giving rise to this action occurred in this District.

## IV.    FACTUAL ALLEGATIONS

9.     UBSFS is part of the UBS Warburg group, a subsidiary of UBS AG, one of the largest financial services firms in the world.  UBS Warburg acquired Paine Webber, Inc., on November 3, 2000, and, after various name changes, it is now known as UBSFS.

10.     UBSFS is a worldwide financial services organization with business groups offering wealth management, investment banking, private banking, securities, and asset management services throughout the United States.

11.     In the United States, UBSFS provides these services through a network of approximately 385 branch offices, each managed by a branch office manager ("BOM"), and approximately 8,000 Financial Advisors (also known as "Brokers").

12.     UBSFS's network of branch offices is in turn managed by two Division Managers and twelve Regional Directors.

13.     Financial Advisors at UBSFS range from entry-level trainees to seasoned brokers with corporate titles.

14.     UBSFS builds its Financial Advisor network by acquiring smaller financial services firms, recruiting seasoned Financial Advisors from competitors, and hiring and training new Financial Advisors.

15.     UBSFS's workforce with respect to its Financial Advisors is dominated by Caucasians and reflects a glaring lack of diversity.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–4–

16.    For example, as of March 2002, out of approximately 8,615 UBSFS Brokers, *only 1.2% were African-American.* This incredibly low percentage of African Americans has not significantly changed since March 2002.

17.    Since at least March 2002, none of UBSFS's Regional Directors or Division Managers have ever been African-American, *and only one African-American has ever been promoted or assigned to a BOM position.*

18.    *Overall, African-Americans have represented only approximately one percent (1%) of field management positions at UBSFS.*

19.    UBSFS's pattern and practice of discrimination against African-Americans reflects its stereotypical orientation that African-Americans can only sell financial products to other African-Americans, and, conversely, that Caucasian customers will not trust African-Americans to invest their money wisely.

20.    This philosophy is illustrated by, *inter alia,* UBSFS's two experiments into hiring significant numbers of non-Caucasian Financial Advisors and advancing minority employees to branch management positions -- which illegally resulted in the creation of two racially segregated offices in New York and Maryland.

### UBSFS's Separate But Unequal "Asian Office" In Flushing, New York

21.    In approximately 1998, UBSFS opened a small satellite branch office in Flushing, New York, a community with a sizeable Asian-American population. UBSFS decided to, and did, for the first time, recruit an Asian-American to act as BOM and recruited new Asian-American Financial Advisors and administrative staff, and directed them to focus on getting business from Asian-Americans in the local community. Experienced Caucasian Financial

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–5–

Advisors and support staff from nearby UBSFS offices were not assigned to Flushing, nor was there any significant interaction between such offices to provide mentoring or training to the newly hired staff.

22.     Unwilling to grant the Flushing branch full autonomy, however, UBSFS opened the Flushing branch as a satellite office of a larger branch office managed by a Caucasian BOM. Despite this relationship, the larger branch did not provide, and was not directed to provide, support to the Flushing branch.

23.     Apparently content with its token gesture of corporate diversity, UBSFS failed to support, fund and operate the Flushing office in a manner comparable to UBSFS's other predominantly Caucasian branch offices.

24.     UBSFS management commonly referred to the Flushing office as a "diversity" office and frequently belittled the office and its staff.

25.     Struggling as a direct result of UBSFS's lack of support and oversight, the Flushing office closed in approximately May 2001.  Its Asian-American staff was largely not offered comparable positions in other branches or divisions of UBSFS.

### UBSFS's Separate But Unequal "African-American Office" In Largo, Maryland

26.     In November 2000, UBSFS opened a satellite branch office in Largo, Maryland, a community with a sizeable African-American population. At Largo, UBSFS engaged in precisely the same discrimination and segregation that marked the failed Flushing experiment. Specifically, UBSFS named an African-American BOM and set about on its first ever campaign to recruit African-American Financial Advisors to staff the Largo branch. This resulted in an office composed almost entirely of newly hired African-American Financial Advisors, including

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–6–

Plaintiffs Cook and Fleming. As with Flushing, UBSFS staffed the Largo office with new management and new Financial Advisors without also assigning experienced personnel to the office.

27.     As with Flushing, UBSFS opened the Largo branch as a satellite office. Largo's parent branch was UBSFS's large Washington, D.C. branch office, which was managed by a Caucasian BOM and staffed nearly entirely by Caucasian Financial Advisors. Despite this readily available resource, neither the UBSFS central office nor the Washington branch provided the technical or support services necessary to enable the Largo branch to take root.

28.     As with Flushing, UBSFS failed to support, fund and operate the Largo branch in a manner comparable to UBSFS's other predominantly Caucasian branch offices.

29.     UBSFS's management also frequently ridiculed the Largo branch office and its staff, commonly referring to it as a "diversity" office.

30.     Due to UBSFS's lack of support and oversight, the Largo office suffered the same fate as the Flushing branch office, and was closed in June 2003. Its African-American branch manager was demoted, many of its Financial Advisors were not offered new positions, and those that were offered new positions, such as Plaintiffs Cook and Fleming, were denied the support provided to Caucasian Financial Advisors and systematically set up to fail.

31.     UBSFS's establishment of the Largo branch office reflects its unwillingness to hire and promote African-American Financial Advisors into the Company in a meaningful way, its failure to train and support them once hired, and its segregation of racial minorities within its workforce.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane   •   Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–7–

32.     The creation of the Largo branch office also illustrates UBSFS's negative and stereotypical views of the abilities of African-Americans to provide services to the investing public.

33.     During the recruitment process, UBSFS informed Plaintiffs Cook and Fleming that the Largo branch office would provide a significant opportunity for business growth and that UBSFS was committed to the success of the Largo branch office.  Based on these representations, Plaintiffs Cook and Fleming accepted the positions offered to them in the Largo office.

34.     UBSFS, however, failed to provide support to the Largo office that was routinely provided to other UBSFS offices staffed largely by Caucasian employees, including, but not limited to the following:

a.     UBSFS failed to provide the Largo branch with an adequate marketing budget so that the branch office could establish a presence in the local market.  As a result, the BOM, Plaintiff Cook, and other African American Financial Advisors at the Largo branch often had to pay out of their pockets to attend or conduct promotional events;

b.     UBSFS designated the Largo BOM as a "producing manager," which violates UBSFS's policy of not designating as a producing manager a BOM with eight (8) or more producing Financial Advisors.  A "producing manager" is one who is responsible not just to manage the office but to engage in sales activities and establish his or her own "book of business." As a result of this designation, the Largo BOM was unable to devote adequate time to manage his staff of new Financial Advisors;

c.     UBSFS  assigned to the Largo branch only one individual holding an NASD Series 8 license (the Largo BOM), rather than the two or three license holders UBSFS

Joseph
Greenwald
& Laake

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–8–

typically assigned to other offices comparable in size to the Largo office. This meant that the already burdened Largo BOM was the only individual at the branch who could approve certain securities transactions before they could be finalized;

d.    UBSFS assigned to the Largo branch office a Sales Manager with no sales experience whereas UBSFS assigned experienced Sales Managers to comparably sized branches. The Sales Manager's lack of experience adversely impacted the new Financial Advisors and deprived them of the training and valuable assistance routinely provided to Financial Advisors by experienced sales managers;

e.    UBSFS failed to assign an adequate number of Client Service Associates ("CSAs") to the Largo office to assist the Financial Advisors in carrying out their business. By contrast, UBSFS assigned CSAs to Financial Advisors in largely Caucasian branches almost immediately upon commencing their employment. Eventually, Plaintiffs Cook and Fleming had to locate and pay for a CSA themselves; and

f.    UBSFS assigned an Operations Manager to the Largo branch office who had no previous experience as an Operations Manager. This lack of experience negatively affected the ability of Plaintiffs Cook and Fleming to conduct business. In contrast, other new UBSFS offices staffed largely by Caucasian brokers were assigned experienced operations managers or the equivalent in support services.

35.    Despite repeated complaints that the Largo office needed additional assistance and resources, UBSFS refused to take appropriate remedial action.

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–9–

36.     In or about June 2003, UBSFS closed the Largo office despite representations one month earlier from UBSFS management that it would remain open and that it had the support of UBSFS.

37.     Upon closure of the Largo office, UBSFS continued in its conduct of failing to provide support to Plaintiffs Cook and Fleming that was routinely provided to similarly situated Caucasian employees.

38.     Plaintiffs Cook and Fleming were transferred to the Washington D.C. branch office. In Washington, D.C., however, UBSFS continued to discriminate against them and other African-American Financial Advisors with regard to training, compensation, access to financial accounts/business, distribution of business support and office resources in the following ways, among others:

a.     unassigned or available UBSFS accounts were distributed to favored Caucasian Financial Advisors;

b.     Caucasian Financial Advisors were given opportunities for advancement and increased compensation that were denied to Plaintiffs Cook and Fleming; and

c.     Plaintiffs Cook and Fleming were denied office space and instead located in a large "bullpen," while Caucasian Financial Advisors had their own offices.

39.     As a result, the working conditions for Plaintiffs Cook and Fleming became so intolerable that they felt compelled to resign from UBSFS. Plaintiffs Cook and Fleming subsequently filed charges of discrimination with the EEOC. Plaintiff Fleming received a Right to Sue letter on August 16, 2005. The EEOC issued Plaintiff Cook a Right to Sue letter on December 29, 2005.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

–10–

## Discrimination In Promotion at UBSFS

40.    Plaintiff Gandy began his employment as a Financial Advisor Trainee at the UBSFS branch office in Oxnard, California, on August 1, 1994.

41.    Desiring to advance to a branch management position, Mr. Gandy successfully completed the UBSFS Branch Office Manager Assessment process in 1999, and graduated from the UBSFS Leadership and Management Development Program ("MDP") in 2000.

42.    Upon graduation from the MDP, Mr. Gandy informed UBSFS that he would be interested in promotion to any branch office management positions that became open.

43.    The MDP program acted as a fast track stepping stone to BOM positions for Mr. Gandy's Caucasian classmates.  However, despite his success in the program and in other positions he held at UBSFS, Plaintiff Gandy was frozen out of branch office management in favor of less qualified Caucasians.

44.    UBSFS did not employ or observe any formal posting process concerning assignment or promotion to branch management positions.  Instead, favored Caucasian employees were promoted by way of a "tap on the shoulder" process.  As a result, Mr. Gandy was repeatedly denied promotion to branch office management positions for which he was qualified while less qualified Caucasian employees advanced above him.

45.    In 2000, a Caucasian Financial Advisor was assigned or promoted to a BOM position in Palm Desert, California, even though this individual had failed the BOM Assessment, did not qualify for the MDP program and had fewer years as a Financial Advisor than Plaintiff Gandy.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–11–

46.     By contrast, following his graduation from the MDP program, Mr. Gandy was offered only a Sales Manager position at the UBSFS branch in Oxnard, California, which he accepted.

47.     In October 2002, when the BOM position in Oxnard became vacant, Mr. Gandy expressed his interest in the position to UBSFS. Rather than give Mr. Gandy the position, however, UBSFS transferred a Caucasian BOM from its branch office in Santa Barbara to fill the Oxnard position and then selected a Caucasian with no BOM experience to fill the Santa Barbara BOM vacancy.

48.     In or around January 2000, a Caucasian was assigned or promoted to a position as Assistant BOM in a very large branch in Century City, California, even though she was less qualified that Mr. Gandy.

49.     Other Caucasian Financial Advisors in Mr. Gandy's MDP class were quickly assigned or promoted to positions as BOM or Assistant BOM.

50.     In approximately July 2003, Mr. Gandy was offered a position as a "Resident" BOM in Westlake, California, meaning that the office branch he managed was not classified as an autonomous branch, but was rather considered a satellite office of a larger branch office managed by a Caucasian BOM.

51.     Mr. Gandy accepted the position. He supervised eight (8) Financial Advisors and approximately four (4) administrative staff, and was the only African-American in the office. The office was very profitable during his stewardship. Even this successful experience did not lead to a BOM position for Mr. Gandy.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

–12–

52.     Faced with the inescapable reality that he would never be given a UBSFS branch to manage, Mr. Gandy resigned from UBSFS on or around November 7, 2003.

## COUNT I
## TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### 42 U.S.C. § 2000e *et seq.*
### (By Plaintiffs Fleming and Cook)

53.     Plaintiffs Fleming and Cook reallege and incorporate by reference the above paragraphs.

54.     Plaintiffs Fleming and Cook filed charges of discrimination with the EEOC and received Right to Sue letters.

55.     UBSFS has discriminated against Plaintiffs Fleming and Cook with respect to the terms and conditions of employment because of their race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991.

56.     UBSFS's conduct has been intentional and/or has had a disparate impact on Plaintiffs Fleming and Cook with respect to the terms and conditions of their employment.

57.     By virtue of UBSFS's conduct as alleged herein, Plaintiffs Fleming and Cook have been injured.

## COUNT II
## THE CIVIL RIGHTS ACT OF 1866
### 42 U.S.C. § 1981
### (By All Plaintiffs)

58.     Plaintiffs reallege and incorporate by reference the above paragraphs.

59.     UBSFS has discriminated against Plaintiffs by denying them the same rights as enjoyed by Caucasian employees with regard to the making, performance, modification and termination of their employment relationship with UBSFS and with regard to the enjoyment of all

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

–13–

benefits, privileges, terms and conditions of that relationship in violation of the Civil Rights Act of 1866 as amended, 42 U.S.C. § 1981.

60.     UBSFS's conduct has been intentional, deliberate, willful and conducted in callous disregard of the rights of Plaintiffs under the law.

61.     By virtue of UBSFS's conduct as alleged herein, Plaintiffs have been injured.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court enter an order:

62.     Adjudicating and declaring that UBSFS's conduct as set forth above is in violation of 42 U.S.C. §2000e *et seq.* and U.S.C. § 1981;

63.     Permanently enjoining and prohibiting UBSFS and its officers, agents, employees and successors from continuing to engage in the practices complained of herein;

64.     Permanently enjoining and requiring UBSFS to adopt policies and practices that ensure the cessation of all discriminatory practices complained of herein and requiring the institution of such measures that are necessary or appropriate to ensure that these practices do not reemerge;

65.     Awarding Plaintiffs such equitable remedies, including, without limitation, back pay and front pay, necessary to provide the Plaintiffs with full equitable relief from the discrimination they have suffered;

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

–14–

66.    Awarding Plaintiffs compensatory damages justified under the circumstances;

67.    Awarding the Plaintiffs punitive damages justified under the circumstances;

68.    Awarding attorneys' fees and reimbursement of costs associated with this action to counsel for Plaintiffs;

69.    Retaining jurisdiction to ensure that UBSFS fully complies with the equitable relief ordered; and

70.    Awarding Plaintiffs such other and further relief as may be appropriate in the interest of justice.

Dated:   March 30, 2007

_____/s/ filed by ECF_____
JOSEPH, GREENWALD & LAAKE, P.A.
Steven M. Pavsner
Brian Markovitz
6404 Ivy Lane, Suite 400
Greenbelt, Maryland  20770
Tel: (301) 220-2200
Fax: (301) 220-1214

BERGER & MONTAGUE, P.C.
Stephen A. Whinston
Keino R. Robinson
Selim Ablo
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

Joseph
Greenwald
& Laake

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane   •   Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

−15−

GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein (BEG 2726)
Brett Cebulash (BC 0044)
Archana Tamoshunas (AT 3935)
1501 Broadway, Suite 1416
New York, NY 10036
Tel: 212-398-0055
Fax: 212-764-6620
**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 30 day of March, 2007, a true and correct

copy of the foregoing Second Amended Complaint, was electronically filed and notification of

such filing was made by the Court via e- mail to all counsel electronically registered with the

Court.

_____ /s/ filed by

ECF_____

Steven M. Pavsner

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____FILED _____ENTERED
_____LODGED _____RECEIVED

AUG - 4 2006

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                                   DEPUTY

|  |  |
|---|---|
| FREDDIE H. COOK, SYLVESTER L. FLEMING, JR. and TIMOTHY J. GANDY, on behalf of themselves and all other similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>UBS FINANCIAL SERVICES, INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil No. 8:06-CV-00803-PJM<br>)<br>)<br>)<br>)<br>)<br>) |

## STIPULATED PROTECTIVE ORDER

IT IS HEREBY STIPULATED AND AGREED, by and between counsel for the parties, pursuant to Federal Rule of Civil Procedure 26(c) and subject to the approval of the Court, that the following Stipulated Protective Order (the "Stipulation") shall govern the handling of confidential and proprietary information produced by any party (the "Producing Party") to any other party (the "Receiving Party") during this litigation or appeals therefrom ("the litigation").

       1.    In responding to a request for discovery, the Producing Party may designate as "Confidential" any documents, information or deposition testimony that it believes in good faith to contain confidential or proprietary information. For purposes of this Stipulation, information considered to be confidential or proprietary includes, but is not limited to, the following: (1) salary and personnel records of current and former employees of defendant, (2) personal medical information, (3) non-public business and marketing procedures, plans, and strategies, (4) customer lists and information, (5) client financial and account information,

(6) non-public personnel information or policies, (7) non-public financial, commercial or other proprietary information, and (8) criminal justice system records or information (collectively "Confidential Material").

2.　　　Any party shall have the right to designate any documents or information received from the other party or from third-parties as "Confidential" if the documents or information originated with or were created by the designating party. The party designating such documents or information as Confidential shall be treated as the Producing Party; the opposing party shall be treated as the Receiving Party.

3.　　　Confidential Material shall be used by the party to whom it is produced (the "Receiving Party") solely for purposes of the litigation and shall not be used for any other purpose during or after the litigation, nor shall it be disclosed to any third parties, except as set forth in this Stipulation or allowed by Court order.

4.　　　The designation of material as Confidential Material for purposes of this Stipulation shall be made in the following manner:

(a)　　　in the case of documents, exhibits, briefs, memoranda or other materials (apart from depositions or other pretrial testimony): by stamping "Confidential" on the first page of any material containing any Confidential Material; and

(b)　　　in the case of depositions or other pretrial testimony: (i) by a statement on the record, by counsel, at the time of such disclosure that such testimony shall be treated as Confidential Material; or (ii) by written notice, sent by counsel to all parties within thirty (30) business days after receiving a copy of the transcript thereof that such testimony shall be treated as Confidential Material.

2

5.      If the Receiving Party has an objection to a Confidential designation, the Receiving Party shall notify the Producing Party of its objection in writing.  The written notification shall describe in detail the basis for the objection.  If the Producing Party continues to believe that the information and/or documents should be designated Confidential, the Producing Party shall, within thirty (30) days of receiving the objection, inform the Receiving Party in writing of the basis for its Confidential designation.  If, after receiving the Producing Party's response, the Receiving Party still objects to the Confidential designation, it may file a motion with the Court for an order removing the Confidential designation.  The Producing Party shall have the burden of demonstrating that the Confidential designation is proper.  The information and/or documents shall be treated as Confidential Material pending a decision by the Court.

6.      Once Confidential Material is produced, it may be disclosed, summarized or otherwise communicated in whole or in part only to the following persons, who may make use of such information only in connection with the litigation:

(a)      outside counsel or in-house counsel who represent parties in the litigation, and employees of counsel assisting in the conduct thereof for use in accordance with this stipulation;

(b)      the named parties and officers, directors, partners or employees of any party hereto who are performing duties in connection with litigation;

(c)      experts or consultants assisting counsel for those parties, pursuant to paragraphs 7 and 8 of this Stipulation;

(d)      potential or anticipated witnesses or deponents and their counsel, pursuant to paragraphs 7 and 8 of this Stipulation;

3

(e)     the Court, pursuant to paragraphs 9 and 10 of this Stipulation; and

(f)     court reporters employed in connection with the litigation.

7.     Any person may be examined concerning any Confidential Material as a witness at trial, subject to compliance with paragraph 10 herein, or during a deposition, subject to compliance with paragraph 8 herein.

8.     Before the Receiving Party or its counsel may show or disclose Confidential Material to any witness, expert, or consultant, that witness, expert or consultant shall be provided a copy of this Stipulation. Such persons shall be required to confirm their understanding and agreement to abide by the terms of this Stipulation by signing a copy of Exhibit A hereto, which copy shall be maintained by counsel for the party retaining the expert or consultant or the counsel who is examining or interviewing the witness.

9.     If the Receiving Party intends to use Confidential Material in connection with any papers to be filed with the Court, the Receiving Party shall file a motion with the Court, including a proposed order, seeking to have such Confidential Material placed under seal. To the extent possible, Confidential Material and non-Confidential Material shall be filed separately, and a party shall seek to file only Confidential Material under seal.

10.     If any party wishes to use Confidential Material during trial of this action, the parties will, before trial, confer in good faith to attempt to agree upon a method to protect such Confidential Material. If the parties are unable to reach agreement, the party opposing the use of such Confidential Material may seek a court order protecting such Confidential Material during trial.

4

11.    Entering into, agreeing to, producing or receiving Confidential Material under, or otherwise complying with this Stipulation shall not be construed as a waiver of any party's rights:

(a)    to object to the production of documents that it considers not subject to discovery;

(b)    to petition the Court for further relief relating to any Confidential Material;

(c)    to seek a Court determination whether any documents, information, or testimony constitute Confidential Material under the terms of this stipulation; or

(d)    to object to the introduction of any Confidential Material as evidence at any hearing or trial in this matter.

12.    The parties to this Stipulation may agree in writing to alter or waive the provisions or protections provided for herein with respect to particular discovery material.

13.    Any personal client information produced by UBSFS in this action shall be deemed to have been produced pursuant to an order of the Court in this action in accordance with the provisions and terms of Regulation S-P issued by the Securities and Exchange Commission.

14.    The inadvertent failure to designate a document as "Confidential" at the time of disclosure shall not be deemed a waiver of the Producing Party's claim of confidentiality. The Producing Party may cure such an inadvertent failure upon written notice to the other party. However, the Receiving Party will not be deemed to have breached this Stipulation by disseminating prior to such notification any documents that were inadvertently not marked "Confidential."

15.    In the event that a Producing Party discovers that information or documents which are subject to attorney-client privilege or the work-product doctrine have been produced, the Producing Party shall notify the Receiving Party within ten (10) days of discovery of the error and add the documents or information to its privilege log. The Receiving Party shall return or certify in writing that it has destroyed all copies of the information or documents to the Producing Party within ten (10) days of receipt of such notice. However, within ten (10) days of receipt of such notice, if the Receiving Party wishes to challenge the Producing Party's assertion of privilege, the Receiving Party may, with notice to the Producing Party, provide the Court with one copy of the disputed privileged material for in camera review together with an explanation as to why the document should not be deemed privileged. The Producing Party shall then have ten (10) days to make a submission to the Court regarding why the disputed privileged material should be considered privileged. Alternatively, the Receiving Party can return all copies of the alleged privileged material to the Producing Party and later challenge the privileged status of that material. There is no deadline for challenging the Producing Party's assertion of privilege, although, if the challenge is made after all copies of the alleged privileged material are returned to the Producing Party, the Producing Party agrees, at the request of the Receiving Party, to provide the Court with one copy of the disputed privileged material for in camera review. The fact that such privileged documents are produced, inadvertently or otherwise, shall not be construed as a waiver of any applicable attorney-client privilege and/or the work product doctrine. The fact that privileged documents are returned shall not be construed as an admission by the Receiving Party that the documents are in fact subject to the attorney-client privilege or the work-product doctrine.

16.     The parties agree to be bound by the terms of this Stipulation pending its entry by the Court, or pending the entry of an alternative thereto which is satisfactory to all parties.

17.     If a Receiving Party is served with a demand, subpoena or other legal process in any other action that seeks discovery material which was produced or designated as "Confidential" by the Producing Party, the Receiving Party shall give prompt written notice by hand or facsimile transmission, within five (5) business days of receipt of such demand, subpoena or other legal process to the Producing Party and shall not produce such Confidential Material until any objections to such production are resolved, unless to do so would require the receiving party to violate an order from a court of competent jurisdiction.

18.     Within thirty (30) days after the termination of this action, including all appeals, the Receiving Parties shall either return the Confidential Material and all copies to counsel for the Producing Party or certify in writing to counsel for the Producing Party that such documents have been destroyed.  Counsel shall make reasonable efforts so that all experts and consultants it has retained abide by this provision.

By: /s/ Stephen A. Whinston
    Stephen A. Whinston
    Carey D'Avino
    Keino R. Robinson
    Shanon J. Carson
    Selim Ablo
    Berger & Montague, P.C.
    1622 Locust Street
    Philadelphia, PA 19103
    215-873-3000

By: /s/ Jeffrey G. Huvelle
    Eric H. Holder, Jr. (*pro hac vice*)
    Jeffrey G. Huvelle (No. 03340)
    Thomas S. Williamson, Jr. (No. 07695)
    Covington & Burling
    1201 Pennsylvania Avenue, N.W.
    202-662-6000

    Attorneys for Defendant

Steven M. Pavsner
Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane, Suite 400
Greenbelt, MD 20770
301-220-2200

Bruce E. Gerstein
Brett H. Cebulash
Archana Tamoshunas
1501 Broadway, Suite 1416
New York, NY 10036
212-398-0055

Attorneys for Plaintiffs

IT IS SO ORDERED this ___3___ day of ___Aug___ 2006

The Honorable Peter J. Messitte
United States District Judge

8

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| FREDDIE H. COOK, SYLVESTER L. FLEMING, JR. and TIMOTHY J. GANDY, on behalf of themselves and all other similarly situated persons, | ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) | Civil No. 8:06-CV-00803-PJM |
| v. | ) ) |  |
| UBS FINANCIAL SERVICES, INC., | ) ) |  |
| Defendant. | ) ) |  |

### Agreement Concerning Confidential Litigation Materials

I hereby acknowledges that I have read the Stipulated Protective Order dated

_____ in the above-captioned action, that I understand the terms thereof, and that I agree

to be bound by such terms.


_____        _____
Date                                  Signature

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Southern Division

| | |
|---|---|
| FREDDIE COOK, et al. | CIVIL ACTION NO. PJM 06-803 (CBD) |
| Plaintiffs, | |
| v. | |
| UBS FINANCIAL SERVICES, INC., | ECF CASE |
| Defendant. | |

## MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFFS' MOTION TO SEVER CLAIMS AND TRANSFER CASES

Pursuant to Federal Rule of Civil Procedure 21 and 28 U.S.C. § 1404(a), Plaintiffs Freddie

Cook, Sylvester Fleming, Jr., and Timothy Gandy, by and through their counsel of record, hereby

move to sever claims and transfer their cases. Plaintiffs respectfully request that Mr. Cook and Mr.

Fleming's cases be transferred to the U.S. District Court for the District of Columbia, and that Mr.

Gandy's case be severed and transferred to the U.S. District Court for the Central District of

California.

### I.    RELEVANT FACTS

Plaintiffs Cook, Fleming and Gandy are African-American former Financial Advisors or

Financial Advisor Trainees (hereinafter "Brokers") of UBS Financial Services, Inc. ("UBSFS"), who

are asserting claims of racial discrimination against UBSFS stemming from their employment with

UBSFS. See Second Amended Complaint, at ¶¶ 1-2. Mr. Cook and Mr. Fleming worked as Brokers

at UBSFS branch offices in Largo, Maryland, and Washington, D.C. They assert that the company

discriminated against them by assigning them to a racially segregated office, denying them compensation and professional support (resources, business support and professional opportunities including training, allocation of accounts and administrative support services) comparable to brokers in UBSFS' other predominantly Caucasian branch offices, resulting in their constructive discharge. Id. at ¶¶ 1-2, 26-39. Mr. Cook and Mr. Fleming bring their claims under Title VII and Section 1981. Mr. Gandy worked as a Broker at UBSFS branch offices in California, and is suing UBSFS for discrimination regarding promotion under Section 1981. Id. at ¶¶ 1-2, 40-52.

This lawsuit was originally filed as a putative class action. On April 23, 2007, however, this Court granted Plaintiffs' motion to amend the Complaint to dismiss without prejudice the class allegations. See Mem. dated April 23, 2007 (Doc. No 80). Fact discovering is still continuing in the case, and no date has been set for trial.

Now that the Court has granted Plaintiffs' motion to amend the Complaint to drop the class action allegations, this case now comprises the claims of three individual plaintiffs. When these individual claims are examined in the light of the discovery that has been taken, it becomes apparent that venue is more proper in another District. Mr. Gandy never worked in Maryland and no witnesses relating to Mr. Gandy are within the subpoena power of this Court. The sole focus of his claims is in California where UBSFS resides, the events giving rise to his claims occurred, and where Mr. Gandy and key witnesses are located. Therefore, his claims, made under 28 U.S.C. Section 1981, should be severed and transferred to the U.S. District Court for the Central District of California.

The proper venue for the claims of Plaintiffs Cook and Fleming is the District of Columbia. As discovery reveals, the decision to open the now defunct Largo office was made, at least in part,

2

in Washington; the authorization to hire both Plaintiffs came from Washington; the Plaintiffs worked for significant portions of their careers with UBSFS in Washington; and many key non-party witnesses reside in (or are within subpoena range of) the District of Columbia. By contrast, the UBSFS office where Plaintiffs worked in Largo has been closed since 2003 and its former "manager" now works in Washington. No UBSFS witnesses are in Maryland. Furthermore, Plaintiffs' key non-party witnesses either live or work in the District of Columbia. Under the venue standards for both Title VII and Section 1981, the claims of Mr. Cook and Mr. Fleming should be transferred to the District of Columbia.

### A.    Facts Supporting Venue in the District of Columbia (Freddie Cook and Sylvester Fleming, Jr.).

Mr. Fleming applied for a Broker position at UBSFS' branch office in Washington D.C. ("Washington office"). Whinston Exh. 1 (Declaration of Sylvester Fleming, Jr. ("Fleming Decl.") at ¶ 5); Whinston Exh. 2 (Sylvester Fleming, Jr. ("Fleming") Dep. Trans., at 87:14-91:10). Mr. Fleming's interviews for the position took place at UBSFS' Washington office. Id. There, the Washington office Branch Office Administrator, Danielle Oristian, informed him that there were no such positions available in the Washington office. Id.; Whinston Exh. 6 (Coe Magruder ("Magruder") Dep. Trans., at 71:3-8). Instead, the Washington Branch Office Manager, Coe Magruder, authorized that Mr. Fleming be hired and assigned to the company's racially segregated Largo "diversity" office, whose staff was composed almost entirely of African-Americans. Whinston Exh. 1 (Fleming Decl. at ¶ 4); Whinston Exh. 6 (Magruder Dep. Trans., at 77:4-11). Mr. Fleming later discovered that a Caucasian Broker had been hired into the Washington office around the same time that UBSFS informed him that no positions were available. Whinston Exh. 1 (Fleming Decl. at ¶ 5). Mr. Magruder also authorized that Mr. Cook be assigned to the company's racially

3

segregated Largo "diversity" office. Whinston Exh. 6 (Magruder Dep. Trans., at 76:21-77-3).

Key unlawful practices against Mr. Cook and Mr. Fleming originated in the Washington office. This is because Mr. Magruder exercised ultimate control over the operation of the Largo office. All significant decisions regarding the Largo office were made by Mr. Magruder and other managers based in the Washington office. Whinston Exh. 1 (Fleming Decl. at ¶ 10); (Whinston Exh. 3 (Declaration of Freddie Cook ("Cook Decl.") at ¶ 9). For example, Mr. Magruder conceived the idea of opening an office in Largo, and obtained approval for his idea from UBSFS. Whinston Exh. 6 (Magruder Dep. Trans., at 12:11-14:7). The Largo office was "complexed" into the Washington office and therefore fell under Mr. Magruder's responsibility. Id.; Whinston Exh. 4 (Declaration of Coe Magruder ("Magruder Decl.") at ¶ 6. The Largo office did not have its own budget, but was instead subsumed within the budget of the Washington office and its "manager", Bradford Carson, reported to Mr. Magruder in Washington. As Mr. Carson testified:

> Q. And there were -- there has been some testimony that UBS -- that the Largo office was complexed into the Washington, D.C. office. Is that your understanding?
> A. That's my understanding, yes.
> Q. What does that mean?
> A. That just means that you report through the regional -- I mean one person other than the regional manager. That's really all. And to me what it means is I am tied to someone else's budget for approval until somebody feels I am free to roam alone. That's all it means to me.
> Q. So you were tied to the Washington, D.C. branch office budget?
> A. Yes.
> Q. And rather than -- a branch office manager would report to a regional?
> MR. WILLIAMSON: Objection. That's a mischaracterization of prior testimony.
> BY MR. WHINSTON:
> Q. A branch office manager would report to a regional director?
> A. That's normally the way it is. I mean that's the way it's set up.
> Q. And because Largo was complexed, you reported to Mr. Magruder?
> A. Yes.

(Whinston Exh. 10 (Carson Dep. Trans., at 88:2-89:8)).

Mr. Magruder played a key role in staffing the Largo office almost entirely with African-American employees. Whinston Exh. 6 (Magruder Dep. Trans at 49:17-52:16, 56:18-57:12). Mr. Magruder selected an African-American Broker from the Washington office, Mr. Carson, to be the "manager" of the Largo office. Whinston Exh. 10 (Carson Dep. Trans., at 33:11-16). Neither the Largo office nor Mr. Carson was given independent status, however, but were instead constrained by Mr. Magruder's authority. Id. at 88:2-89:8). For example, Mr. Carson could not hire Brokers to the Largo office without first obtaining Mr. Magruder's authorization. Id. at 47:13-48:19). As Mr. Magruder testified:

> Q.    Who was responsible for recruiting FAs and NFAs[1] to come work at Largo?
> A.    Brad Carson.
> Q.    And did you play any role in that recruitment process?
>        Yes. Before the office opened, Brad and I recruited more or less jointly. We would both go in different directions, and if I had somebody I wanted him to meet, I would set up the second meeting with Brad and the same for Brad. Once the office was opened, Brad took over the responsibility for recruiting existing producers and trainees. And then when he had somebody he was interested in, he would -- after he had gotten a number of meetings down the road and he determined he's interested and they're interested, then he would have me get involved.
>
> [***]
>
> Q.    Did Mr. Carson have the authority to hire a financial advisor without getting your okay?
> A.    As a trainee?
> Q.    Okay, let's say as a trainee.
> A.    No. At that point in time, he would have had to come to me for both.
> Q.    For both financial advisor and financial advisor trainee, he needed your okay?
> A.    Correct.

(Whinston Exh. 6 (Magruder Dep. Trans., at 56:18-57:12, 235:22-236:8)).

---

[1]    "FAs" refers to Financial Advisors and "NFAs" refers to New Financial Advisors.

Thus, from his office located in Washington, Mr. Magruder authorized the assignment of a number of employees to the Largo office, in particular, Plaintiff Cook, Whinston Exh. 10 (Carson Dep. Trans., at 76:21-77:3) and Plaintiff Fleming, (Id. at 77:4-11).  He also authorized the assignment of a number of other African-American employees to the Largo office, including Jay Walker, (Id. at 47:13-20), Gary Edmonds , (Id. at 48:17-19), Alphonzo Houston, (Id. at 56:18 - 57:1), John Crawford, (Id. at 58:11-16), Andre Gudger (Id. at 62:1-6), Monica Smith, (Id. at 64:10-15), Paul Watkins, (Id. at 66:3-8), and Dionne Watson, (Id. at 67:16 - 22).

Also, Mr. Magruder was directly responsible for staffing the Largo office with inexperienced or unqualified supervisory staff, and creating or perpetuating discriminatory practices that affected that office. Whinston Exh. 6 (Magruder Dep. Trans at 49:17-52:16, 56:18-57:12).  For example, Mr. Magruder assigned Mr. Carson to be "manager" of the Largo office even though Mr. Carson had no prior experience managing Brokers.  Whinston Exh. 6 (Magruder Dep. Trans., at 40:6-42:4); (Whinston Exh. 3 (Cook Decl. at ¶ 9) . Mr. Magruder hired David Weber to be the Sales Manager of the Largo office, even though Mr. Weber did not have, and never obtained, the NASD Series 8 (also known as the Series 9 and 10) license necessary for him to supervise Brokers.  Whinston Exh. 6 (Magruder Dep. Trans at 49:17-52:16); Whinston Exh. 11 (David Weber ("Weber") Dep. Trans., at 43:17-44:20, 151:4-6).  As a result, for a significant period of time, there were an insufficient number of Series 8 license holders based in the Largo office, which impeded the ability of Plaintiffs Cook and Fleming to perform their work duties.  Whinston Exh. 6 (Magruder Dep. Trans at 55:3-56:17); Whinston Exh. 1 (Fleming Decl. at ¶¶ 13-14); (Whinston Exh. 3 (Cook Decl. at ¶ 14).  Managers based in the Washington office, such as Janice Lytle, frequently had to provide the Series 8 approval necessary for the Largo Brokers to conduct business.  Whinston Exh. 5 (Janice Lytle

6

("Lytle") Dep. Trans., at 137:4-138:4, 146:1-147:3; 149:4-11); Whinston Exh. 1 (Fleming Decl. at ¶¶ 11-13); (Whinston Exh. 3 (Cook Decl. at ¶¶ 10-12).

Mr. Magruder assigned Debbie Pittman to the position of Operations Manager of the Largo office even though she had no previous experience as an Operations Manager. Whinston Exh. 6 (Magruder Dep. Trans at 47:5-48:12); Whinston Exh. 10 (Carson Dep. Trans., at 101:20-102:11). Ms. Pittman's lack of experience resulted in her not providing adequate support to Mr. Cook and Mr. Fleming, which detrimentally affected their working conditions. Whinston Exh. 1 (Fleming Decl. at ¶ 16); (Whinston Exh. 3 (Cook Decl. at ¶ 16). Finally, Mr. Magruder was the principal advocate of the decision to close the Largo office. Whinston Exh. 6 (Magruder Dep. Trans at 121:5-127:9).

Mr. Fleming was subsequently transferred to UBSFS' Washington office after the Largo office closed, and spent approximately half (thirteen months) of his tenure with UBSFS working in the Washington office. Whinston Exh. 1 (Fleming Decl. at ¶ ¶ 1-2, 27- 28). While in the Washington office, UBSFS subjected Mr. Fleming to a continuing course of discriminatory conduct that included showing preferential treatment to Caucasian Brokers in the Washington office, by, *inter alia*, favoring them with training and business opportunities, (Id. at ¶¶ 30-32); denying Mr. Fleming professional support such as an adequate Client Service Associate ("CSA"), (Id.); causing him to lose clients and money, (Id. at ¶¶ 33-39); placing him in a "bullpen", (Id. at ¶ 36); treating him as a second-class individual, (Id. at ¶ 37); and failing to remedy the oppressive conditions under which Mr. Fleming was working, such that Mr. Fleming was forced to resign from UBSFS. Id. at ¶¶ 36-39.

Similarly, Mr. Cook spent approximately thirteen months of his employment working in

UBSFS' Washington office. Whinston Exh. 3 (Cook Decl. at ¶¶ 1-2, 25-26). During Mr. Cook's employment in Washington, UBSFS also subjected him to a series of discriminatory actions, including showing preferential treatment to Caucasian Brokers (Id. at ¶¶ 28-30); denying Mr. Cook professional support such as an adequate Client Service Associate ("CSA"), (Id.); causing him to lose clients and money, (Id. at ¶¶ 31-36); placing him in a "bullpen", (Id. at ¶ 33); treating him as a second-class individual, (Id. at ¶ 34); and failing to remedy the oppressive conditions under which Mr. Cook was working, (Id. at ¶¶ 33-35), which led to his constructive discharge. Id. at ¶ 36.

**B.    Facts Supporting Venue in California (Timothy Gandy).**

Mr. Gandy was employed at UBSFS branch offices in California for approximately nine years (1994 through 2003). Whinston Exh. 9 (Timothy Gandy ("Gandy") Dep. Trans., at 34:24-35:4, 201:9-16). During his employment, UBSFS discriminated against Mr. Gandy by repeatedly denying him promotion to branch office management positions in California for which he was qualified and had expressed interest. Id. at 189:18-190:8, 191:1-194:4. After Mr. Gandy successfully graduated from UBSFS' Leadership and Management Development Program ("MDP") in 2000, he was assigned to only a Sales Manager position at the UBSFS branch in Oxnard, California, while less qualified Caucasian employees advanced above him. Id. at 141:9-19, 170:16-23, 215:19-216:25, 220:9-221:17. Subsequently, Mr. Gandy was offered only a "Resident" Branch Office Manager ("BOM") position in Westlake, California, meaning that the office branch he managed was not classified as an autonomous branch, but was rather considered a satellite office of a larger branch office managed by a Caucasian BOM. Id. at 202:12-203:7, 246:24-247:18. Even Mr. Gandy's good work in the Resident Manager position, however, did not lead to a promotion to a BOM position for him, and after concluding that further advancement would not occur, he

8

ultimately resigned from UBSFS. Id. at 417:9-11, 418:13-16; See Second Amended Complaint, at ¶ 52.

## II.    ARGUMENT

### A.    Introduction.

28 U.S.C. § 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Byerson v. Equifax Information Services, LLC, 467 F.Supp.2d 627, 631 (E.D.Va. 2006). The decision regarding whether to transfer an action to another district is committed to the district court's sound discretion. Id. In considering whether to transfer venue, a district court must first determine whether the claims might originally have been brought in the transferee forum. Id. If that is shown, the court must next consider whether the interest of justice and convenience of the parties and witnesses justify transfer to that forum. Id. at 631-632.

Plaintiffs Cook and Fleming's Title VII and Section 1981 claims might originally have been brought in the District of Columbia. Likewise, Mr. Gandy's Section 1981 claims might originally have been brought in California. For the convenience of parties and witnesses, and in the interest of justice, the Court should transfer their respective actions to the U.S. District Court for the District of Columbia and the U.S. District Court for the Central District of California.

### B.    Cook and Fleming's Title VII claims might originally have been brought in the District of Columbia.

Plaintiffs Cook and Fleming's Title VII claims might originally have been brought in the District of Columbia. Title VII's venue provision, 42 U.S.C. § 2000e-5(f)(3), provides that an action may be brought in any judicial district in the State in which:

- [a]: the unlawful employment practice is alleged to have been committed,

- [b]: in the judicial district in which the employment records relevant to such practice are maintained and administered, or

- [c]: the aggrieved person would have worked but for the alleged unlawful employment practice. 42 U.S.C. §2000e-5(f)(3). See Chris v. Tenet, 221 F.3d 648 (4th Cir. 2000).

With respect to Mr. Fleming, venue would be proper in the District of Columbia under subdivisions [a] or [c] because unlawful employment practices against Mr. Fleming were committed in the District of Columbia, and Mr. Fleming would have worked in the District of Columbia but for UBSFS' unlawful practices. As set forth above, Mr. Fleming was denied a Broker position at UBSFS' Washington office, following his interviews in the Washington office. See Section I(A), supra. The Washington office informed Mr. Fleming there were no such positions available in the Washington office, and instead assigned him to UBSFS' segregated Largo office. Id. Yet the Washington office recruited a Caucasian Broker around the time that Mr. Fleming was denied a position there. Id. Significant unlawful practices affecting Mr. Fleming's tenure in Largo were directed and approved by the Washington office. Id. Mr. Fleming subsequently transferred to the Washington office after the demise of the Largo office, and spent a significant portion of his tenure in Washington. Id. While in the Washington office, Mr. Fleming was subjected to a continuing course of discriminatory conduct that included UBSFS' preferential treatment to Caucasian Brokers, denying Mr. Fleming professional support, treating him as a second-class individual, and ultimately forcing him to resign from UBSFS. Id.

Accordingly, venue is proper in the District of Columbia because the unlawful failure to hire Mr. Fleming occurred in that district; his assignment to the segregated Largo office occurred in the

Washington office; a number of unlawful employment practices were committed against Mr.

Fleming in UBSFS' Washington office; and Mr. Fleming would have continued to work in the

Washington office but for the alleged unlawful discrimination.[2] See Perkins v. Town of Princeville,

340 F.Supp.2d 624 (M.D.N.C. 2004) (holding that venue was proper in any district of state where

plaintiff applied for and was denied position).

Similarly, for Mr. Cook, venue would be proper in the District of Columbia under

subdivisions [a] and [c] because unlawful employment practices against Mr. Cook were committed

in the District of Columbia, and Mr. Cook would have worked in the District of Columbia but for

UBSFS' unlawful practices. See Section I(A), supra. Unlawful actions taken by managers in the

Washington office negatively affected Mr. Cook's employment in the Largo office. Id. Mr Cook

spent approximately thirteen months of his employment working in the Washington office. Id.

During Mr. Cook's employment in Washington, UBSFS also subjected him to a series of

discriminatory actions, including showing preferential treatment to Caucasian Brokers, denying Mr.

Cook professional support, treating him as a second-class individual, and causing his constructive

discharge. Id. Therefore, a number of unlawful employment practices were committed against Mr.

Cook in UBSFS' Washington office, and Mr. Cook would have continued to work in the

Washington office but for the alleged unlawful discrimination.

In summary, because unlawful employment practices against Plaintiffs Fleming and Cook

were committed in the District of Columbia, and they would have worked in the District of

---

[2]    Although Mr. Fleming resides in North Carolina, North Carolina is not an
appropriate venue for his Title VII claims as the " plaintiff's place of residence is *not* one of the
three options for venue provided for by 42 U.S.C. § 2000e-5(f)(3)". Benton v. England, 222
F.Supp.2d 728, 731 (D. Md. 2002).

Columbia but for UBSFS' unlawful discrimination, their claims might originally have been brought in the District of Columbia.

### C.    Mr. Cook and Mr. Fleming's Section 1981 claims might originally have been brought in the District of Columbia.

Since there is no specific venue provision for Section 1981 claims, these claims are governed by the general venue provision, 28 U.S.C. § 1391(b). <u>Perkins</u>, 340 F.Supp.2d at 625. Section 1391(b) allows venue in the district where all the defendants reside or a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. <u>See</u> 28 U.S.C. § 1391(b). A corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. <u>See</u> 28 U.S.C. § 1391(c), <u>Byerson</u>, 467 F.Supp.2d at 632.

Venue is proper in the District of Columbia under either of these options. First, UBSFS resides in the District of Columbia because at the time this lawsuit was filed (October 18, 2005), UBSFS engaged in "continuous and systematic" business operations in the District of Columbia, through its branch office located at 1501 K Street, N.W., Washington D.C. Whinston Exh. 4 (Magruder Decl. at ¶ 1-2). <u>See</u> <u>Cognitronics Imaging Systems, Inc. v. Recognition Research Inc.</u>, 83 F.Supp.2d 689 (E.D. Va. 2000) ("general jurisdiction exist[s] when a defendant [] conducts activities in the forum that are "substantial" or "continuous and systematic.""). At the Washington office, UBSFS employed a staff of approximately one hundred (100) employees who provided retail brokerage services to the public. Whinston Exh. 5 (Lytle Dep. Trans., at 71:3-10); Whinston Exh. 6 (Magruder Dep. Trans., at 66:11-18).

Second, a substantial part of the events giving rise to Plaintiffs Cook and Fleming's claims occurred in the District of Columbia. As set forth in Section I(A), <u>supra</u>, the Washington office

controlled the Largo office, Mr. Cook and Mr. Fleming worked in the Washington office for a significant period of their employment at UBSFS, and numerous unlawful employment practices were committed against Mr. Cook and Mr. Fleming in the Washington office. Accordingly, venue for their Section 1981 claims is proper in the District of Columbia because their claims might originally have been brought in the District of Columbia.

###### D.    Mr. Gandy's Section 1981 claims might originally have been brought in California.

Venue for Mr. Gandy's Section 1981 claims would be proper in California. Mr. Gandy asserts claims under Section 1981 only, therefore 28 U.S.C. § 1391(b) controls the venue determination in his case. First, UBSFS resides in California, because at the time this lawsuit was filed, UBSFS engaged in "continuous and systematic" business operations in California, by providing retail brokerage services through its branch offices in California. Whinston Exh. 7 (Declaration of Jennifer Nies ("Nies Decl.") at ¶¶ 2-3); Whinston Exh. 8 (Scott Flanagan ("Flanagan") Dep. Trans., at 13:18-15:8).

Second, all of the events giving rise to Mr. Gandy's claims occurred in California. Mr. Gandy was employed at UBSFS branch offices in California for approximately nine years. See Section I(B), supra. Over the course of his employment, he was repeatedly denied promotion to branch office management positions in California for which he was qualified and had expressed interest. Id. UBSFS managers located in California selected less qualified Caucasian employees for promotion, whereas Mr. Gandy was offered only a "Resident" Branch Office Manager position in California. Id.

Accordingly, venue for Mr. Gandy's claims is proper in California because UBSFS resides there or because a substantial part of the events or omissions giving rise to the claims occurred in

California.

### E.    <u>Transfer of the cases is warranted</u>.

Transfer of the cases to the District of Columbia and California would promote the convenience of the parties and witnesses, and the interest of justice.  In the Fourth Circuit, courts commonly consider seven factors in resolving motions pursuant to § 1404(a): (1) the ease of access to the sources of proof; (2) the convenience of the parties and witnesses; (3) the cost of obtaining the attendance of the witnesses; (4) the availability of compulsory process; (5) the possibility of a view by the jury; (6) the interest in having local controversies decided at home; and (7) the interests of justice.  <u>Byerson</u>, at 632.  However, "[w]hile each of those factors may be weighed, "[t]he principal factors to consider ... are plaintiff's choice of forum, witness convenience, access to sources of proof, party convenience, and the interest of justice."" <u>Id</u>. (citation omitted).  In the present case, each of these factors militates in favor of transfer.

### 1.    <u>The Plaintiffs' choice of venue</u>

Plaintiffs are not in the District of Maryland at their own choosing, but rather as a result of UBSFS' transfer of venue.  Plaintiffs desire that their cases be transferred, and the Court should grant this desire because "the plaintiff's choice of forum is entitled to substantial weight, and should be abandoned only if the defendant can show that it is clearly outweighed by other factors." <u>DPR Const., Inc. v. IKEA Property, Inc.</u>, No. 1:05CV259, 2005 WL 1667778, at * 3(E.D.Va.2005).  As set forth in Section I(A), <u>supra</u>, the District of Columbia is the location where a substantial part of the events giving rise to Plaintiffs Cook and Fleming's claims occurred and where the Washington office at which Mr. Cook and Mr. Fleming were employed is located.  <u>See</u> <u>Dicken v. United States</u>, 862 F.Supp. 91, 94 (D.Md.1994) (holding that case should be transferred to Kansas, partly because

that was where the accident at issue occurred). Cook and Fleming' choice of venue, therefore, is directly related to their claims. See Byerson, at 633. Similarly, California is the location where all of the events giving rise to Mr. Gandy's claims occurred and where the offices at which Mr. Gandy was employed are located. See Section I(B), supra.

Given that the District of Columbia and California are the nucleus of operative facts for the Plaintiffs' respective claims, the Plaintiffs' choice of venue should be granted.

2.    Convenience of the parties and witnesses

"[T]he party convenience factor includes assessment of the ease of access to sources of proof, the cost of obtaining the attendance of witnesses, and the availability of compulsory process." Byerson, at 633. Transferring venue to the District of Columbia and California would promote convenience of the parties and witnesses.

With respect to Plaintiffs Cook and Fleming, a number of key non-party witnesses live or work in the District of Columbia, including Mr. Magruder, (Whinston Exh. 6 (Magruder Dep. Trans., at 7:14-19), Mr. Carson, (Whinston Exh. 10 (Carson Dep. Trans., at 9:4-10:1), and Ms. Lytle, (Whinston Exh. 5 (Lytle Dep. Trans., at 75:8-82:7). Also, Michael Barham, John Crawford, Freddie Moultrie, and Monica Smith, former UBSFS Largo employees who are key non-party witnesses in this case, live or work in the District of Columbia. Whinston Exh. 13 (Michael Barham ("Barham") Dep. Trans., at 25:16-20); Whinston Exh. 14 (John Crawford ("Crawford") Dep. Trans., at 6:14-18); Whinston Exh. 15 (Freddie Moultrie ("Moultrie") Dep. Trans., at 23:9-18); Whinston Exh. 16 (Monica Smith "Smith") Dep. Trans., at 24:7-23). Furthermore, Mr. Barham, Mr. Crawford, Mr. Moultrie, Ms. Smith and three other former UBSFS employees, Mark Spradley, Paul Watkins and Sean Wintz, are plaintiffs in a lawsuit against UBSFS that is pending in the U.S.

15

District Court for the District of Columbia. Whinston Exh. 17 (Barham et al. v. UBS Financial Services, Inc., Civil Action No. 1:07-cv-00853). Like Mr. Cook and Mr. Fleming, the Barham plaintiffs are all African-American former Brokers of the Largo office of UBSFS who are asserting claims of racial discrimination against UBSFS. Id. All of the Barham plaintiffs are very likely to testify live as witnesses in the present case about the discriminatory treatment to which they and Mr. Cook and Mr. Fleming were subjected during their employment at UBSFS. Id. Thus, the availability of compulsory process in the District of Columbia weighs in favor of transfer. The convenience of the District of Columbia as the venue for these claims is underscored by the fact that ten of the eleven key non-party witnesses deposed to date regarding Plaintiffs Cook and Fleming's claims were deposed in Washington D.C., namely Mr. Magruder, Mr. Carson, Ms. Lytle, Mr. Barham, Mr. Crawford, Mr. Moultrie, Ms. Smith, Mr. Watkins and Mr. Weber. Whinston Exh. 6 (Magruder Dep. Trans., at 1); Whinston Exh. 10 (Carson Dep. Trans., at 1); Whinston Exh. 5 (Lytle Dep. Trans., at 1); Whinston Exh. 13 (Barham Dep. Trans., at 1); Whinston Exh. 14 (Crawford Dep. Trans., at 1); Whinston Exh. 15 (Moultrie Dep. Trans., at 1); Whinston Exh. 16 (Smith Dep. Trans., at 1); Whinston Exh. 20 (Paul Watkins ("Watkins") Dep. Trans., at 1); Whinston Exh. 11 (Weber Dep. Trans., at 1).

Access to sources of proof also militates in favor of transfer. UBSFS' existing Washington office will be a source of proof in this action, whereas the Largo office has been closed for almost four years. Pertinent documents, including documents regarding the Largo office and personnel files of Brokers employed in the Washington office, were maintained in the Washington office. (Whinston Exh. 12 (Defendant's Response to Plaintiffs' First Set of Interrogatories, at 11, Response No. 5(2)); Whinston Exh. 5 (Lytle Dep. Trans., at 125:1-126:11). If this case is transferred, the jury

16

will be able to view the Washington office location and aspects of its organization that are relevant to Plaintiffs Cook and Fleming's claims, such as the "bull-pen" office area. Whinston Exh. 1 (Fleming Decl. at ¶ 36) ; Whinston Exh. 3 (Cook Decl. at ¶ 33). As a result of the proximity to the Washington office and the availability of compulsory process, the cost of obtaining witnesses also favors transfer of the case to the District of Columbia.

With respect to Mr. Gandy, transferring venue to California would promote convenience of the parties and witnesses, and facilitate access to sources of proof. As stated in Section I(B), supra, the offices at which Mr. Gandy worked are located in California, thus, it is likely that pertinent documents would be located there. The availability of compulsory process in California weighs in favor of transfer because the key non-party witnesses that Mr. Gandy will very likely call to testify at trial, including Mitchell Ackerman, Mike Davis and Scott Flanagan, live or work in California. Whinston Exh. 18 (Mitchell Ackerman ("Ackerman") Dep. Trans., at 9:13-21); Whinston Exh. 19 (Mike Davis ("Davis") Dep. Trans., at 7:10-14, 114:1-3); Whinston Exh. 8 (Flanagan Dep. Trans., at 6:24-7:7, 10:20-11:4). Mr. Ackerman, Mr. Davis and Mr. Flanagan were managers at UBSFS during the relevant time period who were responsible for assigning Brokers to positions  in California, and made discriminatory decisions regarding promotion that adversely affected Mr. Gandy. Whinston Exh. 18 (Ackerman Dep. Trans., at 56:16-23, 156:4-11); Whinston Exh. 19 (Davis Dep. Trans., at 46:6-18); Whinston Exh. 8 (Flanagan Dep. Trans., at 20:11-22:3, 83:5-25, 122:5-16). These witnesses are all beyond the subpoena power of this Court. As a result of the proximity to the California branch offices and the availability of compulsory process, the cost of obtaining witnesses also favors transfer of the case to California. Furthermore, the convenience of California as the venue for these claims is underscored by the fact that all of the key non-party

17

witnesses deposed to date regarding Mr. Gandy's claims were deposed in California, namely Mr. Ackerman, Mr. Davis, Mr. Flanagan, Patrice Humbel, David Watson and Lawrence Zech. Whinston Exh. 18 (Ackerman Dep. Trans., at 1); Whinston Exh. 19 (Davis Dep. Trans., at 1); Whinston Exh. 8 (Flanagan Dep. Trans., at 1); Whinston Exh. 21 (Patrice Humbel ("Humbel") Dep. Trans., at 1); Whinston Exh. 22 (David Watson ("Watson") Dep. Trans., at 1); Whinston Exh. 23 (Lawrence Zech ("Zech") Dep. Trans., at 1).

       3.     <u>Interest of justice</u>

       Transferring Plaintiffs Cook and Fleming's cases to the District of Columbia would promote judicial efficiency and avoid inconsistent judgments. As stated previously, a number of former employees of UBSFS are pursing claims of racial discrimination against UBSFS in the U.S. District Court for the District of Columbia. Whinston Exh. 17 (<u>Barham</u>, Civil Action No. 1:07-cv-00853). The <u>Barham</u> action is closely related to the present action because it is brought by African-Americans who worked as Brokers in UBSFS' Largo or Washington office during the same time period as Mr. Cook and Mr. Fleming, and who assert similar claims to Plaintiffs Cook and Fleming regarding racial segregation, and discrimination in compensation, support and termination. <u>Id</u>. Given that these related actions raise similar issues of fact and law, transfer of the present case to the District of Columbia would permit consolidation of the cases, promote judicial efficiency, and prevent duplicative litigation and inconsistent adjudications in separate courts. <u>See</u> <u>DPR Const., Inc.</u>, 2005 WL 1667778, at * 5 (transferring venue in order to avoid possibility of inconsistent judgments in separate courts).

       With respect to Mr. Gandy, transfer of his case to California would promote fairness by allowing Mr. Gandy to have his claims settled in his home forum. This is especially so given that

Mr. Gandy is now proceeding with his claims on an individual, rather than class, basis. Proximity to Mr. Gandy and key non-party witnesses, such as Mr. Ackerman, Mr. Davis and Mr. Flanagan, would also promote judicial efficiency.

      **F.**    <u>**Mr. Gandy's claims should be severed**</u>.

      The Court should sever Mr. Gandy's claims from Mr. Cook and Mr. Fleming's in order to transfer of his case to California. Fed. R. Civ. P. 21 provides that "[a]ny claim against a party may be severed and proceeded with separately." Fed. R. Civ. P. 21. The decision to sever actions for trial is within the discretion of the trial court. <u>Watkins v. Hospitality Group Management Inc.</u>, No. 1:02CV00897, 2003 WL 22937710 * 11 (M.D.N.C. 2003) (citing <u>Arnold v. E. Air Lines, Inc.</u>, 681 F.2d 186, 192 (4th Cir.1982). A court should consider whether the risks of prejudice and possible confusion are outweighed by "the risk of inconsistent adjudications of common factual and legal issues, the burden on parties, witnesses and available judicial resources posed by multiple lawsuits, the length of time required to conclude multiple suits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives." <u>Id</u>.

      In the present case, these factors weigh in favor of severance because Mr. Gandy's claims involve a separate sets of events and a separate cause of action from those of Plaintiffs Cook and Fleming. <u>See</u> <u>Watkins</u>, 2003 WL 22937710, at * 11 (severing discrimination cases where involved two separate sets of events and two separate causes of action). Specifically, Mr. Gandy's claims relate to promotion and occurred in California whereas Plaintiffs Cook and Fleming's claims involve segregation, support, compensation and termination, and have no geographic connection to California. <u>See</u> Section I, <u>supra</u>. The only tie uniting the cases is that they all involve the same defendant, UBSFS. Furthermore, Mr. Gandy's claims are limited to violations of Section 1981,

19

whereas Mr. Cook and Mr. Fleming assert both Section 1981 and Title VII claims. Id. There is a significant risk of prejudice and confusion resulting from a joint trial because a jury hearing allegations of discrimination toward all the Plaintiffs may view the evidence in the aggregate, prejudicing them against the Plaintiffs or UBSFS, or they may confuse the evidence in some other manner when looking for discriminatory intent towards one Plaintiff alone. See Watkins, at * 11. Also, because the Plaintiffs' claims stem from separate incidents and constitute different claims, there is little risk that having separate trials will result in any inconsistent adjudications of fact or law. Id. There will not be any overlap in the witnesses called by Mr. Gandy, and Mr. Cook and Mr. Fleming, or any overlapping factual evidence. Id. Thus, a finding that UBSFS discriminated against Mr. Gandy, and not Plaintiffs Cook and Fleming, would not be legally or factually inconsistent. Id. As explained, supra, severance would ease the burden on Mr. Gandy, key witnesses and the court by permitting transfer of the case to California because of its proximity to key witnesses and sources of proof, and compulsory process. Having separate trials, therefore, would relieve the burden on the parties, promote efficient use of judicial resources and ensure a fair and impartial hearing of the Plaintiffs' claims. Id. For these reasons, the Court should sever Mr. Gandy's claims.

## III.    CONCLUSION

For these reasons, the Court should grant Plaintiffs' motion to sever the claims and transfer venue to the U.S. District Court for the District of Columbia for Plaintiffs Cook and Fleming, and to the U.S. District Court for the Central District of California for Mr. Gandy.

20

Dated:  May 24, 2007                          Respectfully Submitted

                                              /s/  Stephen A. Whinston
                                              BERGER & MONTAGUE, P.C.
                                              Stephen A. Whinston
                                              Keino R. Robinson
                                              Shanon J. Carson
                                              Selim Ablo
                                              Jonathan Stanwood
                                              1622 Locust Street
                                              Philadelphia, PA 19103
                                              Tel: 215-875-3000
                                              Fax: 215-875-4604

                                              JOSEPH, GREENWALD & LAAKE, P.A.
                                              Steven M. Pavsner
                                              Brian J. Markovitz
                                              6404 Ivy Lane, Suite 400
                                              Greenbelt, Maryland  20770
                                              Tel: (301) 220-2200
                                              Fax: (301) 220-1214

                                              GARWIN, GERSTEIN & FISHER, L.L.P.
                                              Bruce E. Gerstein
                                              Brett Cebulash
                                              Archana Tamoshunas
                                              1501 Broadway, Suite 1416
                                              New York, NY 10036
                                              Tel: 212-398-0055
                                              Fax: 212-764-6620

                                              AUBERTINE LAW FIRM
                                              Andrew E. Aubertine
                                              1211 SW Sixth Avenue
                                              Portland, Oregon  97204
                                              Tel: 503.221.4570
                                              Fax: 503.221.4590

                                              **Attorneys for Plaintiffs**

21

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 24 day of May, 2007, a true and correct copy of the foregoing Memorandum of Law in Support of Plaintiffs' Motion to Sever Claims and Transfer Cases, was electronically filed and notification of such filing was made by the Court via e- mail to all counsel electronically registered with the Court.

/s/  Stephen A. Whinston

# Exhibit D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **FREDDIE H. COOK,** *et al.*, <br><br> **Plaintiffs,** <br><br> v. <br><br> **UBS FINANCIAL SERVICES INC.,** <br><br> **Defendant.** | **CIVIL ACTION NO. 06 CV 803 (PJM)** |

## JOINT PROPOSED PRETRIAL SCHEDULING ORDER

**A.    Discovery (General Parameters)**

1.    The limit on the number of interrogatories and document requests contained in Local Rule 104 shall apply in this case.

2.    The limit on the number and length of depositions contained in Rule 30(a)(2)(A) is amended to permit each Party to take up to 100 hours of fact depositions in this case. The depositions of experts shall each be limited to eight (8) hours.

3.    Any Party may apply to the Court at any time for other modifications of the discovery rules.

4.    All fact discovery on the individual claims shall be completed by February 2, 2007, and all discovery relating to class certification, except for expert depositions, shall be completed by March 30, 2007.

**B.**     **Plaintiffs' Motion for Class Certification**

1.     On or before March 2, 2007 Plaintiffs shall identify the name of any experts who will submit evidence in support of their motion for class certification and shall describe the subjects about which they will testify.

2.     Plaintiffs' motion for class certification, along with any expert reports supporting class certification, shall be filed on or before April 23, 2007, and Defendant shall not seek to secure a ruling on class certification prior to April 23, 2007 by, for example, filing a motion to strike.

3.     On or before May 4, 2007, Defendant shall identify the name of any experts who will submit evidence in support of its opposition to Plaintiffs' motion for class certification and shall describe the subjects about which they will testify.

4.     Defendant shall have until May 25, 2007, to depose Plaintiffs' class certification experts.

5.     Defendant's opposition to the motion for class certification, along with any expert reports supporting its opposition to class certification, shall be filed on or before July 6, 2007.

6.     Plaintiffs shall have until July 27, 2007, to depose Defendant's class certification experts.

7.     Plaintiffs' reply memorandum in support of class certification shall be filed on or before August 17, 2007.


**C.**     **Dispositive Motions**

1.     Dispositive motions shall be filed no later than thirty (30) days after the close of all discovery.

2.      Briefs in opposition to any dispositive motion shall be filed within twenty-one

(21) days after service of the motions.

3.      Reply briefs shall be filed within fifteen (15) days thereafter.


            ALL OF THE ABOVE IS SO ORDERED.


Dated: _____          _____
                                        Honorable Peter J. Messitte
                                        United States District Court Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **FREDDIE H. COOK, et al.,** | ) |
| | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) **Civil No. 8:06-cv-803-PJM** |
| **v.** | ) |
| | ) |
| **UBS FINANCIAL SERVICES, INC.,** | ) |
| | ) |
| **Defendant.** | ) |

### STIPULATION AND ORDER TO STAY DISCOVERY

The parties hereby stipulate to the stay of discovery for 75 days. The parties have

retained a private mediator and have scheduled three days for mediation in January and early

February of 2007. Except for one deposition, the parties have concluded that resolution of this

matter will be facilitated by staying discovery while the mediation efforts are going forward. As

a result, there is no need for the Court to address at this time the pending motions on discovery.

Moreover, the parties agree that each of the deadlines in the scheduling order shall be extended

by 75 days.

/s/ Jeffrey G. Huvelle                           /s/ Stephen A. Whinston
Eric H. Holder, Jr., Esquire (*pro hac vice*)    Stephen A. Whinston, Esquire
Jeffrey G. Huvelle, Esquire (No. 03340)          Keino R. Robinson, Esquire
Thomas S. Williamson, Jr., Esquire (07695)       Shanon J. Carson, Esquire
Covington & Burling LLP                          Selim Ablo, Esquire
1201 Pennsylvania Avenue, N.W.                    Berger & Montague, P.C.
Washington, D.C. 20004-2401                      1622 Locust Street
(202) 662-6000                                   Philadelphia, PA 19103
                                                 (215) 875-3000
*Attorneys for Defendant*
                                                 *Attorneys for Plaintiffs*


IT IS SO ORDERED this _____ day of December, 2006.


_____
The Honorable Peter J. Messitte
U.S. District Court Judge

# Exhibit E

```
 1

 2       IN THE UNITED STATES DISTRICT COURT

 3         FOR THE DISTRICT OF MARYLAND

 4             SOUTHERN DIVISION

 5 FREDDIE H. COOK, et al.,   )
                             )
 6    Plaintiffs             )
                             )
 7        vs.                )Civil No.
                             )8:06-cv-00803-PJM
 8 UBS FINANCIAL SERVICES,   )
   INC.,                     )
 9                           )
    Defendant                )
10

11

12

13

14

15    Videotaped Deposition of Bradford Carson

16             Washington, D.C.

17             April 17, 2007

18

19

20

21 Reported by:  Bonnie L. Russo

22 JOB NO. 206568
```

Page 33

1   Q.   Okay.  Was it before or after you
2   entered the MDP program, if you can put those
3   two events together?
4   **A.   It was before.  I mean it wasn't a**
5   **grand presentation or anything, but I would say**
6   **it was before.  I wouldn't have gone otherwise.**
7   Q.   You wouldn't have gone to the MDP
8   program?
9   **A.   Right.**
10  Q.   Who presented you -- or strike that.
11      Who made the offer to you to head up
12  the PG County office?
13  **A.   It was Coe Magruder.**
14  Q.   Okay.  And was that done in
15  Washington?
16  **A.   In Washington, yes, sir.**
17  Q.   Do you know if he had received
18  approval from anyone else to make that offer to
19  you?
20  **A.   No, I don't.**
21  Q.   Did he tell you that he needed --
22  that he had gotten approval from Mr. Kennedy?

Page 34

1   **A.   No.  He didn't tell me that.**
2   Q.   Did Mr. Kennedy ever tell you that
3   he had given approval for the opening of the
4   office?
5   **A.   No.**
6   Q.   Or for your -- or for the offer to
7   you of the position of manager of that office?
8   **A.   No.**
9   Q.   Okay.  Were you given the
10  responsibility of obtaining financial advisors
11  to staff the Largo office?
12  **A.   Yes.**
13  Q.   Did anyone else share that
14  responsibility with you?
15  **A.   Not initially.**
16  Q.   Did there come a time when someone
17  else shared that responsibility with you?
18  **A.   You mean later in the --**
19  Q.   Yes.  Anytime prior to the closure
20  of the office?
21  **A.   Susan McGovern was the only other**
22  **formal person installed to help with that.**

Page 35

1   Q.   When did she get that
2   responsibility?
3   **A.   I think she started in right around**
4   **the end of 2001 or probably mid to late**
5   **December 2001.**
6   Q.   So that was when she came to the
7   Largo office?
8   **A.   Yes.**
9   Q.   And she came there as sales manager;
10  is that right?
11  **A.   As sales manager, yes.**
12  Q.   Can you describe how you went about
13  obtaining financial advisors to staff the Largo
14  office?
15  **A.   Well, what I did, and I am fairly**
16  **certain she did as well, worked the list of**
17  **NASD registered account executives who lived in**
18  **the ZIP codes that we were targeting and anyone**
19  **else that we could get our hands on.**
20      **And, you know, really just called**
21  **and dripped on them and tried to get out to**
22  **have breakfast, lunch or dinner or whatever.**

Page 36

1       **And that was an ongoing process, but**
2   **just really working those lists.**
3   Q.   Did you -- I'm sorry.  Were you
4   done?
5   **A.   Yes.**
6   Q.   Did you discuss how you would go
7   about recruiting brokers with anyone?
8   **A.   You mean for management or?**
9   Q.   Yes.  From -- in UBS management.
10  **A.   Not really.**
11  Q.   So you didn't discuss -- you didn't
12  have any discussions with Mr. Magruder about
13  what you were going to do to recruit brokers?
14  **A.   No.  No.  That -- prior to going out**
15  **there we discussed how he did it, and he and I**
16  **went together on a couple of recruiting**
17  **missions.  And he sent me on one alone and sort**
18  **of monitored the process.**
19      **But we didn't have any sort of**
20  **how-to after that.  Once I was out there, I was**
21  **on my own.**
22  Q.   And when you were talking about what

Page 73

1  mailing, calling, trying to find out.

2      Q.   He was on the NASD list?

3      A.   NASD list, yes.

4      Q.   Did this list identify the race of

5  the individuals?

6      A.   No, it did not.

7      Q.   Could you describe the process which

8  led to Mr. Cook being made an offer of

9  employment?

10     A.   I just dripped on him, meaning I

11  mailed things to him.  And a few times went by.

12  He lives on my street.  Went by to see him.

13  And --

14     Q.   You said he lived on your street?

15     A.   Yes.  He lives on my street.

16     Q.   Okay.

17     A.   And just, you know, continued to

18  sort of run him through the cycle.  And after a

19  period of time, he mentioned he was about to

20  retire from the government and wasn't quite

21  sure what he was going to do and, you know, I

22  said to him how great we were and what we could

Page 74

1  do and he could make unlimited money.  So we

2  kind of settled on that.

3      I got him in the program, introduced

4  him with all the paperwork and entered into the

5  program.

6      Q.   The trainee program?

7      A.   The trainee program.  Right.

8      Q.   When you say you mailed things to

9  him, what did you mail to him?

10     A.   Just brochures, handwritten notes.

11  That sort of thing.

12     Q.   Were these -- were any of these

13  brochures specific to the Prince George's

14  County office?

15     A.   No.

16     Q.   So they were general UBS brochures?

17     A.   General -- Paine Webber at that

18  time, yes.

19     Q.   Did you tell Mr. Cook that you

20  wanted him to work at the Largo office?

21     A.   I asked him if he would, yes,

22  consider it.

Page 75

1      Q.   Did you tell him that the Largo

2  office was being set up to focus on the

3  minority community in Prince George's County?

4      A.   No.

5      Q.   Did Mr. Cook start working at the

6  Largo office when it opened; is that correct?

7      A.   He wasn't there in the beginning.

8  It was a few months after.

9      Q.   How long did he stay?

10     A.   To the very end.

11     Q.   We will talk more about him later.

12      Do you know Sylvester Fleming?

13     A.   Yes.

14     Q.   Did Mr. Fleming work at the Largo

15  office?

16     A.   Yes, he did.

17     Q.   And in what capacity?

18     A.   He was a financial advisor trainee.

19     Q.   How did he come to be employed

20  there?

21     A.   Him I'm not sure.

22     Q.   Were you involved in his hiring?

Page 76

1      A.   Eventually, yes.

2      Q.   So you were not involved in the

3  initial contacts with him?

4      A.   Right.  I don't know if he talked to

5  someone else prior, but he came to our office.

6  He wasn't employed when he came to my office,

7  but he had talked -- approached someone else in

8  the firm and I'm not sure who that was.

9      Q.   So he was unemployed when he was

10  recruited?

11     A.   Well, he was with GE.  I think he

12  was still with GE, I believe.

13     Q.   Did he have a background as a

14  financial advisor?

15     A.   No.

16     Q.   Mr. Cook's race, by the way, is

17  African American?

18     A.   Yes.

19     Q.   And so is Mr. Fleming?

20     A.   Yes.

21     Q.   Did you extend the offer of

22  employment to Mr. Cook?

Page 77

1   **A.   Yes, I did.**
2   Q.   Was that authorized by Mr. Magruder?
3   **A.   Yes.**
4   Q.   Did you extend the offer of
5   employment to Mr. Fleming?
6   **A.   Yes, I did.**
7   Q.   Was that specifically for the Largo
8   office?
9   **A.   For the Largo office, yes.**
10  Q.   Was that authorized by Mr. Magruder?
11  **A.   Yes, it was.**
12  Q.   Who is Gerald Chin Young?
13  **A.   He is a broker who was in the D.C.**
14  **office.**
15  Q.   And he came to the D.C. office after
16  you were hired?
17  **A.   Yes.**
18  Q.   What is his race?
19  **A.   I think he is half Chinese and half**
20  **Jamaican.**
21  Q.   Did you ever discuss with him the
22  possibility of coming on to the Largo office?

Page 78

1   **A.   I mentioned it to him.  I didn't**
2   **approach him about actually moving because I**
3   **felt he wasn't going.  He was actually**
4   **interested in being a chef or something**
5   **somewhere.  But I mentioned it to him.**
6   Q.   And he did not express an interest
7   in doing that?
8   **A.   No.**
9   Q.   Did he give any reason?
10  **A.   None that I can think of.**
11  Q.   Why did you approach him about that
12  possibility about going to Largo?
13  **A.   I thought he could help me get into**
14  **the government in Jamaican and get some money**
15  **out of there.  That was my thought process.**
16  Q.   Do you know Timothy States?
17  **A.   Yes.**
18  Q.   He was a financial advisor in the
19  D.C. office?
20  **A.   Yes, he was.**
21  Q.   He is African American?
22  **A.   Yes.**

Page 79

1   Q.   He came to work for UBS after you
2   did?
3   **A.   He did, yes.**
4   Q.   Did you ever talk to him about going
5   out to the Largo office?
6   **A.   I did, yes.**
7   Q.   And what did he say about that?
8   **A.   He preferred to live in D.C. and he**
9   **didn't want to come out there.  He didn't give**
10  **me any reasons other than that.**
11  Q.   Do you know Noel Yameogo?
12  **A.   Noel, yes.**
13  Q.   Noel.  And who is that?
14  **A.   He is a broker in Washington.**
15  Q.   A financial advisor?
16  **A.   Financial advisor, yes.**
17  Q.   What is his race?
18  **A.   He is African.**
19  Q.   And he was working at the Washington
20  office -- he started work in the Washington
21  office before you came in?
22  **A.   He was there, yes, when I was**

Page 80

1   recruited.
2   Q.   Were there -- other than yourself --
3   other than Mr. Yameogo, were there any other
4   African-American brokers at the Washington
5   office when you started there?
6   **A.   Well, I don't believe so because**
7   **there is a young lady that came the day that I**
8   **came.  But I don't think there was anyone else**
9   **that I can think of.**
10  Q.   Who was that?
11  **A.   Debora Winfree.**
12  Q.   Was she still working there when the
13  Largo office opened?
14  **A.   Yes.**
15  Q.   Have you ever talked to her about
16  going out to the Largo office?
17  **A.   No, I did not.**
18  Q.   Any particular reason you didn't
19  approach her about that?
20  **A.   I didn't like her work habits.**
21  Q.   Okay.  Did you talk to Mr. Yameogo
22  about possibility going out to the Largo

Page 85

1 Texas.  Down in the -- whatever that branch is
2 down there on the Gulf Coast.  But it's in
3 Texas.
4       I can't think of the name of it now,
5 but that branch office is where he went.
6    Q.   And he actually went there?
7    A.   I think he actually decided not to.
8 Someone told me he decided to go to school and
9 finish his M.B.A.  And he was actually in the
10 office for a week or two, but decided he
11 wouldn't continue.
12    Q.   Okay.  This individual whose first
13 name is Todd, were you involved in his
14 recruitment?
15    A.   Ted.  I'm sorry.
16    Q.   Ted.  Okay.
17    A.   Ted.  Yes, I was.
18    Q.   And what was his background?
19    A.   It wasn't finance.  He had been
20 either a store manager for one of the large
21 food chains.  I want to say Safeway, but it
22 could be Giant.

Page 86

1    Q.   How did he come to your attention?
2    A.   I'm not sure.  He could have either
3 read something on us, but I know Suzy McGovern
4 chased him down.
5    Q.   How did Mr. Minfee come to your
6 attention?
7    A.   I'm not sure where we got him from
8 either.  He could have been a referral from
9 Bethesda or somewhere because he lived over
10 that way.
11    Q.   The third individual, white
12 individual whose name you don't recall?
13    A.   Uh-huh.
14    Q.   Were you involved in his
15 recruitment?  Or his or her.  Is it a male?
16    A.   It was a male, yes.
17    Q.   Were you involved in his
18 recruitment?
19    A.   Yes.
20    Q.   What was his background?
21    A.   It wasn't finance, as I recall.
22    Q.   How did he come to your attention?

Page 87

1    A.   I'm not sure of that either.
2    Q.   How long did he work at Largo?
3    A.   It wasn't very long.  Five or six
4 months.
5    Q.   Did he go on to another UBS office?
6    A.   No.
7    Q.   What were the circumstances of his
8 departure?
9    A.   Well, we were shutting down and, you
10 know, decided not to continue.
11    Q.   Was the Largo office a branch
12 office?
13    A.   What do you mean by that?
14    Q.   Well, did -- UBS had a term for
15 certain offices known as branch offices; is
16 that right?
17    A.   Yes.
18    Q.   And there were other offices that
19 were known as satellite offices?
20    A.   Right.  You mean were we
21 freestanding?
22    Q.   Yes.

Page 88

1    A.   Yes, we were.
2    Q.   And there were -- there has been
3 some testimony that UBS -- that the Largo
4 office was complexed into the Washington, D.C.
5 office.
6       Is that your understanding?
7    A.   That's my understanding, yes.
8    Q.   What does that mean?
9    A.   That just means that you report
10 through the regional -- I mean one person other
11 than the regional manager.  That's really all.
12       And to me what it means is I am tied
13 to someone else's budget for approval until
14 somebody feels I am free to roam alone.  That's
15 all it means to me.
16    Q.   So you were tied to the Washington,
17 D.C. branch office budget?
18    A.   Yes.
19    Q.   And rather than -- a branch office
20 manager would report to a regional?
21       MR. WILLIAMSON:  Objection.  That's
22 a mischaracterization of prior testimony.

Page 89

BY MR. WHINSTON:

1
2    Q.    A branch office manager would report
3    to a regional director?
4    A.    That's normally the way it is.  I
5    mean that's the way it's set up.
6    Q.    And because Largo was complexed, you
7    reported to Mr. Magruder?
8    A.    Yes.
9    Q.    Were there -- by the way, for those
10   folks that you hired from -- strike that.
11         You testified earlier about some
12   names that were referred to you from Merrill
13   Lynch.  Do you recall that?
14   A.    Yes.
15   Q.    Did you specifically ask that you be
16   referred names of minority brokers?
17   A.    No.  I didn't ask.  I pretty much
18   asked all the people in the office to anyone
19   that they knew that might consider working for
20   us to give me their names.  That's how I got
21   the Merrill people.
22         But I actually knew them personally

Page 90

1    anyway.  I knew of them having come from
2    Merrill, so it wasn't --
3    Q.    Did you attempt to contact any
4    Caucasian brokers of Merrill Lynch to come work
5    at Largo?
6    A.    Not at Merrill Lynch, but other
7    firms.
8    Q.    Okay.  Why didn't you contact any
9    Caucasian brokers at Merrill Lynch?
10   A.    There weren't any that I thought I
11   could really approach or that I thought would
12   really want to come out.  Merrill Lynch had
13   just shut an office down there so.
14         And I mean that was really the only
15   reason.  If I had come across somebody who I
16   knew was approachable I would have gone after
17   them.
18   Q.    Where was the Merrill Lynch office?
19   A.    Greenbelt.
20   Q.    Do you know why it was shut down?
21   A.    I'm not sure, no.
22   Q.    And did that occur before the Largo

Page 91

1    office opened?
2    A.    I'm not sure the date, but I believe
3    it was closed when we actually opened.
4    Q.    Were you aware of other brokerage
5    firms that had offices in Prince George's
6    County?
7    A.    Not real offices, no.
8    Q.    Were you aware of an office that UBS
9    opened in Flushing, New York?
10   A.    I heard of it, yes.
11   Q.    What did you hear about it?
12   A.    That it was an Asian office, and
13   that's really all.
14   Q.    Did you speak to white brokers from
15   outside UBS about coming to work at Largo?
16   A.    Yep.
17   Q.    Can you tell me who you spoke to?
18   A.    Probably can't give you exact names,
19   but there was a Navy commander, retired Navy
20   commander who worked for Morgan Stanley that I
21   spoke with frequently.  And he wanted to come
22   but openly admitted he was afraid that his

Page 92

1    clients wouldn't move with him.
2         There were a few white brokers who
3    were at smaller firms in Columbia, I think.
4    Again, in fact, had two or three who were ready
5    to come and they didn't check out because they
6    had bad credit and some other things.  And so
7    they washed out.  They were willing to come.
8         And there was one young fellow who
9    had gotten licensed somewhere and I think he
10   was the Republican town chairman for Bowie who
11   was close to signing on, but I think he had a
12   rape charge was in the high school.  It was
13   supposed to be expunged from his record or
14   something, but it wasn't.  So we couldn't go
15   forward because we couldn't get clearance on
16   that.
17         And there were several that lived,
18   several meaning four or five, that lived in
19   Annapolis that I knew who were -- they were
20   actually commuting to Baltimore.  And I was
21   hopeful of trying to pull them in.
22         So there were ongoing talks and

Page 101

1       And Fulwood for options, but I
2   wasn't hardly encouraging options so.
3   Q.   Why not?
4   A.   Well, these guys were just learning
5   how to write tickets, so they were not really
6   into options strategy.  That would have been
7   suicide.
8   Q.   In light of the experience levels of
9   the brokers hired for the Largo office, did you
10  think it was important to have an experienced
11  sales manager there?
12      MR. WILLIAMSON:  Objection.
13  Argumentative.
14      THE WITNESS:  No, I don't think so.
15      BY MR. WHINSTON:
16  Q.   Was there an administrative manager
17  for the Largo office?
18  A.   We had an ops manager.
19  Q.   Who was that?
20  A.   Debbie Pittman.
21  Q.   Was she there when the office
22  opened?

Page 102

1   A.   Yes.
2   Q.   And how long did she stay?
3   A.   Right through the end.
4   Q.   Did she have any previous experience
5   as an operations manager?
6   A.   She had been assistant ops manager
7   for D.C. for about three years is my
8   recollection.
9   Q.   But no experience as an operations
10  manager?
11  A.   Actual ops, no.
12  Q.   Were you what is known as a
13  producing manager?
14  A.   Yes.
15  Q.   What is a producing manager?
16  A.   It's just somebody who is actually
17  managing but also has a book of business to
18  maintain.
19  Q.   And was your compensation based in
20  part on your book of business and in part based
21  on your role as manager?
22  A.   Yes.

Page 103

1   Q.   Can you estimate how much -- what
2   percentage of time you spent working on your
3   own book versus managing the office?
4   A.   I'm cheating myself now, but I would
5   say 80 to 85 percent managing the office,
6   15 percent on my book as evidenced by my
7   commission.
8   Q.   Okay.  During the period of time
9   that you were in Largo, your commission income
10  decreased?
11  A.   Yes.
12      MR. WHINSTON:  We can take a break.
13  It's the end of the tape.
14      THE VIDEOGRAPHER:  Going off the
15  record at 12:06:27.  End of Tape 1.  Off the
16  record.
17      (A short recess was taken.)
18      THE VIDEOGRAPHER:  We are going back
19  on the record.  The time is 12:08.  This marks
20  the beginning of Videotape No. 2 in the
21  deposition of Bradford Carson, being taken at
22  1201 Pennsylvania Avenue, N.W., Washington,

Page 104

1   D.C.
2       The videographer is Steve Schaal on
3   behalf of Esquire Deposition Services located
4   at 1020 19th Street, N.W., Washington, D.C.
5       Counsel may proceed.
6       MR. WHINSTON:  Thank you.
7       BY MR. WHINSTON:
8   Q.   You are still under oath,
9   Mr. Carson.
10      Did you have any discussions with
11  anyone about whether you would be a producing
12  manager or a full-time manager, if I can use
13  that terminology?
14      MR. WILLIAMSON:  I will object to
15  form on that.
16      THE WITNESS:  I don't recall having
17  any specific discussions, no.
18      BY MR. WHINSTON:
19  Q.   Was it -- did you understand that
20  you had the option of going to Largo either as
21  a producing manager or as a -- or in some other
22  capacity?

# Exhibit F

```
 1            IN THE UNITED STATES DISTRICT COURT

 2               FOR THE DISTRICT OF MARYLAND

 3                    Southern Division

 4  - - - - - - - - - - - - - - - X

 5  FREDDIE H. COOK, et al.,        :

 6       Plaintiffs,               :

 7            v.                   :  Civil No.

 8  UBS FINANCIAL SERVICES,         :  8:06-cv00803-PJM

 9  INC.,                          :

10       Defendant.                :

11  - - - - - - - - - - - - - - - X

12                            Washington, D.C.

13                            Thursday, March 22, 2007

14

15            Videotaped deposition of COE MILTON
   MAGRUDER, a witness herein, called for examination by
16 counsel for Defendant in the above-entitled matter,
   pursuant to notice, the witness being duly sworn by
17 MARY GRACE CASTLEBERRY, a Notary Public in and for
   the District of Columbia, taken at the offices of
18 Covington & Burling, 1201 Pennsylvania Avenue, N.W.,
   Washington, D.C., at 9:30 a.m., Thursday, March 22,
19 2007, and the proceedings being taken down by
   Stenotype by MARY GRACE CASTLEBERRY, RPR, and
20 transcribed under her direction.

21

22
```

1    MR. WILLIAMSON:  Why don't we take a short
2  break now.  The videographer has indicated he needs
3  to change a tape.
4        THE VIDEOGRAPHER:  This concludes tape 1
5  in the deposition of Coe Magruder.  Off the record at
6  10:57.
7        (Recess.)
8        THE VIDEOGRAPHER:  This begins tape 2 in
9  the deposition of Coe Magruder.  On the record at
10  11:09.
11      BY MR. WILLIAMSON:
12    Q.   Mr. Magruder, we have been talking about
13  recruiting FAs and NFAs at Largo.  And now I would
14  like to ask you a few questions about the hiring
15  process.  Who was responsible for hiring FAs and NFAs
16  at Largo?
17    A.   Brad Carson.
18    Q.   And was the Washington office involved in
19  hiring FAs and NFAs for Largo?
20    A.   We were involved in two ways.  One is for
21  bringing in producers from the competition, existing
22  producers.  Brad would have me become involved when

1    A.   Well, Janice Lytle from an administrative
2  position would probably help, would talk about --
3  with the staff.  Daniele Oristian, my assistant who
4  was an administrative -- a branch office
5  administrator, which is different from an
6  administrative manager, but would help process the
7  human resources forms, paperwork, get them on
8  payroll, get the benefits signed up.
9    Q.   Was anybody from the home office involved
10  in hiring FAs or NFAs at the Largo office?
11    A.   Yes.  For existing producers coming from
12  the competition, there was a department at our home
13  office in Weehawken that helped screen the people,
14  run the compliance checks on it.  The terms of any
15  kind of signing bonus or contract for changing firms
16  was done at that level.  There were standard
17  schedules that were processed.
18        And then for new FAs -- it also
19  required -- I'm going to go back.  To bring in a
20  producer from the competition required the sign-off
21  by your regional manager, division manager and what
22  we would call the recruiting department.

1  it got to the point where they had an interest, and
2  it was a serious process because of the signing
3  bonuses and the contracts, et cetera, it was a large
4  financial commitment.  And he would use me for input
5  and to help him check out the situation as I used
6  people I worked for when I was hiring in the
7  Washington office.
8        The second involvement is from a paperwork
9  processing standpoint.  And when they filled out the
10  human resource forms and the documents to check out
11  either existing producers or trainees, we would
12  become involved in helping process that as well.
13    Q.   And who was responsible for hiring
14  administrative staff at the Largo office?
15    A.   Ultimately, Brad.  When Susie McGovern got
16  there, Brad would be involved with it.  I mean,
17  excuse me, Susie would be involved with it as well.
18  And I suspect Brad would use Debbie Pittman or other
19  people in the office to help with interviews.
20    Q.   Was anybody else from the D.C. office
21  involved in hiring FAs or administrative staff at
22  Largo?

1        For trainees, there was a different
2  system.  There was the testing system, the
3  interviewing system I talked about earlier, then the
4  final screen which was done by an individual that
5  would do the final interview.  And then the
6  processing of the paperwork through the training
7  department.  And again, the HR paperwork went through
8  Daniele Oristian up to human resources and payroll.
9    Q.   And with respect to hiring FAs or
10  trainees, was race ever one of the criteria for
11  making the employment decision?
12    A.   No.
13    Q.   Did you or anyone else at UBS steer
14  African-Americans to the Largo office who might
15  otherwise have wanted to work in the Washington
16  office or someplace else in the UBS system?
17    A.   No.
18    Q.   Did you steer Sylvester Fleming to the
19  Largo office?
20    A.   No.
21    Q.   Now, the majority of the FAs and the NFAs
22  at the Largo office were African-Americans, is that

1    Q.    Because that's the office that you were in
2    charge of, right?
3    A.    Yes.  So anyways, I'm sorry, back to the
4    trainees, the policy I used in Washington, and I
5    believe most of my peers used, although you would
6    have to check with all of them, is that when somebody
7    comes in and really has no business to support, as
8    they're growing their business, it's incumbent upon
9    them to fully understand the operational systems and
10   what it takes to do everything.
11        So I would not provide CSA or secretarial
12   support to a trainee.  I would pair them up in a
13   buddy system to cover their phones and then they
14   would need to know how to do the paperwork to open an
15   account, how to execute trades, if they had to do it
16   in a paper fashion as opposed to online order entry.
17   But I thought it was important to do that.
18        After a period of time, a year, two years,
19   if a trainee was particularly successful, doing a
20   wonderful job, was ranked first quintile, meaning the
21   top 20 percent of his peers at that point in time, I
22   would try to make an effort, if I had the staffing,

1    A.    That's a reference to quintile rankings.
2    And the first number is production and the second
3    number is assets.  So what he's saying is if the
4    trainees are the second quintile, would mean you're
5    in the top 40 percent of your respective trainee
6    class, in terms of production.
7         And in addition, you need to have the
8    corresponding asset level.  You don't want somebody
9    that's producing a lot of revenue on no assets.
10   That's indicative of a compliance issue.  So you put
11   both of them in there.  You need to be second
12   quintile in production and second quintile in assets.
13   And if you fall below that, then he's not going to
14   provide CSA support.
15        Q.    Did Fleming and Cook receive CSA support
16   at Largo even though they were still -- well, let me
17   go back.  When Fleming and Cook were at Largo, were
18   they trainees or experienced FAs?
19        A.    Fleming and Cook were trainees.
20        Q.    And did they receive CSA support at Largo
21   even though they were NFAs or trainees?
22        A.    I believe they did, yes.

1    to give him some secretarial support.
2         Q.    Did FA trainees at Largo receive CSA
3    support?
4         A.    Yes.  Brad put in his training area one of
5    the CSAs -- I think it was because he had enough to
6    do this.  He put one in the area with the trainees to
7    support them.
8         Q.    I would like to ask you to take a look at
9    a document we're going to mark as Exhibit 9.
10            (Magruder Exhibit No. 9 was
11            marked for identification.)
12       BY MR. WILLIAMSON:
13        Q.    Can you tell us what Exhibit 9 is?  What's
14   the title?
15        A.    The title is Prince George 2002 plan.  So
16   it appears to be a plan Brad typed up with his
17   trainees.
18        Q.    And do you see in the middle of the page,
19   it says, goal, "Any trainee not ranked 2/2 will not
20   have CSA support"?
21        A.    Yes.
22        Q.    What do you understand that to mean?

1         Q.    Do you recall receiving any complaints
2    from Cook and/or Fleming about CSA support when they
3    were at Largo?
4         A.    I don't remember any.  I'm not saying I
5    didn't receive anything, but nothing sticks in my
6    mind.
7         Q.    I want to turn to allocation of accounts
8    at Largo now.  There are situations where an FA
9    leaves and doesn't take the business or somebody dies
10   or retires, and then the office has to allocate their
11   business?
12        A.    Yes.
13        Q.    Who made decisions about how to allocate
14   available accounts at Largo when an FA left the firm?
15        A.    Brad Carson.
16        Q.    And do you know how those decisions were
17   made?
18        A.    Probably similar to most managers.  Brad
19   would look at the -- I mean, the first concern is
20   taking care of the client, so you look at the
21   account, you see what type of business, what type of
22   client it is.  And you would match it up to

1  sufficient experience and expertise for that
2  particular type of business.
3       The next thing you have to do is look at
4  the registrations and licensings.  You need to be
5  sure the advisor's licensed to do the type business
6  that's in the account.  Then you also need to check
7  the state registrations and make sure that the FA is
8  registered correctly in the state to do that type of
9  business.
10     Q.   To your knowledge, was race ever a factor
11  that Mr. Carson used in allocating available accounts
12  at Largo?
13     A.   No.
14     Q.   And did Mr. Cook or Mr. Fleming ever
15  complain to you about allocation of available
16  accounts while they were at Largo?
17     A.   I don't remember any complaints.
18     Q.   Would you tell us, what training did NFAs
19  receive after they were hired by UBS?
20     A.   The training program was standardized by
21  the firm.  It was approximately a two-year -- it
22  might have been two years and a quarter program that

1  marketing and approach to the business.  And that was
2  done with the manager, so the manager and the trainee
3  would build a joint business plan.
4       Once that was done and clients were --
5  prospects were targeted, the trainee would go to
6  Weehawken for a few weeks of training where they live
7  there.  And they generally work them from 7:30 in the
8  morning until into the evening.
9       And then when that was completed, assuming
10  they did well enough there -- there were people
11  excused out of those programs if they weren't
12  performing sufficiently -- they would come back to
13  the branch.  And then the branch manager would take
14  over again and start working with this individual and
15  executing his business plan.
16      And you would meet with the individual as
17  frequently as needed, I would say no less than once a
18  week, where you sit down and talk about what they're
19  doing, what's working, what problems they're having,
20  what's not working.  You would monitor them from -- I
21  would -- from an emotional standpoint and see how
22  they're doing, how they're holding up.  There is a

1  was laid out by the national training department in
2  Weehawken.  And it was broken down by week and by
3  day.  And every week -- you had a program text.  You
4  could literally flip to week one, day one and it
5  would tell you exactly what you need to do in that
6  day and that continued.
7       The first part of the training program was
8  an overview of the firm, and then it got pretty
9  quickly into the licensing requirements, because if
10  the financial advisor didn't pass the licensing
11  requirement, he was released at that point.  So they
12  would go immediately into the financial advisor
13  licensing.  And it's required.  It's multiple
14  licenses, insurance licenses that are required.
15      And then also tied into that, happening
16  concurrently, in the program text for the firm would
17  be an education about the firm and its systems and
18  the way to do business at the firm.  And it would go
19  through everything from how to open an account to
20  compliance and sales practice issues.
21      After a period of when the licenses were
22  complete, you would work on a business plan, target

1  lot involved in it.
2       You would always have your ear to the
3  ground for anything you felt they were doing that was
4  not professional, inappropriate, a compliance issue.
5  So you watched them pretty closely.  Now, you would
6  also watch trade monitors every day.  You would watch
7  everything they do.
8       Q.   For these different types of training,
9  including going to Weehawken, did all of the NFAs
10  hired at Largo receive this training?
11      A.   Yes.  It was standardized for the firm.
12  There were no exceptions.
13      Q.   Were any NFAs hired at Largo excluded from
14  the Weehawken training, for example, because of their
15  race?
16      A.   No.
17      Q.   Were they excluded from any other aspect
18  of UBS's training offerings because of their race?
19      A.   No.
20      Q.   Who was overseeing the training process at
21  Largo?
22      A.   Brad Carson.

# Exhibit G

```
 1        IN THE UNITED STATES DISTRICT COURT

 2           FOR THE DISTRICT OF MARYLAND

 3 FREDDIE H. COOK, et al.,       )

 4            Plaintiffs,         )

 5         v.                     )   Civil Action No.

 6 UBS FINANCIAL SERVICES, INC., )   06 CV 803 (PJM)

 7            Defendant.          )

 8

 9                     Washington, D.C.

10                     Thursday, April 5, 2007

11 The video deposition of

12              FREDDY MOULTRIE,

13 called for oral examination by Counsel for the

14 Defendant, pursuant to notice, held in the law

15 offices of Covington & Burling, 1201 Pennsylvania

16 Avenue, N.W., Washington, D.C., beginning at 9:42

17 a.m., before Carol J. Robinson, Registered

18 Professional Reporter and a Notary Public, when

19 were present:

20

21

22
```

Page 41

1  office that was going to be opened in Largo when
2  he spoke to you?
3      A     **Mr. Carson did not try to persuade**
4  **me.  Once again, Coe Magruder introduced me,**
5  **indicating that Largo may be a good office for me**
6  **to go to.**
7      Q     And did Mr. Carson have any role in
8  influencing you to go to the Largo office?
9      A     **Once I met Mr. Carson, yes, I decided**
10  **that office would be a good office to go to.**
11      Q     Why was it that you made that
12  decision after meeting Mr. Carson?
13      A     **Based on his years of experience and**
14  **his vision.**
15      Q     What was it about his vision that
16  influenced you to go to the Largo office?
17      A     **New -- a community where there were**
18  **no other brokerage firms and an affluent**
19  **community that we could actually go in and**
20  **penetrate.**
21      Q     That's something he discussed with
22  you when you met with him?

Page 42

1      A     **Yes, he did.**
2      Q     What race is Mr. Carson?
3      A     **African American.**
4      Q     Do you know if Mr. Carson tried to
5  persuade any whites to work as financial advisors
6  at the Largo office?
7      A     **I have no knowledge of that.**
8      Q     Who offered you the position of
9  financial advisor in the Largo branch office of
10  UBS?
11      A     **Coe Magruder offered me the position**
12  **at the Washington, D.C. office and introduced me**
13  **to Mr. Carson.  And between the two of them, I**
14  **guess they decided for me to go to Largo, that it**
15  **was okay.**
16      Q     You say you guess.  Was it one of
17  them or both of them told you that you could go
18  to Largo or asked if you would like to go to
19  Largo?
20      A     **Both of them communicated that to me,**
21  **yes.**
22      Q     Was that done orally or did they

Page 43

1  communicate it in letter?  I am trying to get a
2  sense of exactly how that was communicated to
3  you.
4      A     **To the best of my knowledge, from**
5  **what I remember, a document came out of the D.C.**
6  **office for me being hired at UBS.  I don't recall**
7  **if there was a document sent to me in regards to**
8  **going to Largo.**
9      Q     But you do recall the two of them
10  telling you about the new office and encouraging
11  you to consider working there, is that right?
12      A     **I do remember being encouraged by Coe**
13  **Magruder.**
14      Q     Now, did Mr. Magruder ever say you
15  could not stay at the D.C. office if you wanted
16  to?
17      A     **No, he did not.**
18      Q     When did you decide that you wanted
19  to go to the Largo office?
20      A     **Shortly after I spoke with**
21  **Mr. Carson.**
22      Q     How did you communicate that you

Page 44

1  wanted to go to the Largo office?
2      A     **I don't recall who I spoke directly**
3  **to after that, after I decided.**
4      Q     But you spoke to either Mr. Magruder
5  or Mr. Carson and told one of them that you would
6  like to go to the Largo office?
7      A     **That's correct.**
8      Q     Do you remember when the Largo office
9  opened?
10      A     **Can you clarify when you say opened?**
11      Q     When people -- I'll get back to that
12  in a minute but -- I'll get back to it right now.
13            When people started working there,
14  when you started going to work or when financial
15  advisors opened the doors and said we can provide
16  services here in Largo, do you remember about
17  when that was?
18      A     **I want to say, and this is an**
19  **estimate, January, maybe.**
20      Q     January of --
21      A     **That would have been '01, 2001.**
22      Q     Now, who was the branch manager of

Page 45

```
 1  the Largo office while you were employed there?
 2      A    While I was employed there, the
 3  branch manager was Brad Carson.
 4      Q    Okay.  Did anybody else perform the
 5  functions of branch manager at Largo while you
 6  were employed there?
 7      A    Can you clarify what you mean by
 8  responsibilities?
 9      Q    Okay.  What does a branch manager at
10  a UBS office do, based on your experience at UBS?
11      A    He is responsible for the office --
12      Q    Okay.
13      A    -- for running it and the training
14  and marketing and sales, and all of those things.
15      Q    So, while you were at Largo, the
16  person who held the branch manager position was
17  Mr. Carson, is that right?
18      A    That's correct.  Yes.
19      Q    What I want to know is during the
20  time you were at Largo, was there anybody else
21  who held the position of branch manager for
22  Largo?
```

Page 46

```
 1      A    Not to my knowledge, no.
 2      Q    Now, during the time you worked at
 3  the Largo office, were there any whites employed
 4  there as financial advisors?
 5      A    Yes, there were.
 6      Q    Do you remember who they were --
 7  first, do you remember about how many?
 8      A    One.
 9      Q    You only remember one?
10      A    I only remember one white person.
11  No.  Two.
12      Q    Do you remember what their names
13  were?
14      A    Yes.
15      Q    Who were they?
16      A    Suzie McGovern and David Weber.
17      Q    Do you ever remember meeting someone
18  named Michael Gauzza?
19      A    Mike Gauzza, yes, he was there as
20  well.
21      Q    Was he a white financial advisor?
22      A    Yes.
```

Page 47

```
 1      Q    What about Thaddeus Holbrook?  Do you
 2  ever remember --
 3      A    No, I do not remember him.
 4      Q    What about Benjamin Menfi?
 5      A    Benjamin?  I don't recall that name.
 6      Q    Do you ever recall meeting a Karl
 7  Zagorin?
 8      A    Yes, I do.
 9      Q    Was he a white financial advisor at
10  the Largo office?
11      A    I did not think he was white.  I
12  don't know what his nationality was but I didn't
13  think he was white.
14      Q    What did you think he was?
15      A    I don't know.  I didn't think he was
16  white.
17      Q    Do you have any sense of what other
18  nationality he might have been?
19      A    No.  No, I just never deduced that he
20  was white.
21      Q    Did you think he was Asian?
22      A    No.
```

Page 48

```
 1          MR. AUBERTINE:  Objection.  Asked and
 2  answered.
 3          BY MR. WILLIAMSON:
 4      Q    Did you think he was Hispanic?
 5      A    Possibly or part, maybe mixed.
 6      Q    And do you know who recruited Michael
 7  Gauzza to work at the Largo office?
 8      A    Can you be more specific when you say
 9  recruited?
10      Q    Who contacted Mr. Gauzza about
11  coming to work at the Largo office?
12      A    Yes, I do.
13      Q    Who was that?
14      A    That would have been me.
15      Q    I see.  And how did that happen?
16      A    During an internship program we had
17  at the office.
18      Q    Was he -- can you explain that a
19  little bit more?
20      A    I spoke at the University of Maryland
21  during a finance meeting or class.  He was one of
22  the individuals there, and he inquired about an
```

# Exhibit H

```
 1                UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MARYLAND

 3

 4 - - - - - - - - - - - - - - - x

 5 FREDDIE COOK, ET AL.,           :

 6                                 :

 7        Plaintiffs,              :

 8                                 :   Civil Action No.

 9     v.                          :

10                                 :    06 CV 803 (PJM)

11 UBS FINANCIAL SERVICES, INC.,   :

12                                 :

13        Defendant.               :

14 - - - - - - - - - - - - - - - x

15

16                          Washington, D.C.

17                          Monday, April 9, 2007

18        The video deposition of JOHN CRAWFORD,

19 called for examination by counsel for Defendant in the

20 above-entitled matter, pursuant to notice, in the

21 offices of Covington & Burling, 1201 Pennsylvania

22 Avenue, Northwest, Washington, D.C., convened at 9:52

23 a.m., before Judy Brown, a notary public in and for

24 the District of Columbia, when were present on behalf

25 of the parties:
```

Page 45

1  that was definitely more attractive.
2  Q    Now, you said when you first started
3  there, there was at least one white financial
4  advisor working there; is that right?
5  A    There were two, actually, but --
6  Q    What were their names?
7  A    Karl Zagorin and Dave Weber.
8  Q    During the time you worked at the Largo
9  office, were there any other whites employed there
10  as financial advisors?
11  A    As financial advisors, yes.
12  Q    Who were they?
13  A    For the most part, it was pretty short
14  term, so I don't really recall names. There was
15  one gentleman that I know when I left, they
16  indicated he went to the Baltimore office, but I
17  -- was just -- I mean, I only worked with him
18  for a long -- short period of time, so I don't
19  remember his name.
20       There was a gentleman named Ben Menfi
21  or something like that. There was another
22  gentleman I think was there maybe a few weeks. I
23  don't recall what his name was.
24  Q    Is there a Thaddeus Holbrook who was
25  there while you were there?

Page 46

1  A    Thaddeus Holbrook is the guy I believe
2  I'm talking about went to Baltimore. I think
3  that's him.
4  Q    What about Michael Gauzza; do you ever
5  remember --
6  A    Okay. Mike, yeah. Mike was
7  initially -- initially he was an intern from the
8  University of Maryland, but, yes.
9  Q    He was another Caucasian who worked
10  there as a financial advisor?
11  A    Pardon?
12  Q    He was another Caucasian who worked in
13  the office as a financial advisor?
14  A    Yes.
15  Q    Do you know when the Largo branch
16  office was first opened?
17  A    I was told that was mid November 2000.
18  Q    You started when?
19  A    January 16 or thereabout, 2001.
20  Q    Who offered you the position of
21  financial advisor in the Largo branch office?
22  A    Brad Carson, the branch manager.
23  Q    What did he say at the time?
24  A    I'm not sure what you mean.
25  Q    How did he communicate the offer?

Page 47

1  A    Through an engagement letter
2  essentially.
3  Q    And you accepted that offer and started
4  on January 16, 2001?
5  A    That's correct.
6  Q    Who was the branch manager of the Largo
7  office while you were employed there?
8  A    Brad Carson.
9  Q    And did anybody else perform the
10  functions of branch manager at Largo while you
11  were employed there?
12  A    When you say "the functions," are you
13  saying filled in for him?
14  Q    Just was there anybody else who either
15  -- either filled in or replaced him as the branch
16  manager at Largo during the time you were there?
17  A    If Brad were on vacation, there was
18  somebody that would act as -- as -- as someone who
19  was signing tickets, that type of thing. I didn't
20  necessarily think of them as being a branch
21  manager.
22  Q    Other than --
23  A    Other than that, no.
24  Q    Okay. How long did you work in the --
25  the Largo office of UBS?

Page 48

1  A    From January 2001 until May of 2003.
2  Q    Did an individual by the name of
3  Freddie Cook also work as a financial advisor in
4  UBS' Largo branch office during your tenure there?
5  A    Yes. During part of it, yes.
6  Q    How -- how did you become acquainted
7  with Freddie Cook?
8  A    The way the things were set up in the
9  bullpen, essentially we were a sharing cubicle,
10  so...
11  Q    Let me understand now, did Mr. Cook
12  have his own office or did he sit in the bullpen?
13  A    Initially he was in the bullpen.
14  Q    And then did he move to having his own
15  office?
16  A    That's correct.
17  Q    And initially were you in the bullpen
18  when you same to -- to Largo?
19  A    That's correct.
20  Q    And did you move to your own office as
21  well?
22  A    No.
23  Q    You stayed in the bullpen?
24  A    No.
25  Q    Now, did you first meet Mr. Cook when

# Exhibit I

```
 1                 UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MARYLAND

 3

 4  - - - - - - - - - - - - - - - x

 5  FREDDIE COOK, ET AL.,          :

 6           Plaintiffs,           :

 7                                 : Civil Action No.

 8       v.                        :

 9                                 : 06 CV 803 (PJM)

10  UBS FINANCIAL SERVICES, INC., :

11           Defendant.            :

12  - - - - - - - - - - - - - - - x

13

14                         Washington, D.C.

15                         Monday, April 9, 2007

16           The video deposition of MONICA SMITH, called

17  for examination by counsel for Defendant in the

18  above-entitled matter, pursuant to notice, in the

19  offices of Covington & Burling, 1201 Pennsylvania

20  Avenue, Northwest, Washington, D.C., convened at 1:37

21  p.m., before Judy Brown, a notary public in and for

22  the District of Columbia, when were present on behalf

23  of the parties:

24

25
```

Page 29

1  Freddie Moultrie.  She gave him a call, gave him a
2  call.  He referred me to Brad Carson.
3     Q    So then what happened with Brad Carson?
4     A    I interviewed with Mr. Carson towards
5  the end of 2000.  I want to say roughly November,
6  December of 2000.
7     Q    What was said -- what was discussed
8  during that interview?
9     A    Just the process of, you know, the
10 interview process just, you know, basically he
11 told me more about the office itself.  It was a
12 new office.  I mean, they were literally just
13 opening up at that particular time, so...
14    Q    About what time was that?
15    A    This was late, I want to say late
16 November or early December of 2000, and basically
17 just, you know, share with me that this was an
18 opportunity to really, you know, develop a
19 business in that market, and the market was really
20 underserved in terms of financial services.
21    Q    Did he tell you that it was his view
22 that it was under -- an area that was underserved
23 in terms of financial services?
24    A    Yes.
25    Q    And did you agree with that?

Page 30

1     A    I later realized that.
2     Q    Did you tell him anything about your
3  prior experience with UBS?
4     A    My prior experience, no, I did not.
5     Q    Did you ask him or did you -- at that
6  time, did you express any interest in working in
7  the D.C. office?
8     A    No.
9     Q    What race is Mr. Carson?
10    A    African-American.
11    Q    And was he the one who offered you the
12 position of financial advisor in the Largo branch
13 office?
14    A    Yes.
15    Q    What did he say at the time?
16    A    At the time of?
17    Q    When he made the offer?
18    A    After the interview, he called me back
19 and offered me the job.
20    Q    And you accepted?
21    A    Yes, I did.
22    Q    When was that that you accepted the
23 position?
24    A    I believe it was December of 2000.
25    Q    And who was the manager of the Largo

Page 31

1  branch office while you were employed there?
2     A    Brad Carson.
3     Q    And did anybody else perform the
4  functions of branch manager at Largo while you
5  were employed there?
6     A    No.
7     Q    Do you know if Mr. Carson recruited any
8  whites to work as financial advisors at the Largo
9  office?
10    A    In the training program?
11    Q    Either in the training program or -- or
12 as experienced financial advisors?
13    A    David Weber was employed there, and I
14 believe there was someone else who came along.
15 Honestly I don't know his -- his ethnicity.
16    Q    Do you know if Michael Gauzza worked at
17 Largo while you were there?
18    A    I don't know Michael Guazza.  Did he go
19 by Mike?  I don't know.  I think that might be
20 Mike.
21    Q    There's real chance if his first name
22 was Michael that he might have gone by Mike.
23    A    Could have been Mike.  Then Mike --
24 Mike I did know and I think he was white.
25 Honestly I don't know.

Page 32

1     Q    What about Thaddeus Holbrook, is that
2  somebody you ever met while you were there?
3     A    Does he have an alias, because --
4  Maybe Thad Holbrook.
5     A    I don't know Thad either.
6     Q    What about a Ben or Benjamin Menfi?
7     A    No.
8     Q    And Karl Zagorin?
9     A    Yes.  I don't know if he's white,
10 but...
11    Q    What else do you think he might be?
12    A    I think he may be a little Filipino.  I
13 don't know.
14    Q    Did you ever ask him?
15    A    No.  I don't tend to ask people's
16 ethnicities.
17    Q    Did you ever see Zagorin was a Filipino
18 name?
19    A    No.  That's why I'm going just based on
20 my observation.  He could be Caucasian, I don't
21 know.
22    Q    Okay.  He was a financial advisor?
23    A    Yes.
24    Q    And Gauzza was a financial advisor?
25    A    I don't know him -- oh, that's Mike.

# Exhibit J

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MARYLAND

 3 - - - - - - - - - - - - - - - - x

 4 FREDDIE H. COOK, et al.,        :

 5                  Plaintiffs,  :

 6         vs.                  : Civil Action No.

 7 UBS FINANCIAL SERVICES, INC., : 06-CV-803 (RJM)

 8                  Defendant.   :

 9 - - - - - - - - - - - - - - - - x

10          Deposition of MICHAEL S. BARHAM, a

11 witness herein, called for examination by counsel

12 for Defendant in the above-entitled matter, pursuant

13 to notice, the witness being duly sworn by Robert M.

14 Jakupciak, a Notary Public in and for the District

15 of Columbia, taken at the offices of Covington &

16 Burling, L.L.P., 1201 Pennsylvania Avenue, N.W.,

17 Washington, D.C.  20004, at 1:38 p.m., on April 10,

18 2007, and the proceedings being taken down by

19 Stenotype by Robert M. Jakupciak, RPR.

20

21

22

23

24

25
```

Page 37

1  you were a financial advisor; correct?
2    **A.   Yes.**
3    Q.   And you began as a financial advisor in
4  UBS's Largo, Maryland branch office; correct?
5    **A.   No.  I began as a trainee in the FA**
6  **training program.**
7    Q.   And where was that located?
8    **A.   At Largo.**
9    Q.   So you began as an FA trainee at UBS's
10 Largo office?
11   **A.   Yes.**
12   Q.   An FA trainee is a type of sales job,
13 isn't it?
14   **A.   No.**
15   Q.   What are the job duties of being a
16 financial advisor?
17   **A.   A financial advisor, the job duties are**
18 **to convince, convince individuals to bring their**
19 **assets to the firm.  Which is not the trainee job**
20 **responsibilities.**
21   Q.   What are the job responsibilities of an
22 FA trainee?
23   **A.   To, number one, pass the licensing**
24 **requirements, and to participate in the broker**
25 **training, the three-week training program in**

Page 38

1  Weehawken, New Jersey.
2    Q.   Do FA trainees have any other
3  responsibilities?
4    **A.   No.**
5    Q.   Do FA trainees have any clients of their
6  own?
7    **A.   No.**
8    Q.   How long were you an FA trainee for?
9    **A.   Approximately six months.**
10   Q.   And then did you become a financial
11 advisor?
12   **A.   Yes.**
13   Q.   Do you believe that being a financial
14 advisor is a type of sales job?
15   **A.   Yes.**
16   Q.   Do FA trainees attempt to bring business
17 in for UBS?
18   **A.   Sometimes.**
19   Q.   Under what circumstances would an FA
20 trainee attempt to bring in business for UBS?
21   **A.   If the trainee has fulfilled the**
22 **licensing requirements, thus enabling that trainee**
23 **to receive some sort of compensation for it.**
24   Q.   What licensing requirements are you
25 referring to?

Page 39

1    **A.   The Series 7 exam and the Investment**
2  **Advisor's exam, which I believe is the Series 63 or**
3  **Series 66.**
4    Q.   When did you apply for a position with
5  UBS's Largo, Maryland franchise?
6    **A.   In July of '02.**
7    Q.   Did you apply for a position of financial
8  advisor?
9    **A.   No.**
10   Q.   Or financial advisor trainee?
11   **A.   Advisor trainee; correct.**
12   Q.   Why did you apply for a position with
13 UBS?
14   **A.   I was contacted by Suzi McGovern, of the**
15 **Largo branch.**
16   Q.   Had you already submitted a resume' to
17 UBS at that time?
18   **A.   No.**
19   Q.   Do you know how Ms. McGovern got your
20 phone number?
21   **A.   I believe through some sort of resume'**
22 **circulating Web site like Monster.**
23   Q.   So you had your resume' uploaded onto
24 Monster dot com at that time?
25   **A.   Yes.**

Page 40

1    Q.   Who offered you the position of FA
2  trainee in the Largo branch office?
3    **A.   Suzi McGovern.**
4    Q.   Did you speak to Brad Carson prior,
5  before Ms. McGovern offered you the position of FA
6  trainee?
7    **A.   Yes.**
8    Q.   What did you speak to Mr. Carson about?
9    **A.   It was an interview.**
10   Q.   So you interviewed with Mr. Carson?
11   **A.   Yes.**
12   Q.   What did Mr. Carson say to you during the
13 interview?
14   **A.   He basically told his story of how he**
15 **entered into the business and how he was able to**
16 **accomplish success in the business.**
17   Q.   Did you receive a letter offering you a
18 position at UBS's Largo office?
19   **A.   I don't recall.**
20   Q.   Did Mr. Carson offer you a position at
21 UBS's Largo office?
22   **A.   Via Suzi McGovern, yes.**
23   Q.   So your understanding is Ms. McGovern was
24 relaying the offer that Mr. Carson was extending to
25 you?

Page 41

1    A.  Yes.
2    Q.  Do you know if Mr. Carson -- when I say
3 Mr. Carson, I'm referring to Brad Carson.
4    A.  Gotcha.
5    Q.  Do you know if Mr. Carson sought to
6 employ any whites to work as financial advisors at
7 the Largo office?
8    A.  I don't know.
9    Q.  Did you accept the position as financial
10 advisor trainee at the Largo branch office?
11   A.  Yes.
12   Q.  When did you accept the position?
13   A.  In August of 2002.
14   Q.  Was September 9th, 2002 your first day of
15 work at UBS?
16   A.  Yes.
17   Q.  Who was the manager of the Largo branch
18 office while you were employed there?
19   A.  Brad Carson.
20   Q.  Did anyone else perform the functions of
21 branch manager at Largo while you were employed
22 there?
23   A.  No.
24   Q.  During the time that you worked at the
25 Largo branch office for UBS were there any whites

Page 42

1 employed there?
2    A.  Yes.
3    Q.  Who were they?
4    A.  Suzi McGovern; the other two trainees
5 that were hired with me.
6    Q.  Is that Michael Gauzza?
7    A.  He was the trainee -- he was one class
8 ahead of us, so he was hired, I believe, maybe two
9 to three months before we were.
10   Q.  Who were the two other trainees that you
11 were mentioning?
12   A.  Ben Menfi.  And Thaddeus -- I'm not sure
13 what his last name is.
14   Q.  Holbrook?
15   A.  Yes.
16   Q.  And was Michael Gauzza another white
17 individual who worked at the Largo office for UBS?
18   A.  Yes.  And Dave Weber.
19   Q.  Any other white employees?
20   A.  Not to my knowledge.
21   Q.  How about Karl Zagorin?
22   A.  I don't know who that is.
23   Q.  What position did Suzi McGovern hold?
24   A.  Assistant manager.
25   Q.  Ben Menfi?

Page 43

1    A.  Trainee.
2    Q.  Thaddeus Holbrook?
3    A.  Trainee.
4    Q.  Dave Weber?
5    A.  Broker.
6    Q.  He was an FA?
7    A.  FA.
8    Q.  Michael Gauzza, which is G-A-U-Z-Z-A?
9    A.  FA.
10   Q.  If Brad Carson did not recruit these
11 white FAs and FA trainees for Largo, who did recruit
12 them?
13   A.  Suzi McGovern.
14   Q.  When was the Largo branch office opened?
15   A.  I don't recall.  Before I started working
16 there.
17   Q.  Do you know the total number of FAs and
18 FA trainees who worked at Largo while you were
19 there?
20   A.  There were three FA trainees and
21 approximately ten brokers.  Maybe even as many as 12
22 or 15.  Somewhere in that range.
23   Q.  During the time that you worked in the
24 Largo branch office did an individual by the name of
25 Freddie Cook also work there?

Page 44

1    A.  Yes.
2    Q.  How did you become acquainted with
3 Freddie Cook?
4    A.  He introduced himself as I was brought
5 around to the other brokers.
6    Q.  So you did not know Mr. Cook before you
7 started working for UBS?
8    A.  No.
9    Q.  How would you describe your relationship
10 with Mr. Cook?
11   A.  Somewhat distant.  As a trainee, our
12 relationship with most of the senior brokers tended
13 to be distant.
14   Q.  Would you describe yourself as a friend
15 of Mr. Cook's?
16   A.  Sure.  It depends on what time frame you
17 are talking about.  So I guess I would need you to
18 clarify.  I may have --
19   Q.  At what time did you consider yourself a
20 friend of Mr. Cook?
21   A.  I guess December of '02.
22   Q.  Is when you became friends with him?
23   A.  Sure.
24   Q.  Have you stopped being a friend of his?
25   A.  Not to my knowledge.

# Exhibit K

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| FREDDIE H. COOK, et al., | ) |
| | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil No. 8:06-cv00803-PJM |
| v. | ) |
| | ) |
| UBS FINANCIAL SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES

Defendant UBS Financial Services Inc. ("Defendant" or "UBSFS") submits the following answers and objections to Plaintiffs' First Set of Interrogatories ("Plaintiffs' Interrogatories").

## GENERAL OBJECTIONS

### General Objection A

Defendant objects to these Interrogatories to the extent that they call for information subject to the attorney-client privilege or the work product privilege.

### General Objection B

Defendant objects to these Definitions, Instructions, and Interrogatories, including without limitation Definition No. 5, to the extent that they call for information that reflects confidential personal information relating to present and former employees of UBSFS on the grounds that they constitute an unwarranted invasion into the privacy of its employees or that they reflect confidential business information.

**General Objection C**

Defendant objects to Definition No. 14, which defines the terms "Professional Positions" and "Professional," on the grounds that it is vague and ambiguous to the extent that it includes "non-clerical non-technical positions" and does not define the term "managers" and on the further grounds that it is overly broad, unduly burdensome and not relevant to any claim or defense in this action to the extent that it includes positions that were neither occupied nor sought by any of the Plaintiffs. Defendant shall construe the terms "Professional Positions" and "Professional" to mean only Financial Advisors, Financial Advisor trainees, as well as Sales Managers, Assistant Branch Managers, and Branch Managers (hereinafter referred to as "branch managerial positions").

**General Objection D**

Defendant objects to Plaintiffs' definition of the "Relevant Time Period" to the extent it seeks information from a time period not relevant to this action. Defendant shall construe the "Relevant Time Period" (unless otherwise indicated) as beginning on January 1, 2000 and ending on June 30, 2006.

**General Objection E**

Defendant objects to Plaintiffs' Interrogatories, Definitions, and Instructions to the extent that they are vague, ambiguous, overly broad, unduly burdensome, and/or are not reasonably calculated to lead to the discovery of admissible evidence related to Plaintiffs' claims or any defense Defendant has raised.

**General Objection F**

Defendant objects to Plaintiffs' Interrogatories to the extent they seek information that is not relevant to Plaintiffs' individual claims or to the class certification requirements of Fed. R. Civ. P. 23 (a) and (b).

### General Objection G

Defendant objects to Plaintiffs' Interrogatories to the extent that they call for information that cannot be located through a reasonably diligent search.

### General Objection H

Defendant objects to Plaintiffs' Definition No. 5, which defined the term "identify," on the ground that it is overly broad, unduly burdensome, and/or is not reasonably calculated to lead to the discovery of admissible evidence.

With respect to Financial Advisors, Financial Advisor trainees, and persons in branch managerial positions, Defendant will provide the name and, in the case of persons employed by UBSFS in one of those positions as of June 30, 2006, the branch in which that employee worked as of June 30, 2006. Defendant also has or will produce documents sufficient to show the address of each of its branch offices. Defendant will further indicate, where applicable, that a person identified left such a position prior to June 30, 2006, the first year-end date on which the employee was no longer employed by UBSFS in one of those positions, and the branch in which that employee worked as of the last year-end date on which that person was employed by UBSFS in one of those positions.

Defendant has also already produced documents sufficient to show the identity of Financial Advisors, Financial advisor trainees, and persons in branch managerial positions at the Largo, MD, Washington, DC, Westlake Village, CA, and Oxnard/Ventura, CA Branch Offices on a monthly basis from January 2001 through December 2005. *See* UBSFS0001464-1572.

With respect to all other persons identified herein, UBSFS will indicate that person's title, if that person is currently employed by UBSFS. If that person is not currently a UBSFS employee, Defendant will provide the last position that the person held at UBSFS.

3

### General Objection I

Defendant provides the following responses based on information reasonably available at this time, and reserves the right to supplement or amend these responses when and if necessary.

### ANSWERS TO INTERROGATORIES OF PLAINTIFF FREDDIE COOK

### INTERROGATORY NO. 1

**For each position held by Mr. Cook at UBSFS, identify all persons who were responsible for and/or participated in:  a) evaluating Mr. Cook's work performance; and b) determining Mr. Cook's compensation.**

### RESPONSE TO INTERROGATORY NO. 1

Defendant objects to this Interrogatory on the ground that it is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

As Branch Manager of the Largo Branch Office, Brad Carson was responsible for personnel matters at that Branch Office, including evaluations of Mr. Cook from June 2001 through June 2003 and the compensation offered to Mr. Cook when he first became employed by UBSFS.  Mr. Carson is currently employed as a Financial Advisor at UBSFS' Washington, DC Branch Office.  He may be contacted through UBSFS' counsel.

As Branch Manager of the Washington, DC Branch Office, Coe Magruder was responsible for personnel matters at that Branch Office, including evaluations of Mr. Cook from June 2003 through July 2004.  Mr. Magruder left UBSFS' employ in April 2006.  His last position was Branch Manager of the Washington, DC and Alexandria, VA Branch Offices.  He may be contacted through UBSFS' counsel.

With respect to Mr. Cook's compensation, other than the compensation offered to him when he commenced his employment with UBSFS, his compensation was not determined by a person, but pursuant to UBSFS' standard Financial Advisor Compensation Plan.

## INTERROGATORY NO. 2

**Identify all individuals involved in the decision to establish the UBSFS branch office in Largo, Maryland in 2000.**

### RESPONSE TO INTERROGATORY NO. 2

Defendant objects to this Interrogatory as overbroad, unduly burdensome, and on the ground that the phrase "involved in" is unduly vague and ambiguous. Subject to and without waiving its objections, UBSFS responds as follows:

The primary individuals responsible for the decision to establish the Largo, MD Branch Office were Coe Magruder, Brad Carson and Bill Kennedy.

Mr. Kennedy is currently a consultant for UBSFS. He may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 3

**Identify all individuals involved in the decision to establish the UBSFS branch office in Flushing, New York in 1998.**

### RESPONSE TO INTERROGATORY NO. 3

Defendant objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not relevant to Plaintiffs' individual claims or to the class certification requirements of Fed. R. Civ. P. 23 (a) and (b).

## INTERROGATORY NO. 4

**Identify all individuals responsible for the management of the UBSFS branch office in Largo, Maryland, from 2000 through 2003.**

### RESPONSE TO INTERROGATORY NO. 4

Defendant objects to this Interrogatory on the ground that it is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

As the Largo Branch Office's Branch Manager, Brad Carson was responsible for the management of the Largo Branch Office.  Mr. Carson reported to Coe Magruder.

## INTERROGATORY NO. 5

**Identify all the individuals responsible for establishing or managing the finances, expenses and budget of the UBSFS branch office in Largo, Maryland, from 2000 through 2003.**

### RESPONSE TO INTERROGATORY NO. 5

Defendant objects to this Interrogatory on the ground that it is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

As the Largo Branch Office's Branch Manager, Brad Carson was responsible for managing the finances and expenses of the Largo Branch Office.  Mr. Carson reported to Coe Magruder.  No individual or group of UBSFS employees was responsible for establishing a budget for the Largo Branch Office.

## INTERROGATORY NO. 6

**Identify all the individuals responsible for hiring, selecting and recruiting personnel (including brokers, client service associates and managers) for the UBSFS branch office in Largo, Maryland, from 2000 through 2003.**

### RESPONSE TO INTERROGATORY NO. 6

Defendant objects to this Interrogatory as overbroad, unduly burdensome, unduly vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it calls for information relating to positions other than Financial Advisors, Financial Advisor trainees, and persons in branch managerial positions.  *See* General Objection C.  Subject to and without waiving its objections, UBSFS responds as follows:

6

The individuals responsible for hiring, selecting and recruiting Financial Advisors, Financial Advisor trainees, and members of the branch managerial team for the Largo Branch Office were Coe Magruder and Brad Carson.

## INTERROGATORY NO. 7

**Identify all the individuals responsible for hiring, selecting and recruiting personnel (including brokers, client service associates and managers) for the UBSFS branch office in Washington, D.C.**

### RESPONSE TO INTERROGATORY NO. 7

Defendant objects to this Interrogatory as overbroad, unduly burdensome, unduly vague and ambiguous, not reasonably calculated to lead to the discovery of admissible evidence, and to the extent it calls for information relating to positions other than Financial Advisors, Financial Advisor trainees, and persons in branch managerial positions. *See* General Objection C. Subject to and without waiving its objections, UBSFS responds as follows:

The individual responsible for hiring, selecting and recruiting Financial Advisors, Financial Advisor trainees, and members of the branch managerial team (other than the Branch Manager) for the Washington, DC Branch Office would have been the Branch Manager.

The Branch Manager of the Washington, DC office between January 1, 2000 and April 4, 2006 was Coe Magruder. Between April 5, 2006 and June 5, 2006, the position of Branch Manager was vacant; the Assistant Branch Manager was during this time (and is now) Tim Thompson. Since June 5, 2006, the Branch Manager has been Robert Clark. Messrs. Magruder, Thompson and Clark may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 8

**Identify all the individuals responsible for assigning unsolicited accounts and accounts that become available after a broker leaves his/her employment with UBSFS, with respect to UBSFS' branch office in Largo, Maryland, from 2000 through 2003.**

### RESPONSE TO INTERROGATORY NO. 8

Defendant objects to this Interrogatory as overbroad, unduly burdensome, unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

The individual responsible for assigning unsolicited accounts and accounts that became available after a broker left UBSFS' Largo Branch Office was Brad Carson.

### ANSWERS TO INTERROGATORIES OF PLAINTIFF SYLVESTER FLEMING, JR.

### INTERROGATORY NO. 1

**For each position held by Mr. Fleming at UBSFS, identify all person who were responsible for and/or participated in:  a) evaluating Mr. Fleming's work performance; and b) determining Mr. Fleming's compensation.**

### RESPONSE TO INTERROGATORY NO. 1

Defendant objects to this Interrogatory on the ground that it is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

As Branch Manager of the Largo office, Brad Carson was responsible for personnel matters at that Branch Office, including evaluations of Mr. Fleming from May 2002 through June 2003 and the compensation offered to Mr. Fleming when he first became employed by UBSFS.

As Branch Manager of the Washington, DC Branch Office, Coe Magruder was responsible for personnel matters at that Branch Office, including evaluations of Mr. Fleming from June 2003 through June 2004.

With respect to Mr. Fleming's compensation, other than the compensation offered to him when he commenced his employment with UBSFS, his compensation was not determined by a person, but pursuant to UBSFS' standard Financial Advisor Compensation Plan.

**INTERROGATORY NO. 2**

Identify all the individuals responsible for assigning unsolicited accounts and accounts that become available after a broker leaves his/her employment with UBSFS, with respect to UBSFS' branch office in Washington, D.C.

**RESPONSE TO INTERROGATORY NO. 2**

Defendant objects to this Interrogatory as overbroad, unduly burdensome, unduly vague and ambiguous. Subject to and without waiving its objections, UBSFS responds as follows:

The individual responsible for assigning unsolicited accounts and accounts that became available after a broker left UBSFS' Washington, DC Branch Office is that office's Branch Manager. The Branch Manager of the Washington, DC office between January 1, 2000 and April 4, 2006 was Coe Magruder. Between April 5, 2006 and June 5, 2006, the position of Branch Manager was vacant; the Assistant Branch Manager was during this time (and is now) Tim Thompson. Since June 5, 2006, the Branch Manager has been Robert Clark.

**INTERROGATORY NO. 3**

Identify all individuals responsible for maintaining or administering personnel or human resources documents with respect to UBSFS' branch office in Largo, Maryland from 2000 through to the present.

**RESPONSE TO INTERROGATORY NO. 3**

Defendant objects to this Interrogatory as overbroad, unduly burdensome, on the ground that the phrases "responsible for maintaining or administering" and "personnel or human resources documents" are unduly vague and ambiguous, and insofar as it seeks information for positions other than Financial Advisors, Financial Advisor trainees and persons in branch managerial positions. *See* General Objection C. Subject to and without waiving its objections, UBSFS responds as follows:

The individual with primary responsibility for maintaining UBSFS' personnel and human resources databases is Robert Di Taranti, Group Manager of HR Operations. Mr. Di Taranti's business address is UBS Financial Services Inc., 1000 Harbor Boulevard, Weehawken, NJ 07086. He may be contacted through UBSFS' counsel. It is unclear what plaintiff means by "personnel or human resources documents." Depending on the meaning given to that term, it is possible that, in addition to Mr. Di Taranti, several different individuals within the Largo Branch Office might have "maintain[ed] or administer[ed]" such documents.

## INTERROGATORY NO. 4

**Identify all individuals responsible for maintaining or administering personnel or human resources documents with respect to UBSFS' branch office in Washington, D.C., from 2000 through to the present.**

### RESPONSE TO INTERROGATORY NO. 4

Defendant objects to this Interrogatory as overbroad, unduly burdensome, on the ground that the phrases "responsible for maintaining or administering" and "personnel or human resources documents" are unduly vague and ambiguous, and insofar as it seeks information for positions other than Financial Advisors, Financial Advisor trainees and persons in branch managerial positions. *See* General Objection C. Subject to and without waiving its objections, UBSFS responds as follows:

The individual with primary responsibility for maintaining UBSFS' personnel and human resources databases is Mr. Di Taranti. It is unclear what plaintiff means by "personnel or human resources documents." Depending on the meaning given to that term, it is possible that, in addition to Mr. Di Taranti, several different individuals within the Washington, DC Branch Office might have "maintain[ed] or administer[ed]" such documents.

## INTERROGATORY NO. 5

**Identify the address of all locations where UBSFS has maintained documents (or copies thereof) regarding the Largo, Maryland, branch office, from 2000 through to the present.**

## RESPONSE TO INTERROGATORY NO. 5

Defendant objects to this Interrogatory as overbroad, unduly burdensome, unduly vague and ambiguous, and not reasonably calculated to lead to admissible evidence. Subject to and without waiving its objections, UBSFS responds as follows:

The primary locations where UBSFS has maintained documents regarding the Largo, Maryland, branch office are:

1. UBSFS' Largo, Maryland office.

2. UBSFS' Washington, DC office.

3. UBSFS' Weehawken, New Jersey Headquarters.

4. An "ArchivesOne" storage facility located at 7726 Southern Drive in Springfield, VA.

With respect to electronic data, UBSFS understands such data to be "maintained" where the individuals responsible for maintaining the information are located.

## INTERROGATORY NO. 6

**Identify all individuals involved in making the decision to close the UBSFS branch office in Largo, Maryland, in 2003.**

## RESPONSE TO INTERROGATORY NO. 6

Defendant objects to this Interrogatory as overbroad and unduly burdensome, and on the ground that the phrase "involved in" is unduly vague and ambiguous. Subject to and without waiving its objections, UBSFS responds as follows:

The primary individuals involved in the decision to close the UBSFS Branch Office in Largo were Coe Magruder, Mike Williams and Tim Sennatt.

Mr. Sennatt is no longer employed by UBSFS. His last position at UBSFS was Division Manager, Eastern Division. He may be contacted through UBSFS' counsel.

Mike Williams is currently the Branch Manager of UBSFS' Charlotte, North Carolina Branch Office. He may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 7

**Identify, including by race and job title, all employees in UBSFS' branch office in Largo, Maryland, from 2000 through 2003.**

### RESPONSE TO INTERROGATORY NO. 7

Subject to and without waiving its objections, including but not limited to General *Objections C and H*, UBSFS has or will produce documents sufficient to show this information. *See* UBSFS0001464-1572.

## INTERROGATORY NO. 8

**Identify, including by race and job title, all employees in UBSFS' branch office in Washington, D.C.**

### RESPONSE TO INTERROGATORY NO. 8

Subject to and without waiving its objections, including but not limited to General *Objections C, D and H*, UBSFS has or will produce documents sufficient to show this information. *See* UBSFS0001464-1572.

## INTERROGATORY NO. 9

**Identify, including by race and job title, all employees in UBSFS' branch office in Flushing, New York, from 1990 through 2001.**

### RESPONSE TO INTERROGATORY NO. 9

Defendant objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not relevant to Plaintiffs' individual claims or to the class certification requirements of Fed. R. Civ. P. 23(a) and

(b).  Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents, Request No. 1, UBSFS objects to providing any such information.  *See* Defendant's Supplemental Responses To Plaintiffs' First Set of Requests for Documents.

**ANSWERS TO INTERROGATORIES OF PLAINTIFF TIMOTHY GANDY**

**INTERROGATORY NO. 1**

    **Identify, including by race and job title, all graduates of the 1999 and 2000 UBSFS Management Development Program ("MDP") who were promoted subsequent to completing MDP.**

    **RESPONSE TO INTERROGATORY NO. 1**

        Defendant objects to this Interrogatory to the extent that the term "promotion" is unduly vague or ambiguous.

        UBSFS has or will produce documents sufficient to show all graduates of the 1999 and 2000 MDP and their positions subsequent to completing MDP.  *See* UBSFS0001459-1463.

**INTERROGATORY NO. 2**

    **Identify all individuals responsible for managing UBSFS' MDP, in 1999 and 2000.**

    **RESPONSE TO INTERROGATORY NO. 2**

        Defendant objects to this Interrogatory the extent that the phrase "responsible for managing" is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

        The director of the MDP from January 1999 through February 2000 was Antonio Rendeiro.  The director of the MDP from August 2000 through December 2000 was Jerry Johnson.  The position of MDP director was vacant between February 2000 and August 2000.

Mr. Rendeiro left UBSFS' employ in February 2000.  His last position at UBSFS was Manager of Management Development.  He may be contacted through UBSFS' counsel.

Mr. Johnson is currently the Regional Manager for the South Central Region.  His business address is UBS Financial Services Inc., 3102 West End Avenue, Nashville, Tennessee.  He may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 3

**For each position held by Mr. Gandy at UBSFS, identify all person who were *responsible for and/or participated in*:  a) evaluating Mr. Gandy's work performance; and b) determining Mr. Gandy's compensation.**

### RESPONSE TO INTERROGATORY NO. 3

Defendant objects to this Interrogatory on the ground that it is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

As Branch Manager of the Oxnard/Ventura, CA Branch Office, Doug Messner was responsible for personnel matters at that Branch Office, including evaluations of Mr. Gandy from August 1994 through October 2002.  He left UBSFS' employ in October 2002.  He may be contacted through UBSFS' counsel.

From October 2002 to May 2003, the individual responsible for evaluation and compensation decisions relating to Mr. Gandy was the Regional Manager, Scott Flanagan.  Mr. Flanagan is currently employed by UBSFS.  He may be contacted through UBSFS' counsel.

As Branch Manager of the Oxnard/Ventura Branch Office, Dave Watson was responsible for personnel matters at that Branch Office, including evaluations of Mr. Gandy from May 2003 through June 2003.  Mr. Watson is currently employed as a Financial Advisor in UBSFS' Santa Barbara Branch Office.  He may be contacted through UBSFS' counsel.

The compensation offered to Mr. Gandy when he assumed the position of Producing Sales Manager in the Oxnard/Ventura Branch Office was determined by Mr. Messner.

14

The compensation paid to him as a Financial Advisor or for production generated by him was determined not by a person, but pursuant to UBSFS' standard Financial Advisor Compensation Plan.

From July 2003 to November 2003, the individual responsible for evaluating Mr. Gandy in his role as Branch Manager of the Westlake Village, CA Branch Office was Mitch Ackerman. The compensation paid to him in this position was determined in accordance with UBSFS' Branch Office Manager Compensation Plan, with minimal input where required by Mr. Ackerman. Mr. Ackerman is currently employed as the Branch Manager of UBSFS' San Francisco (One California Street) Branch Office. He may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 4

**Identify, including by race and job title, all brokers in UBSFS' branch office in Westlake, California in 2003.**

### RESPONSE TO INTERROGATORY NO. 4

Defendant objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous. Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis. Subject to and without waiving its objections, including but not limited to General Objection H, Defendant has or will produce documents sufficient to show this information. See UBSFS0001464-1572.

## INTERROGATORY NO. 5

**Identify, including by race and job title, all brokers in UBSFS' branch office in Oxford/Ventura, California in 2002 and 2003.**

### RESPONSE TO INTERROGATORY NO. 5

Defendant objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous. Defendant understands the term broker in this Interrogatory to mean

"Financial Advisor" and/or Financial Advisor trainee, and responds on that basis.  Subject to and without waiving its objections, including but not limited to General Objection H, Defendant has or will produce documents sufficient to show this information.  *See* UBSFS0001464-1572.

## INTERROGATORY NO. 6

**Identify, including by race and job title, all brokers in UBSFS' branch office in Encino, California in 2001 and 2003.**

### RESPONSE TO INTERROGATORY NO. 6

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action.  Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous.  Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis.  Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents, Request No. 1, UBSFS objects to providing any such information.  *See* Defendant's Supplemental Responses To Plaintiffs' First Set of Requests for Documents.

## INTERROGATORY NO. 7

**Identify, including by race and job title, all brokers in UBSFS' branch office in Mission Viejo, California in 2001 and 2003.**

### RESPONSE TO INTERROGATORY NO. 7

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action.  Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous.  Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis.  Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents,

Request No. 1, UBSFS objects to providing any such information.  *See* Defendant's Supplemental Responses To Plaintiffs' First Set of Requests for Documents.

## INTERROGATORY NO. 8

**Identify, including by race and job title, all brokers in UBSFS' branch office in Santa Barbara, California in 2002 and 2003.**

### RESPONSE TO INTERROGATORY NO. 8

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action.  Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous.  Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis.  Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents, Request No. 1, UBSFS objects to providing any such information.  *See* Defendant's Supplemental Responses To Plaintiffs' First Set of Requests for Documents.

## INTERROGATORY NO. 9

**Identify, including by race and job title, all brokers in UBSFS' branch office in Carlsbad, California in 2001 and 2002.**

### RESPONSE TO INTERROGATORY NO. 9

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action.  Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous.  Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis.  Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents,

Request No. 1, UBSFS objects to providing any such information. *See* Defendant's Supplemental Responses To Plaintiffs' First Set of Requests for Documents.

## INTERROGATORY NO. 10

**Identify, including by race and job title, all brokers in UBSFS' branch office in Century City, California in 2000.**

### RESPONSE TO INTERROGATORY NO. 10

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action. Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous. Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis. Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents, Request No. 1, UBSFS objects to providing any such information. *See* Defendant's Supplemental Responses To Plaintiffs' First Set of Requests for Documents.

## INTERROGATORY NO. 11

**Identify, including by race and job title, all brokers in UBSFS' branch office in Palm Desert, California in 2000.**

### RESPONSE TO INTERROGATORY NO. 11

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action. Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous. Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis. Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents,

Request No. 1, UBSFS objects to providing any such information. *See* Defendant's *Supplemental Responses To Plaintiffs' First Set of Requests for Documents.*

## INTERROGATORY NO. 12

**Identify, including by race and job title, all brokers in UBSFS' branch office in Las Vegas, Nevada, in 2001 and 2003.**

### RESPONSE TO INTERROGATORY NO. 12

Defendant objects to this Interrogatory on the grounds that it calls for information that is not relevant to any claim or defense in this action. Defendant further objects to this Interrogatory to the extent that the term "broker" is vague and ambiguous. Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis. Except insofar as such information is evidenced by documents UBSFS has agreed to produce in response to Plaintiffs' First Request For Documents, Request No. 1, UBSFS objects to providing any such information. *See* Defendant's *Supplemental Responses To Plaintiffs' First Set of Requests for Documents.*

## INTERROGATORY NO. 13

**Identify all individuals responsible for hiring, selecting and recruiting brokers with respect to each UBSFS branch office listed in Interrogatory Nos. 4 through 12, above.**

### RESPONSE TO INTERROGATORY NO. 13

Defendant objects to this Interrogatory to the extent that it calls for information that is not relevant to any claim or defense in this action and to the extent that the term "broker" is vague and ambiguous. Defendant understands the term broker in this Interrogatory to mean "Financial Advisor" and/or Financial Advisor trainee, and responds on that basis.

Defendant further objects to this Interrogatory as overbroad, unduly burdensome, and unduly vague and ambiguous. Subject to and without waiving its objections, UBSFS responds as follows:

The individual with primary responsibility for hiring, selecting and recruiting Financial Advisors and Financial Advisor trainees is the Branch Manager for the office into which a candidate is being considered.

Subject to and without waiving its objections, including but not limited to General Objections D and H, Defendant has or will produce documents sufficient to show the Branch Manager of each UBSFS office during the relevant time period.

## INTERROGATORY NO. 14

**Identify all individuals responsible for maintaining or administering personnel/human resources documents with respect to each UBSFS branch office listed in Interrogatory Nos. 4 through 12, above.**

### RESPONSE TO INTERROGATORY NO. 14

Defendant objects to this Interrogatory as overbroad, unduly burdensome, on the ground that the phrases "responsible for maintaining or administering" and "personnel or human resources documents" are unduly vague and ambiguous, and insofar as it seeks information for positions other than Financial Advisors, Financial Advisor trainees and persons in branch managerial positions. *See* General Objection C. Subject to and without waiving its objections, UBSFS responds as follows:

The individual with primary responsibility for maintaining UBSFS' personnel and human resources databases is Mr. Di Taranti. It is unclear what plaintiff means by "personnel or human resources documents." Depending on the meaning given to that term, it is possible that, in addition to Mr. Di Taranti, a variety of different individuals within the multiple different branch offices listed in Interrogatory Nos. 4 through 12 might have "maintain[ed] or administer[ed]" such documents.

20

## ANSWERS TO CLASS INTERROGATORIES

### INTERROGATORY NO. 1

**Identify all electronic and machine-readable databases and files containing personnel and/or human resource information for all Professional employees of UBSFS during the Relevant Time Period.**

### RESPONSE TO INTERROGATORY NO. 1

Defendant objects to this Interrogatory as overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and on the ground that the phrase "personnel and/or human resource information" is unduly vague and ambiguous.

Subject to and without waiving its objections, including General Objections C and D, Defendant states that from May 9, 2005 to date UBSFS maintains what it defines as personnel and human resource information, which does not include payroll information, in a proprietary database entitled "HRi." From May 9, 2005 through August 2002, UBSFS maintained what it defined as personnel and human resource information in a PeopleSoft database. Prior to August 2002, UBSFS maintained what it defined as personnel and human resource information in a database entitled "Integral." For the relevant time period, UBSFS maintained payroll information in a database entitled "Integral."

### INTERROGATORY NO. 2

**Identify all electronic and machine-readable databases and files containing information on internal or external applicants and/or candidates for placement in Professional Positions at UBSFS during the Relevant Time Period.**

### RESPONSE TO INTERROGATORY NO. 2

Defendant objects to this Interrogatory as overly broad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not relevant to Plaintiffs' individual claims or to the class certification requirements of Fed. R. Civ. P. 23(a) and (b). Subject to and without waiving its objections, including without limitation General

Objection C, Defendant states that UBSFS does not maintain any electronic or machine-readable databases containing information on internal applicants or candidates for placement as Financial Advisors, Financial Advisor trainees, or branch managerial positions.   Defendant further responds that it has or will produce "Management Notes," which contain information regarding available branch managerial positions.

## INTERROGATORY NO. 3

**Identify the individuals responsible for maintaining and operating the databases and files set forth in your response to Interrogatory Nos. 1 and 2 during the Relevant Time Period.**

### RESPONSE TO INTERROGATORY NO. 3

Defendant objects to this Interrogatory the extent that it is unduly vague and ambiguous.  Subject to and without waiving its objections, UBSFS responds as follows:

The individual responsible for the management of electronic databases and files that contain what UBSFS defines as personnel and human resource information, as well as payroll information, is Mr. Di Taranti.   The individual responsible for management of the electronic records of "Management Notes" is Jon Steele.  Mr. Steele may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 4

**Identify the individuals responsible for managing UBSFS' MDP during the Relevant Time Period.**

### RESPONSE TO INTERROGATORY NO. 4

Defendant objects to this Interrogatory the extent that it is unduly vague and ambiguous.  Subject to and without waiving its objections, including without limitation General Objection D, UBSFS responds as follows:

The persons who have held the position of MDP director during the relevant time period are Antonio Rendeiro, Jerry Johnson, Patrick Weiler and Marc Sieben.  Mr. Weiler is currently employed as the Branch Manager of UBSFS' Hartford, Connecticut Branch Office.

Mr. Sieben left UBSFS' employ in October 2005.  His last position at UBSFS was Business Development Officer.  He may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 5

**Identify all individuals responsible for managing UBSFS' "F.A.I.R." program** *during the Relevant Time Period.*

### RESPONSE TO INTERROGATORY NO. 5

Defendant objects to this Interrogatory the extent that it is unduly vague and ambiguous.  Subject to and without waiving its objections, including without limitation General Objection D, UBSFS responds as follows:

The individual responsible for managing the "F.A.I.R." program for the relevant time period is Stephanie Morse-Shamosh.  She may be contacted through UBSFS' counsel.

## INTERROGATORY NO. 6

**Identify all individuals responsible for compiling for all or any part (i.e., group, division, geographical or organizational department or office) of UBSFS statistical information by race, ethnicity and/or gender, including but not limited to "demographic profiles" as that term is used or understood by UBSFS, during the Relevant Time Period.**

### RESPONSE TO INTERROGATORY NO. 6

Defendant objects to this Interrogatory as overly broad, unduly burdensome, and on the ground that the phrase "demographic profiles" is unduly vague and ambiguous.  Subject to and without waiving its objections, Defendant directs Plaintiffs to its response to Class Interrogatory No. 3.

Signed as to objections:

Eric H. Holder, Jr. (*pro hac vice*)
Jeffrey G. Huvelle (No. 03340)
Thomas S. Williamson, Jr. (No. 07695)
Covington & Burling
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000

Attorneys For Defendant UBS Financial
Services Inc.

Dated:  September 6, 2006

Signed as to answers:

Claudia Cohen

STATE OF NEW JERSEY    )
                       )    ss:
COUNTY OF HUDSON       )

     Subscribed and sworn to before me this 6th day of September, 2006, by Claudia Cohen, UBS Financial Services Inc., Executive Director and Senior Associate General Counsel.

Notary Public

My Commission expires: _____

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of September 2006, I caused a true and correct copy of Defendant's Response To Plaintiffs' First Set of Interrogatories to be served, via electronic and first class, postage pre-paid U.S. mail, on the below listed counsel for plaintiffs:

Keino Robinson
Berger & Montague, P.C.
1622 Locust Street
Philadelphia, PA  19103
krobinson@bm.net

Jeffrey G. Huvelle

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| _____ | ) | |
| | ) | |
| | ) | |
| **MICHAEL BARHAM, JOHN CRAWFORD,** | ) | |
| **FREDDIE MOULTRIE, MONICA SMITH,** | ) | |
| **MARK SPRADLEY, PAUL WATKINS, and** | ) | |
| **SEAN WINTZ** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Civil No. 07-CV-00853-RMU** |
| **v.** | ) | |
| | ) | |
| **UBS FINANCIAL SERVICES INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

**[PROPOSED] ORDER**

Upon consideration of Defendant's Motion To Transfer Case to the District of Maryland, and all other materials submitted in support and in opposition, IT IS ORDERED THAT:

Defendant's Motion is GRANTED.

This action shall be transferred to the District of Maryland (Greenbelt Division).

ALL OF THE ABOVE IS SO ORDERED.

Dated: _____       _____
Honorable Ricardo M. Urbina
United States District Court Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ) | |
| ) | |
| ) | |
| **MICHAEL BARHAM, JOHN CRAWFORD,** ) | |
| **FREDDIE MOULTRIE, MONICA SMITH,** ) | |
| **MARK SPRADLEY, PAUL WATKINS, and** ) | |
| **SEAN WINTZ** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) **Civil No. 07-CV-00853-RMU** | |
| **v.** ) | |
| ) | |
| **UBS FINANCIAL SERVICES INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS MOTION
## TO TRANSFER CASE TO THE DISTRICT OF MARYLAND

Of Counsel:

Claudia Cohen, Esq.
Executive Director and Senior Associate
General Counsel
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086-6791

Dated:  June 7, 2007

Eric H. Holder, Jr. (303115)
Jeffrey G. Huvelle (227769)
Thomas S. Williamson, Jr. (217729)
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000

*Attorneys for Defendant*
 *UBS Financial Services Inc.*

Defendant UBS Financial Services Inc. ("UBSFS") has moved to transfer this case to the United States District Court for the District of Maryland (Greenbelt Division), in Prince George's County. That District is the more appropriate venue for three reasons. First, all seven plaintiffs worked in UBSFS' branch office in Largo, Maryland. Their common claim – and the only claim that five of them assert – is that UBSFS unlawfully discriminated against them on the basis of race while they worked in Largo. Second, a "closely related" case filed against UBSFS by two of plaintiffs' co-workers in the Largo Branch has been pending before Judge Peter J. Messitte in the District of Maryland since early 2006. The Maryland case was brought by the same eleven lawyers/four law firms that represent plaintiffs in this action, and familiarity with the issues in the Maryland case will be necessary for the resolution of many of the issues that will arise in this case. Third, this suit has only a tenuous connection to the District of Columbia. Five of the seven plaintiffs make *no* claim that they were subjected to any racial discrimination while working in the District of Columbia, and only two of the plaintiffs live in the District of Columbia. It therefore would serve the interests of justice and avoid a wasteful duplication of judicial resources if this case were transferred to the District of Maryland.

## **BACKGROUND**

Plaintiffs Michael Barham, John Crawford, Freddie Moultrie, Monica Smith, Mark Spradley, Paul Watkins, and Sean Wintz are seven African-Americans who formerly worked as Financial Advisors in a UBSFS retail brokerage branch office in Largo, Maryland. They bring this action under the Civil Rights Act of 1866, 42 U.S.C. § 1981, and allege that UBSFS unlawfully discriminated against them on the basis of their race.

The facts relevant to this venue motion are as follows:

**The Maryland Connection**.  All seven plaintiffs worked for UBSFS in Largo, Maryland.  All seven claim that they were subjected to racial discrimination while working in UBSFS' Largo Branch.  In describing the "Nature of the Action," the Complaint focuses almost exclusively on the establishment, operation, and staffing of the Largo office.  (*Barham* Compl. ¶ 1.)

Plaintiffs allege that Prince George's County, where Largo is located, has a "sizeable African-American population."  (*Id.* ¶ 23.)  An African-American was the Branch Office Manager in charge of the Largo Branch, which UBSFS established in November 2000, and plaintiffs allege that UBSFS concentrated on recruiting African-American Financial Advisors to staff that office.  (*Id.* ¶¶ 21, 23.)  According to plaintiffs, "UBSFS decided to create the Largo Diversity Office as a separate 'ethnic' office" because of its alleged view that "African American Brokers were best suited to attract African American clients, while Caucasian Brokers were best suited to attract Caucasian clients."  (*Id.*)  Plaintiffs further allege that "the level of technical and support services routinely provided to UBSFS offices staffed primarily by Caucasian Brokers were not made available to the Largo" Branch Office (*id.* ¶ 1), and the "unequal treatment" received by five of the seven plaintiffs at the Largo office led to their termination, "including [p]laintiffs Crawford, Moultrie and Wintz," who were "terminated on or around the time of the [Largo] office closing" in mid-2003 (*id.* ¶¶ 33, 53, 59, 64, 79, 85).  Only two of the plaintiffs (Barham and Spradley) continued to work for UBSFS after the Largo Branch was closed.

Four of the seven plaintiffs (Moultrie, Smith, Spradley, and Watkins) reside in Maryland.  (*Id.* ¶¶ 4-7.)

**The Related Action in the District of Maryland**.  Two of plaintiffs' co-workers in Largo, Freddie Cook and Sylvester Fleming (hereinafter, the "Maryland litigants"), have been litigating essentially the same claim in the District of Maryland for more than one year.  *Cook v. UBS Financial Services, Inc.*, No. 06-cv-803-PJM.  That litigation, which is far advanced, is "closely related" to the *Barham* action.

The Maryland litigants initially filed suit against UBSFS for racial discrimination in late 2005 in the Southern District of New York.[1]  In March 2006, Judge Sidney Stein of the Southern District transferred the *Cook* case to the District of Maryland, Greenbelt Division.  As Judge Stein explained, he granted UBSFS' motion in part because "Maryland ha[d] a … substantial connection to the dispute … because *most of the events at issue occurred there*."  *Cook v. UBS Fin. Servs., Inc.*, No. 05 Civ. 8842(SHS), 2006 WL 760284, at *6 (S.D.N.Y. Mar. 21, 2006) (emphasis added).  Since that time, the case has been pending before Judge Messitte.[2]

The Maryland litigants are represented by the same eleven lawyers/four law firms that represent the *Barham* plaintiffs.  As a comparison of the complaints in the *Barham* and *Cook* actions demonstrate, the core claims of the two Maryland litigants – like the core claims of the *Barham* plaintiffs – concern the actions of UBSFS in establishing, staffing and supporting the Largo Branch.  Indeed, a review of the complaints reveals the following, materially identical allegations:

- that the Largo Branch was referred to as a "diversity office" (*Barham* Compl ¶ 1; *Cook* Compl. ¶ 29);

---

[1]    A third plaintiff in the *Cook* case, Timothy J. Gandy, worked for UBSFS exclusively in Southern California.

[2]    Plaintiffs' Second Amended Complaint in the Maryland action is attached as Exhibit A to the Declaration of Jeffrey G. Huvelle ("Huvelle Decl."), filed herewith.

- that the managers of the Largo Branch were inexperienced (*Barham* Compl ¶¶ 1, 23; *Cook* Compl. ¶¶ 26, 34);

- that the Branch Office Manager of the Largo Branch was improperly designated a "producing manager" (*Barham* Compl ¶ 25; *Cook* Compl. ¶ 34);

- that the Largo Branch was improperly made a "satellite office" of, or "complexed" into, the D.C. office (*Barham* Compl. ¶ 23; *Cook* Compl. ¶ 27);

- that UBSFS assigned insufficient administrative ("CSA") support to the Largo Branch (*Barham* Compl ¶ 30; *Cook* Compl. ¶ 34);

- that UBSFS assigned too few individuals holding Series 8 licenses to the Largo Branch (*Barham* Compl ¶ 26; *Cook* Compl. ¶ 34);

- that UBSFS provided an inadequate marketing budget for the Largo Branch (*Barham* Compl ¶ 31; *Cook* Compl. ¶ 34);

- that UBSFS provided Financial Advisors in the Largo Branch insufficient training, mentoring and support (*Barham* Compl ¶ 29; *Cook* Compl. ¶ 31);

- that UBSFS closed the Largo Branch in June 2003 after assurances that it would not (*Barham* Compl ¶ 33; *Cook* Compl. ¶ 36); and

- that UBSFS continued to discriminate against certain Financial Advisors who transferred to UBSFS' D.C. Branch after the Largo Branch was closed (*Barham* Compl. ¶¶ 34-35; *Cook* Compl. ¶¶ 37-38.).[3]

Discovery in the Maryland case has necessarily addressed the factual issues raised in the *Barham* action. All of the managers identified in the *Barham* action as allegedly responsible for the claimed discrimination have already been deposed in the Maryland action. (Huvelle Decl., ¶ 3.) All but one of the seven *Barham* plaintiffs has been deposed as a witness in

---

[3]    Indeed, to the extent that there are differences between the allegations of the *Barham* and *Cook* complaints regarding the Largo Branch, it is due to the fact that the plaintiffs' counsel have apparently refined their allegations using discovery materials from the *Cook* case. The fact that some of the materials relied upon by counsel in drafting the *Barham* Complaint may be covered by a Protective Order issued by Judge Messitte in the *Cook* action, which prohibits the use of confidential materials outside of that case, is an example of the inter-relationship between the two lawsuits. (*See* Huvelle Decl., Ex. B.)

the Maryland action.  (*Id.*, ¶ 4.)  (The one exception is Spradley, who failed to appear for his deposition although Mr. Whinston, his attorney in both the Maryland litigation and this case, had accepted service of a subpoena on his behalf.  (*Id.*))  UBSFS has produced over 110,000 pages of documents to plaintiffs in the Maryland case – a large number of which will be the same documents that will be subject to discovery in the *Barham* case.[4]  (*Id.*, ¶ 5.)

Judge Messitte has been actively involved in the management of the Maryland case, issuing orders relating to scheduling, discovery, the confidential treatment of documents and amendments to the complaint.  Fact discovery in the case, according to the Court's scheduling order, has closed.[5]  One summary judgment motion is fully briefed and scheduled for argument on June 18, 2007; additional summary judgment motions will be filed shortly. (Huvelle Decl., ¶ 6.)

On May 24, 2007 (just 16 days after this action was filed), the Maryland litigants filed a motion to transfer Cook and Fleming's claims to this Court on the basis of the pendency of this action.  In support of their motion, they argued that

> The *Barham* action is *closely related* to the present [*Cook*] action because it is brought by African-Americans who worked as Brokers in UBSFS' Largo or Washington office during the same time period as Mr. Cook and Mr. Fleming, and who assert similar claims to Plaintiffs Cook and Fleming regarding racial segregation, and discrimination in compensation, support, and termination…. [T]hese related cases raise *similar issues of fact and law*….

---

[4]    After the Maryland litigants dropped their class allegations, Judge Messitte ordered them to return confidential documents produced by UBSFS that were relevant only to their class claims.  They have, however, not yet done so.  *See* Huvelle Decl. ¶ 5.

[5]    *See* Huvelle Decl., ¶ 9 & Ex. D.  By agreement a few depositions of fact witnesses were not completed until after the cut-off date set in the scheduling order.  Only the Spradley deposition (see above) remains to be done.

(Huvelle Decl., Ex. C, p. 18 (emphasis added).)   UBSFS intends vigorously to oppose this blatant, and hopelessly belated, attempt at forum shopping.   Having litigated their claims in Maryland for over a year, and recognizing that the claims of the *Barham* plaintiffs are closely related to the Maryland claims, counsel should have filed the *Barham* action in Maryland.   The Maryland litigants' transparent boot-strapping effort likely will be rejected by the District of Maryland because that case has proceeded before Judge Messitte for well over a year and because, like the Complaint in this case, Cook and Fleming's claims relate almost exclusively to events that occurred in Largo, Maryland.

**The Tenuous Connection to the District of Columbia**.   Only two of the seven plaintiffs (Barham and Crawford) reside in D.C.   (*Compare Barham* Compl. ¶¶ 2-3, *with id.* ¶¶ 4-8.)   Only two of the plaintiffs (Barham and Spradley) allege that they were discriminated against by UBSFS while employed in its D.C. Branch Office.   (*Compare id.* ¶ 34, *with id.* ¶¶ 3-5, 7-8, 33.)   Indeed, none of the other five plaintiffs worked in UBSFS' D.C. office after the Largo Branch Office was closed in mid-2003.   (*See id.* ¶¶ 3-5, 7-8.)   Thus, a majority of the plaintiffs neither live in D.C. nor allege that UBSFS discriminated against them while they were employed in D.C.

Moreover, plaintiffs' allegation that "all significant decisions regarding hiring, firing, managing and financing of the [Largo] office were made, approved, and/or imposed by management in the D.C. office" (*Barham* Compl. ¶ 23) is belied by facts established in the Maryland action, including the *Barham* plaintiffs' own testimony.[6]   The Largo Branch Office Manager, Brad Carson, was located in the Largo Branch and spent 80%-85% of his time

---

[6]     *See e.g.*, Huvelle Decl., Ex. G (Moultrie Tr. 44-46); *id.* Ex. H (Crawford Tr. 46-48); *id.* Ex. I (Smith Tr. 30-31); *id.* Ex. J (Barham Tr. 40-41).

managing the daily operations that branch.  (Huvelle Decl., Ex. E (Carson Tr. at p. 103)).  Mr.

Carson was the person responsible for, among other things, recruiting Financial Advisors to the

Branch.  (*Id.* (p. 34)).  Indeed, it was he who, for instance, extended Cook and Fleming their

offers of employment.  (*Id.* (pp. 76-77)).  He was also the person with ultimate responsibility for

hiring administrative staff for the Largo Branch.  (*Id.*, Ex. F (Magruder Tr. at p. 69).)  Moreover,

Mr. Carson was the responsible for the "allocat[ion] of available accounts at Largo when an FA

left the firm" (*id.* (p. 96)); "overseeing the training process at Largo" (*id.* (p. 100)); and

establishing and managing the finances and expenses of the Largo Branch (*id.*, Ex. K (Cook

Interrogatory No. 5)).[7]

## **ARGUMENT**

Because they raise the same core claims, the *Barham* litigation will cover the

same ground as the Maryland litigation and will require familiarity with the positions taken by

the parties in the Maryland action and the rulings of the court in the Maryland action.  Transfer

of the *Barham* action to the District of Maryland will avoid a needless duplication of judicial

resources.  Moreover, the majority of the *Barham* plaintiffs reside in Maryland, and their core

claims relate to events that occurred in Maryland.  These factors *strongly* support a transfer in

this case.

---

[7]    It is true that, as a Resident Branch Office Manager, Mr. Carson reported to a Complex
Manager, in this case Coe Magruder, who was located in D.C., rather than directly to a Regional
Manager.  (*See* Huvelle Decl., Ex. E (Carson Tr. 88-89).)  However, it is neither surprising nor
significant that the plaintiffs' immediate supervisor, Mr. Carson, himself reported to another
individual higher up the corporate ladder, who needed to approve certain of his decisions.  *Cf.*
*Robinson v. Potter*, No. Civ. A 04-0890, 2005 WL 1151429, at *4 (D.D.C. May 16, 2005)
(observing, in context of Title VII's venue provision, that it is not enough to claim that acts
occurring in D.C. "had an impact" when plaintiff worked in Maryland and the locus of his claims
was Maryland).  The significant fact is that virtually all of the employment decisions relating to
the plaintiffs were made, at least in the first instance, by Mr. Carson, in Largo.

**I.      The Court Should Exercise Its Discretion To Transfer This Case to Maryland.**

This Court "may transfer any civil action to any other district or division where it might have been brought" for "the convenience of parties and witnesses, in the interest of justice."  28 U.S.C. 1404(a).  Thus, under the discretionary venue statute, a defendant seeking a transfer must first establish that venue would be proper in the transferee jurisdiction.  Here, venue is plainly proper in Maryland under the general venue statute, 28 U.S.C. 1391, which governs the *Barham* plaintiffs' Section 1981 claims.[8]

Under the general venue statute, venue is proper where "a substantial part of the events or omissions giving rise to the claim occurred" or where the "defendant resides."  28 U.S.C. § 1391(b).  A corporate defendant resides "in any judicial district in which it is subject to personal jurisdiction."  *Id.* § 1391(c).  A substantial part of the events giving rise to plaintiffs' claims occurred in Largo since all seven of them worked for substantial periods of time for UBSFS in its Largo Branch Office, and all seven allege that they were discriminated against while employed in that Branch.  Moreover, UBSFS is plainly subject to personal jurisdiction in Maryland because it does business there.

In addition to showing that venue is appropriate in the transferee jurisdiction, a defendant moving to transfer a case pursuant to Section 1404 "must demonstrate that considerations of convenience and the interest of justice weigh in favor of transfer to th[e transferee] district."  *Johnson v. Lumenos, Inc.*, 471 F. Supp. 2d 74, 76 (D.D.C. 2007).  In making its determination whether to grant a transfer motion, Section 1404(a) "calls on the court

---

[8]      Although plaintiffs allege that venue is proper in this District pursuant to 42 U.S.C. § 2000e-5(f)(3) (*see Barham* Compl. ¶ 11), they do not bring claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and that statute's venue provision is therefore inapplicable to their claims.

to weigh a number of case-specific private and public-interest factors." *Id.* The balance of these public and private-interest factors weighs decisively in favor of a transfer of the *Barham* case to the District of Maryland.

A.     **The Public Interest Factors Strongly Support the Transfer of This Action.**

The public interest factors in this case weigh strongly in favor of a transfer. Where one court "is more familiar with the same parties and issues or related issues than other courts," this fact weighs heavily in favor of a transfer.  *See Weinberger v. Tucker*, 391 F. Supp. 2d 241, 245 (D.D.C. 2005).  "In fact, courts have occasionally called the existence of related litigation, in light of the need for fair and efficient administration of justice, 'the most compelling factor in determining the appropriateness of transfer.'"  *Boisjoly v. Morton Thiokol, Inc.*, Civ. A. No. 87-0194, 1987 WL 11217, at *2 (D.D.C. May 14, 1987) (citation omitted).  As the Supreme Court has emphasized, "[t]o permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that section 1404(a) was designed to prevent."  *Continental Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960).

The related litigation in Maryland – involving the same defendant, the same counsel and the same issues – has been pending in the District of Maryland for more than a year. It too centers largely on alleged discrimination in establishing, staffing, supporting, and closing the Largo Branch Office.  The Maryland Court has made a number of substantial rulings, and will soon be addressing several summary judgment motions.  This case, by contrast, has not progressed beyond the filing of the Complaint.  *See Johnson*, 471 F. Supp. 2d at 78 (noting that where a case "has not evolved past the earliest stages of litigation ... the proposed transfer would not unduly delay the case's progress").  Whether it be this Court or Judge Messitte in the District of Maryland, the decision-maker in the *Barham* litigation will need to take account of the rulings

in the Maryland case.  The efficient use of judicial resources therefore requires the transfer of this case to the District of Maryland.

Another important public interest factor – "the local interest in deciding local controversies at home," *Johnson*, 471 F. Supp. 2d at 76 – also weighs heavily in favor of a transfer here.[9]  It is well-established that "controversies should be resolved in the locale where they arise."  *Payne v. Giant of Maryland, L.L.C.*, No. 05-897, 2006 WL 1793303, at *6 (D.D.C. June 28, 2006).  In *Devaughn v. Inphonic, Inc.*, for instance, this Court held that "the local interest factor … weigh[ed] in favor of transfer to Maryland" in large part because the plaintiff's allegations involved "discriminatory practices that occurred at the defendant's office in Largo, Maryland."  403 F. Supp. 2d 68, 73-74 (D.D.C. 2005).  Here, too, the gravamen of plaintiffs' claims relates to alleged discrimination that allegedly occurred in UBSFS' Largo Branch.

With respect to five of the seven plaintiffs, their claims relate *only* to their employment by UBSFS in Maryland.  And, according to the Complaint, the claims of the two plaintiffs who allege that they were also discriminated against while employed by UBSFS in D.C. are largely derivative of their Largo-related claims.  (*See Barham* Compl. ¶ 35 ("Plaintiffs Barham and Spradley continued to suffer from the stigma of being labeled as Brokers who had worked in the Largo Diversity Office" after transferring to UBSFS' D.C. Branch.).)  Moreover, insofar as a jurisdiction has a local interest in adjudicating the claims of its residents, only two of the *Barham* plaintiffs reside in D.C., whereas four reside in Maryland (and five within the Fourth

---

[9]    Two other public interest factors – namely "the transferee's familiarity with the governing laws" and "the relative congestion of the calendars of the potential transferee and transferor courts," *Johnson*, 471 F. Supp. 2d at 76 – are not significantly implicated in this case.

Circuit).  Thus, Maryland has a much stronger local interest in resolving this dispute than does D.C.

In sum, the public interest factors point unequivocally in the direct of the District of Maryland and strongly support a transfer in this case.

B.     **The Private Interest Factors Also Support A Transfer.**

The private interest factors weigh strongly in favor of a transfer as well.  In this case, the most significant private interest factor relates to the fact that plaintiffs' "claim[s] arose elsewhere," *Johnson*, 471 F. Supp. 2d at 76 – to wit, in Largo, Maryland.  "Courts have often granted motions for transfer of venue where the circumstances giving rise to the controversy happened in the transferee forum."  *Payne*, 2006 WL 1793303, at *4.  Plaintiffs' claims relate to alleged discrimination that allegedly occurred in UBSFS' Largo Branch Office, as is demonstrated by the fact that the *Barham* Complaint contains 65 separate references to Largo. With respect to five of the seven plaintiffs, their claims relate *only* to their employment by UBSFS in Maryland.  The claims of all seven plaintiffs therefore relate primarily to events that arose elsewhere, and the claims of five of them relate *exclusively* to events that arose elsewhere. Thus, this private interest factor plainly supports UBSFS' transfer motion.

Most of the remaining private interest factors – which include "the convenience of the parties"; "the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora"; and "the ease of access to sources of proof," *Johnson*, 471 F. Supp. 2d at 76 – also fail to support retaining this case in D.C.  A number of local "courts have found that the close proximity of the Maryland courthouses to the District of Columbia minimizes any inconvenience to the parties or witnesses where a case is transferred from one venue to the other."  *Payne*, 2006 WL 1793303, at *5; *accord Weinberger*, 391 F. Supp. 2d at 245 ("Moreover, as defendant notes, '[t]ransferring this case to a court that sits less

than nine miles away, in a neighboring jurisdiction, will have minimal effect on witnesses, the availability of compulsory process, proximity to evidence and the other factors considered under § 1404(a).'").  Here, fewer than fifteen miles separate the Greenbelt Division of the District of Maryland from this Court.  The so-called 100-mile bulge rule, *see* Fed. R. Civ. P. 45(b)(2), is sufficient to ensure that any D.C. witness who would be subject to this Court's subpoena power would also be subject to a subpoena to appear at trial in the Greenbelt Division.  In any event, plaintiffs cannot credibly point to any witness who would be available to them in D.C. but unavailable to them in Maryland.

Indeed, the only private interest factor that might support retaining this case is that D.C. is plaintiffs' choice of forum.  "While courts normally defer to the plaintiff's choice of forum, courts afford 'substantially less deference' to that choice where the plaintiff is not a resident of that forum or where the claims lack substantial connections to that forum." *Devaughn*, 403 F. Supp. 2d at 72.  Here, five of the seven plaintiffs' claims have *no connection* to D.C., and none of their claims is as substantially connected to D.C. as to Maryland.

Moreover, "numerous cases in this Circuit recognize that [plaintiffs' forum] choice receives substantially less deference where plaintiffs ... neither reside in, nor have any substantial connection to, that forum." *DeLoach v. Philip Morris Cos., Inc.*, 132 F. Supp. 2d 22, 24 (D.D.C. 2000); *accord Weinberger*, 391 F. Supp. 2d at 245 ("'substantially less deference' is warranted where … the transferring court is not plaintiff's home forum").  Deference to plaintiffs' choice of forum is also "substantially diminished where ... transfer is sought to the forum where plaintiffs reside." *Citizen Advocates for Responsible Expansion, Inc. v. Dole*, 561 F. Supp. 1238, 1239 (D.D.C. 1983).  Here, only two of the plaintiffs reside in D.C., and four of

them reside in Maryland.  The choice-of-forum factor, therefore, does not outweigh all of the other factors strongly supporting a transfer to the District of Maryland in this case.

In sum, this case and the Maryland action are, in plaintiffs' counsels' own words, "closely related," involving "similar issues of law and fact."  This Court should reject the suggestion that this Court, rather than the District of Maryland, is the appropriate location for any such consolidated action.  First, while this case has for all intents and purposes not yet begun, the Maryland action has been in active litigation for well over a year.  During this time fact discovery has essentially been completed, motions to compel have been decided, and one of defendant's summary judgment motions has been fully briefed.  Second, even in the absence of the Maryland action, the focus of the *Barham* Complaint is squarely on UBSFS' Largo Branch, where all seven plaintiffs worked.  The fact that two of the seven plaintiffs also worked for a time in UBSFS' D.C. Branch Office is simply too slender a reed on which to support venue in D.C. over this seven-plaintiff action.

## CONCLUSION

For the foregoing reasons, the Court should grant UBSFS' motion and transfer this case to the District of Maryland (Greenbelt Division).

Respectfully Submitted,

Of Counsel:

Claudia Cohen, Esq.
Executive Director and Senior Associate General Counsel
UBS Financial Services Inc.
1200 Harbor Boulevard
Weehawken, New Jersey 07086-6791

Dated:  June 7, 2007

/s/  Jeffrey G. Huvelle
Eric H. Holder, Jr. (303115)
Jeffrey G. Huvelle (227769)
Thomas S. Williamson, Jr. (217729)
Covington & Burling LLP
1201 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2401
(202) 662-6000

*Attorneys for Defendant
  UBS Financial Services Inc.*