UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL BARHAM, JOHN CRAWFORD, FREDDIE MOULTRIE, MONICA SMITH, MARK SPRADLEY, PAUL WATKINS, and SEAN WINTZ, ) ) ) ) | Civil No. 07-CV-00853-RMU |
| Plaintiffs, ) | (ECF) |
| ) | |
| v. ) | |
| ) | |
| UBS FINANCIAL SERVICES, INC., ) | |
| ) | |
| Defendant. ) | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO TRANSFER TO THE DISTRICT OF MARYLAND**

Pursuant to 28 U.S.C. § 1391(b) and § 1404(a), Plaintiffs Michael Barham, John Crawford, Freddie Moultrie, Monica Smith, Mark Spradley, Paul Watkins and Sean Wintz ("Plaintiffs"), by and through their counsel of record, hereby oppose Defendant UBS Financial Services, Inc.'s ("UBSFS") motion to transfer this case to the District of Maryland. Venue is proper in this District, and Defendant has failed to overcome its heavy burden of establishing that Plaintiffs' choice of forum is inappropriate and that transfer is necessary.

**I.    RELEVANT FACTS**

Plaintiffs are African-American former Financial Advisors or Financial Advisor Trainees (hereinafter "Brokers") of UBS Financial Services, Inc. ("UBSFS"), who are asserting claims of racial discrimination against UBSFS stemming from their employment with UBSFS. See Complaint ("Compl."), at ¶ 1. Three of the Plaintiffs worked as Brokers at UBSFS' branch office in Washington, D.C. ("Washington"), and all of the Plaintiffs worked at a satellite office of the Washington branch in Largo, Maryland. Id. They assert that the

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

company discriminated against them by assigning them to a racially segregated office, denying them compensation, career opportunities and professional support comparable to that provided to brokers in UBSFS' predominantly Caucasian branch offices, resulting in their termination or constructive discharge. Id. at ¶¶ 20-42. Plaintiffs allege that the establishment, structure, staffing, operation and closure of the Largo office, and staffing and operation of the Washington office, were discriminatory. Id. Plaintiffs bring their claims under 42 U.S.C. § 1981.

The District of Columbia is a proper venue for Plaintiffs' claims. As set forth more fully below, the decision to open the Largo office was made in Washington. Key decisions regarding the establishment, structure, staffing, operation and closure of the Largo office were made by managers based in Washington. The authorization to hire each of the Plaintiffs occurred in Washington. Furthermore, a number of the Plaintiffs worked for a period of time in Washington. Accordingly, under the venue standards for Section 1981 claims, the Plaintiffs' claims should remain in the District of Columbia.

The facts supporting venue in this District, include the following:

A.    **The decision to open the Largo office**.

Coe Magruder, the Branch Office Manager of UBSFS' Washington, D.C. office,[1] conceived the idea of opening a new office in Prince George's County, Maryland, to among other things, target a "minority population" living in the area. Pavsner Exh. 1 (Coe Magruder ("Magruder") Dep. Trans., at 12:11-14:7)[2]; Pavsner Exh. 3 (William Kennedy ("Kennedy")

---

[1]    The Washington office, where Mr. Magruder was based, was located on "K" Street, in Washington, D.C.

[2]    All depositions cited in this memorandum were taken in Cook et al., v. UBS

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane • Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

Dep. Trans., at 56:4-58:25). Mr. Magruder proposed to his supervisors, Raymond McClure and William Kennedy, that the company open such an office in Maryland. Id. At the time, the offices of Mr. McClure and Mr. Kennedy were located in Washington, D.C., and Weehawken, NJ, respectively. Id.; Pavsner Exh. 2 (Declaration of Coe Magruder ("Magruder Decl.") at ¶ 3. Mr. Magruder drafted a detailed written proposal regarding the opening of a new office and submitted it to these managers for approval. Pavsner Exh. 2 (Magruder Decl. at ¶ 4). Mr. McClure and Mr. Kennedy gave Mr. Magruder final approval to open the new office. Pavsner Exh. 2 (Magruder Decl. at ¶ 5); Pavsner Exh. 3 (Kennedy Dep. Trans., at 58:21-25). There is no evidence that any aspect of the decision to open the new office occurred in Maryland.

### B. The structure of the new office.

Mr. Magruder then proceed to set up and staff the new office, which was based in Largo, Maryland. All significant decisions regarding the structure, staffing and operation of new office were made by Mr. Magruder and other managers in his Washington office. Mr. Magruder (or Mr. Kennedy) decided that the new office would be a "satellite" office of the Washington branch, meaning that the new office was not independent but rather was tied to Mr. Magruder's branch and fell under Mr. Magruder's responsibility. Pavsner Exh. 3 (Kennedy Dep. Trans., at 46:4-48:13); Pavsner Exh. 4 (Magruder Decl. at ¶ 6). As a result, the Largo office did not have its own budget, but was instead subsumed within Mr. Magruder's budget for the Washington office. Pavsner Exh. 3 (Kennedy Dep. Trans., at 46:4-

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

---

Financial Services, Inc., No. 8:06-00803-PJM (D. Md. 2006) (hereinafter, "Cook"). The Magruder transcript has been redacted to prevent the disclosure of any information marked "confidential".

48:13); (Pavsner Exh. 4    (Bradford Carson ("Carson") Dep. Trans., at 88:2-89:8)).

Furthermore, Mr. Magruder was responsible for securing office space for the new office,

paying employee salaries and benefits. Pavsner Exh. 3 (Kennedy Dep. Trans., at 46:4-48:13).

As Mr. Kennedy testified:

> Q   Okay.  You had mentioned the term "satellite office", correct?
> A   Yes.
> Q   And what does the term "satellite office" mean?
> A   An offshoot of a bigger office.
> Q   Was the Largo office a satellite office?
> A   Yes.
> Q   And which large office was the Largo office a satellite office of?
> A   Washington, D.C.
> Q   Why was the Largo office a satellite office of the Washington, D.C.
> office?
> [***]
> A   It was a satellite because it was a small branch, and the way -- I'm not
> speaking
> specifically about Washington, but the way you start a new branch in a lot of
> cases is that you support it through a bigger branch, and that's what was
> happening in Washington.
> Q   Okay.
> A   Financial support.
> Q   Who made the determination that the Largo office would be a satellite of
> the
> Washington, D.C. branch?
> A   I don't recall, frankly, whether it was me or Coe that wanted to do it that
> way.
> Q   But it was definitely yourself or either Mr. Magruder that made that
> determination?
> A   Yes.
> Q   You told me some of the factors that went into the classification of a
> branch
> as a satellite branch, one of them being financial support from the larger office;
> is
> that correct?
> A   That's correct.
> Q   Typically, what kind of financial support would the larger office provide
> to a
> satellite office?
> A   Pay the rent, pay the salaries, pay the benefits.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

4

Id. at 46:14-48:13.

Yet Mr. Magruder failed to provide adequate support to the Largo office and its employees. Compl. at ¶¶ 27-31. Pavsner Exh. 9 (Freddie Moultrie ("Moultrie") Dep. Trans., at 106:11-107:9, 132:15-133:22). UBSFS has presented no evidence that decisions regarding policies, procedures or budgeting for the new office were made in Maryland.

### C.    Staffing the new office.

Mr. Magruder made a number of key decisions regarding assigning employees to the Largo office. He played a key role in staffing the Largo office almost entirely with African-American employees. Pavsner Exh. 1 (Magruder Dep. Trans at 49:17-52:16, 56:18-57:12). Mr. Magruder selected an African-American Broker who was working in the Washington office, Bradford Carson, to be the "manager" of the Largo office. Pavsner Exh. 4 (Carson Dep. Trans., at 33:11-16). However, Magruder's authorization was required to hire or assign Brokers to the satellite office. Pavsner Exh. 4 (Carson Dep. Trans., at 47:13-48:19, 88:2-89:8); Pavsner Exh. 9 (Moultrie Dep. Trans., at 134:20-137:12). As Mr. Magruder testified:

> Q.    Who was responsible for recruiting FAs and NFAs[3] to come work at Largo?
> A.    Brad Carson.
> Q.    And did you play any role in that recruitment process?
>        Yes. Before the office opened, Brad and I recruited more or less jointly.
>
>        We would both go in different directions, and if I had somebody I wanted
>
>        him to meet, I would set up the second meeting with Brad and the same for Brad. Once the office was opened, Brad took over the responsibility for
>
>        recruiting existing producers and trainees. And then when he had

---

[3]    "FAs" refers to Financial Advisors and "NFAs" refers to New Financial Advisors or Financial Advisor Trainees.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

> Q.    somebody he was interested in, he would -- after he had gotten a
> number of meetings down the road and he determined he's interested
> and they're interested, then he would have me get involved.
> [***]
> Q.    Did Mr. Carson have the authority to hire a financial advisor without
> getting your okay?
> A.    As a trainee?
> Q.    Okay, let's say as a trainee.
> A.    No.  At that point in time, he would have had to come to me for both.
> Q.    For both financial advisor and financial advisor trainee, he needed your
> okay?
> A.    Correct.

Pavsner Exh. 1 (Magruder Dep. Trans., at 56:18-57:12, 235:22-236:8).

Thus, from his Washington office, Mr. Magruder authorized the hiring or assignment

of a number of employees to the satellite office, including all the Plaintiffs.  Pavsner Exh. 4

(Carson Dep. Trans., at 58:11-16. 64:10-15, 66:3-8).

Mr. Magruder was also directly responsible for selecting inexperienced or unqualified

supervisory staff for the Largo office.  Pavsner Exh. 1 (Magruder Dep. Trans at 49:17-52:16,

56:18-57:12).  For example, Mr. Magruder assigned Mr. Carson to be "manager" of the

satellite office even though Mr. Carson had no prior experience managing Brokers.  Pavsner

Exh. 1 (Magruder Dep. Trans., at 40:6-42:4);  (Pavsner Exh. 5 (Cook Decl. at ¶ 9); Pavsner

Exh. 9 (Moultrie Dep. Trans., at 73:20-77:14).

Mr. Magruder hired David Weber to be the Sales Manager of the Largo office, even

though Mr. Weber did not have, and never obtained, the NASD Series 8[4] license necessary for

him to supervise Brokers.  Pavsner Exh. 1 (Magruder Dep. Trans at 49:17-52:16); Pavsner

Exh. 6 (David Weber ("Weber") Dep. Trans., at 43:17-44:20, 151:4-6).  As a result, for a

---

[4]     Also known as the Series 9 and 10.

Joseph
Greenwald
& Laake

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

significant period of time, there were an insufficient number of Series 8 license holders based in the Largo office, which impeded the ability of Plaintiffs to perform their work duties. Compl. at ¶ 26; Pavsner Exh. 1 (Magruder Dep. Trans at 55:3-56:17).  Managers based in the Washington office, such as Janice Lytle, frequently had to provide the Series 8 approval necessary for the Largo Brokers to conduct business.  Pavsner Exh. 7 (Janice Lytle ("Lytle") Dep. Trans., at 137:4-138:4, 146:1-147:3; 149:4-11); Pavsner Exh. 8 (John Crawford ("Crawford") Dep. Trans., at 90:7-15).

Mr. Magruder assigned Debbie Pittman to the position of Operations Manager of the satellite office even though she had no previous experience as an Operations Manager. Pavsner Exh. 1 (Magruder Dep. Trans., at 47:5-48:12); Pavsner Exh. 4 (Carson Dep. Trans., at 101:20-102:11).  Ms. Pittman's lack of experience resulted in her not providing adequate support to certain Plaintiffs, which detrimentally affected their working conditions.  Pavsner Exh. 8 (Crawford Dep. Trans., at  77:17-78:1).   By contrast, UBSFS has presented no evidence that the decision to hire or transfer any supervisor was made in Maryland.

**D.    The decision to close the Largo office.**

Mr. Magruder was the principal advocate of the decision to close the Largo office. Pavsner Exh. 1 (Magruder Dep. Trans at 121:5-127:9).  As he testified:

> Q.  Were you involved in the discussions about whether to close the Largo office?
> A.  Yes.
> Q.  And what was your role?
> A.  I was one of the central -- it was my responsibility.  I built it.  I was responsible for fixing it, stopping it, doing something.

Id. at 121:5-11.

In fact, Mr. Magruder personally informed the Plaintiffs and other Largo staff that the

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

7

office was closing in approximately June 2003. Compl. at ¶ 33; Pavsner Exh. 1 (Magruder Dep. Trans at 131:4-12). By contrast, UBSFS has presented no evidence that the decision to close the Largo office was made in Maryland.

Mr. Magruder continued to manage Plaintiffs Barham and Spradley, who were subsequently transferred to the Washington office when the satellite office closed. Mr. Spradley spent approximately twenty-six months of his tenure working in the Washington office, and Mr. Barham spent approximately six months working in the Washington office. Compl. at ¶¶ 2, 6. While they were in the Washington office, UBSFS subjected Mr. Barham and Mr. Spradley to a continuing course of discriminatory conduct that included showing preferential treatment to Caucasian Brokers, by, *inter alia*, favoring Caucasian Brokers with training and business opportunities, (Compl. at ¶ ¶ 38, 68-69); denying Mr. Barham and Mr. Spradley professional support, (Compl. at ¶¶ 38-39); treating them as a second-class individuals by conducting racially segregated Broker meetings and relegating them to the back of the lunch line, (Compl. at ¶¶ 35-37); perpetuating or permitting a racially hostile work environment, (Compl. at ¶¶ 35-42), failing to remedy the discriminatory employment conditions, (Compl. at ¶¶ 41-42), and terminating their employment with UBSFS. Compl. at ¶¶ 47, 73. Mr. Magruder had also managed Mr. Moultrie, who he hired to the Washington office. Pavsner Exh. 9 (Moultrie Dep. Trans., at 31:13-35:19). After approximately two months, Mr. Moultrie was transferred to the satellite office. Id. The Washington office remains in operation today.

## II.  ARGUMENT

### A.  Introduction.

**Joseph Greenwald & Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

The standards for considering a motion to transfer venue are well established. A court first analyzes whether a plaintiff's choice of venue is proper under the standards set forth in 28 U.S.C. §1391(b). If the plaintiff passes this test, the court then moves to an analysis of the appropriateness of a transfer under 28 U.S.C. §1404. See Devaughn v. Inphonic, Inc., 403 F.Supp.2d 68, 70-72 (D.D.C. 2005) (Urbina, J.); Johnson v. Lumenos, Inc., 471 F.Supp.2d 74, 76 (D.D.C. 2007) (Urbina, J.).

28 U.S.C. § 1391(b), which governs Plaintiffs' Section 1981 claims, provides that venue is proper in the district where the defendant resides or a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred. See 28 U.S.C. § 1391(b). A corporation is deemed to reside in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. See 28 U.S.C. § 1391(c); Devaughn, 403 F.Supp.2d 68, 70-72. The District of Columbia is a proper venue for the Plaintiffs' claims.

Section 1404(a) permits a court to transfer an action "to any other district where it could have been brought for the convenience of parties and witnesses, in the interest of justice[.]." Devaughn, 403 F.Supp.2d at 71 (internal quotations omitted). Accord, Johnson, 471 F.Supp.2d 74, 76. The party requesting transfer must show that private and public-interest factors weigh in favor of transfer. Id. The private interest factors include: (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum;  (3) whether the claim arose elsewhere;  (4) the convenience of the parties;  (5) the convenience of the witnesses, but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

9

access to sources of proof.  The public interest factors include:  (1) the transferee's familiarity

with the governing laws;  (2) the relative congestion of the calendars of the potential

transferee and transferor courts;  and (3) the local interest in deciding local controversies at

home.  Id.

UBSFS has failed to meet its heavy burden of establishing that Plaintiffs' choice of

forum is inappropriate and that transfer is necessary under 28 U.S.C. § 1404(a).

**B.    Venue is Proper in the District of Columbia.**

In the present case, venue is proper in the District of Columbia.  First, UBSFS resides

in the District of Columbia because at the time this lawsuit was filed (May 8, 2007), UBSFS

engaged in "continuous and systematic" business operations in the District of Columbia,

through its branch office located at 1501 K Street, N.W., Washington D.C.  Pavsner Exh. 2

(Magruder Decl. at ¶ 1-2).  See Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.

408, 415-16 (1984) (explaining that, where a defendant's contacts with the forum are

"continuous and systematic," the forum will have jurisdiction over any matter involving the

defendant).  At its Washington office, UBSFS employed a staff of approximately one hundred

(100) employees who provided retail brokerage services to the public.  Pavsner Exh. 7 (Lytle

Dep. Trans., at 71:3-10); Pavsner Exh. 1 (Magruder Dep. Trans., at 66:11-18).[5]

Second, essential events giving rise to Plaintiffs' claims occurred in the District of

Columbia, whereas none occurred in Maryland.  Courts have recognized that "there can be

---

[5]    UBSFS provides no support for its statement that Defendant is subject to
personal jurisdiction in Maryland.  See Defendant's Memorandum of Law ("Def. Memo."), at
9.  The Largo office has been closed since 2003.  UBSFS' bare-bones claim that it is "plainly
subject to personal jurisdiction in Maryland because it does business there", is not supported
by any citation to an accompanying affidavit or document. Id.

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

more than one district in which a substantial part of the events giving rise to the claim occurred". FC Investment Group LC v. Lichtenstein, 441 F.Supp.2d 3, 11 (D.D.C. 2006). In such a situation, "it is no longer appropriate to ask which district is the "best" venue, or which venue has the most significant connection to the claim[]. The proper question is "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts." Id. (citations omitted).

In the present case, the District of Columbia has a substantial connection to the claims. As set forth in Section I, supra, key events giving rise to Plaintiffs' claims occurred in the District of Columbia, including:

·      The decision to establish the Largo office to cater to minorities;

·      Key decisions regarding structure, staffing, operation and closure of the Largo office that Mr. Magruder made form the basis for Plaintiffs' claims of discrimination;

·      The authorizations to hire each of the Plaintiffs, to making it a segregated establishment;

·      The assignment of inexperienced or unqualified supervisory staff to the Largo office, including Mr. Carson, Mr. Weber and Ms. Pittman;

·      Managers responsible for or involved in supervising the Largo office and Plaintiffs' employment were based in Washington, including Mr. Magruder and Ms. Lytle;

·      Three of the Plaintiffs (Mr. Barham, Mr. Moultrie and Mr. Spradley) worked in Washington;

·      Key decisions regarding operation of the Washington office form the basis for

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

11

Plaintiffs' claims of discrimination.

In sum, a substantial part of the events giving rise to Plaintiffs' claims occurred in the District of Columbia.    By contrast, no significant decision was made in Maryland. Accordingly, venue is proper in the District of Columbia.

### C.    Defendant has not met its burden under § 1404(a), thus transfer of the case is not warranted.

The moving party "bear[s] a heavy burden of establishing that plaintiffs' choice of forum is inappropriate." Thayer/Patricof Educ. Funding, L.L.C. v. Pryor Resources, Inc., 196 F.Supp.2d 21, 31 (D.D.C. 2002).  UBSFS has not met this burden.

### 1.    Private Interest Factors.

a.    The Plaintiffs' choice of forum

The plaintiff's choice of a forum is "a paramount consideration" in any determination of a transfer request.  Thayer/Patricof Educ. Funding, 196 F.Supp.2d at 31.  A plaintiff's choice  is given "substantial deference" where the particular controversy has "meaningful ties to the forum, and the plaintiff is a resident of that forum".  Id.  See Green v. Footlocker Retail, Inc., No. Civ.A. 04-1875, 2005 WL 1330686 at * 1, 2 (D.D.C. 2005) (" Plaintiff's choice should rarely be disturbed unless the balance is strongly in favor of the defendant.").

As set forth in Section I, the Plaintiffs' choice of forum has meaningful ties to the controversy.  Numerous actions that took place in Washington form the basis of Plaintiffs' claims, key decision-markers were located in Washington, key decisions were made in Washington, and a number of the Plaintiffs worked in Washington.  In addition, two of the Plaintiffs, Michael Barham and John Crawford currently reside in the District of Columbia. Pavsner Exh. 10 (Michael Barham ("Barham") Dep. Trans., at 25:16-20); Pavsner Exh. 8

Joseph
Greenwald
& Laake

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

12

(John Crawford ("Crawford") Dep. Trans., at 6:14-18).  See The Wilderness Soc. v. Babbitt, 104 F.Supp.2d 10, 14-15 (D.D.C. 2000) (finding that plaintiffs' ties to the forum weighed against transfer where *some, although not all,* of the plaintiffs resided in the forum).  Also, UBSFS resides in Washington.  See Green, 2005 WL 1330686 at * 2 ("it cannot be argued that plaintiff's choice lacks any meaningful ties to the controversy, since plaintiff lives here and defendant does business here.").  As a result of these meaningful ties to the forum, and the fact that some of the Plaintiffs reside here, Plaintiffs' choice of forum is entitled to substantial deference.

      b.    Whether the claim arose elsewhere.[6]

As set forth in Section I, the activities that form the basis of this suit focus on discriminatory actions taken by Mr. Magruder and other managers located in UBSFS' Washington office.  These actions have a significant connection with the District of Columbia, therefore, UBSFS cannot credibly argue that venue is improper in this District. UBSFS' claim that a substantial part of the events giving rise to Plaintiffs' claims occurred in Largo is inaccurate, but even if true, would not justify the conclusion that venue is improper in the District of Columbia.  Courts have rejected similar arguments by a movant that because "major events" allegedly occurred elsewhere transfer was warranted:  "The court may not transfer simply because the court thinks another forum may be superior to plaintiff's chosen forum".  Green, 2005 WL 1330686 at * 2.  As the court stated in FC Investment Group LC , "[d]efendants' contention that the nucleus of facts giving rise to the claim occurred in Illinois, [] does not necessarily warrant the conclusion that venue is improper in the District of

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

--------------------------------------

[6]      With respect to Defendant's choice of forum, Defendant's reasons for wanting

Columbia.[...] [I]t is entirely proper for this Court to hear Plaintiffs' claim so long as they bear a substantial connection to the District of Columbia." Id. at 12 (citations and internal quotations omitted). Plaintiffs' claims arose in Washington and venue is proper in this District.

   c.    Convenience of the parties and witnesses.

Defendant has failed to show that Plaintiffs' choice of forum is clearly outweighed by other factors. "In order to demonstrate that it is necessary to transfer venue, a defendant must make a substantial showing that transfer is necessary." FC Investment Group LC, at 13. Regarding the convenience of the parties and witnesses, "a defendant must show that witnesses would be unwilling to testify in the [plaintiffs' chosen forum]." Id. at 14. UBSFS makes no showing of party or witness inconvenience, and misconstrues its burden to make an affirmative showing that transfer is *necessary*, by claiming that this factor "fail[s] to support retaining this case in D.C." Def. Memo., at 12. Absent such a showing by UBSFS, it is assumed that key witnesses will appear. FC Investment Group LC , at 14. Nor has UBSFS established any "particular hardship" in litigating this suit in the District of Columbia. The Wilderness Soc., 104 F.Supp.2d at 15. In fact, throughout its brief, UBSFS makes a number of arguments for transfer based on convenience that are accompanied by little-to-no evidentiary support. See Thayer/Patricof Educ. Funding, 196 F.Supp.2d at 33 ("[I]n connection with motions to transfer, courts should only consider undisputed facts supported by affidavits, depositions, stipulations or other relevant documents. ").

The reality is that the District of Columbia is a more convenient venue for the parties

Joseph
Greenwald
& Laake

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

the case transferred to Maryland are set out fully in its motion.

14

and witnesses. A number of key non-party witnesses live or work in the District of Columbia, including Mr. Magruder, (Pavsner Exh. 1 (Magruder Dep. Trans., at 7:14-19), Mr. Carson, (Pavsner Exh. 4 (Carson Dep. Trans., at 9:4-10:1), and Ms. Lytle, (Pavsner Exh. 7 (Lytle Dep. Trans., at 75:8-82:7). Furthermore, the locus of discovery in the Cook case has overwhelmingly been in the District of Columbia, which underscores the convenience of the District of Columbia as the venue for these claims. At Defendant's request, Mr. Cook and Mr. Fleming, and nine of the twelve key non-party witnesses deposed to date regarding Mr. Cook and Mr. Fleming's claims were deposed in the District of Columbia, namely Mr. Magruder, Mr. Carson, Ms. Lytle, Mr. Barham, Mr. Crawford, Mr. Moultrie, Ms. Smith, Mr. Watkins and Mr. Weber. Pavsner Exh. 1 (Magruder Dep. Trans., at 1); Pavsner Exh. 4 (Carson Dep. Trans., at 1); Pavsner Exh. 7 (Lytle Dep. Trans., at 1); Pavsner Exh. 10 (Barham Dep. Trans., at 1); Pavsner Exh. 8 (Crawford Dep. Trans., at 1); Pavsner Exh. 9 (Moultrie Dep. Trans., at 1); Pavsner Exh. 11 (Monica Smith "Smith") Dep. Trans., at 1); Pavsner Exh. 12 (Paul Watkins ("Watkins") Dep. Trans., at 1); Pavsner Exh. 6 (Weber Dep. Trans., at 1). Notably, not one single plaintiff or witness in the Cook case was deposed in Maryland. It is also noteworthy that the offices of defense counsel, Covington & Burling, are located in the District of Columbia. See Green, 2005 WL 1330686 at * 1, 2 (listing the "location of counsel" as one of the private and public interest factors considered by courts, and finding that "defendants fail to establish that a transfer would be significantly more convenient for their counsel".). In sum, UBSFS has not met its burden to show that the District of Columbia is an inconvenient forum for the parties and witnesses.

       d.     Ease of access to sources of proof.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

UBSFS does not contend that transfer of this case to Maryland would promote ease of access to sources of proof. By contrast, maintaining the case in this District would enable access to sources of proof. For example, UBSFS' existing Washington office will be a source of proof in this action, whereas the Largo office has been closed for almost four years. Pertinent documents, including documents regarding the Largo office and personnel files of Brokers employed in the Washington office, were maintained in the Washington office. See Exhibit C to Defendant's Motion to Transfer, at 16; Pavsner Exh. 7 (Lytle Dep. Trans., at 125:1-126:11). By contrast, UBSFS does not point to any documents located in Maryland. Also the jury will be able to view the Washington office, the locus of many of the acts underlying Plaintiffs' claims. Based on these factors, UBSFS has not met its burden to transfer venue from the District of Columbia.

### 2.    Public Interest Factors[7]

#### a.    Local interest in deciding local controversies at home.

The local interest of the District of Columbia is served by maintaining venue here. As explained above, Plaintiffs' choice of forum has meaningful ties to the controversy because of actions that took placed in Washington, a number of the Plaintiffs worked in this District, and a number of the Plaintiffs reside in this District.

#### b.    Related litigation.

UBSFS attempts to make much of the fact that the Cook case is pending in the District

---

[7]    Plaintiffs agree that the transferee court's familiarity with the governing laws, and the relative congestion of the calendars of the potential transferee and transferor courts, are factors which are not significantly implicated in this case. See Def. Memo., at 9.

Joseph
Greenwald
& Laake

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

of Maryland, however, such attention is misplaced.  First, Judge Stein's venue ruling in <u>Cook</u>

addressed whether  New York or Maryland was the proper venue for the claims; he did not

rule on whether the District of Columbia was a proper venue for the case.  Pavsner Exh. 13

(Opinion and Order of Sidney H. Stein, dated March 21, 2006, at 5-10).  Moreover, Judge

Stein found that "unlawful employment practices alleged in the Complaint [...] occurred in

Maryland *and Washington, D.C.*".  <u>Id</u>. at 6 (emphasis added).  This lends further support to

the conclusion that venue is proper in the District of Maryland.

Second, the fact that the <u>Cook</u> case was filed before the <u>Barham</u> case does not mean

that transfer is necessary.  In <u>Thayer/Patricof Educ. Funding</u>, the court  rejected defendant's

argument that because they first-filed the case in an alternate court, equitable considerations

of comity and the efficient administration of justice warranted transferring the second suit to

the venue of the first.  <u>See</u> <u>Thayer/Patricof Educ. Funding</u>, 196 F.Supp.2d at 29.  The court

stated, "[t]he first-filed rule is not rigidly or mechanically applied", and emphasized that the

plaintiff's choice of forum must be given proper weight and "cannot be dismissed merely

because defendants opt for a different forum."  <u>Id</u>. at 30.  Furthermore, although UBSFS

claims that the <u>Cook</u> Court has made a number of "substantial rulings", (Def. Memo., at 10),

Defendant does not cite to any specific rulings made by the Court or provide any supporting

documents.  This is because no substantial ruling has been issued to date. The only rulings

made in Maryland to date are: (1) an order granting plaintiffs' request to dismiss the class

allegations without prejudice, (2) an order granting defendant's motion to compel production

of the plaintiffs' tax returns, and (3) an order dismissing plaintiffs' motion to compel without

prejudice, instructing the parties to meet and confer regarding outstanding discovery and

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

17

extension of the discovery deadline. Pavsner Exh. 14 (Memorandum Order, dated April 23, 2007); Pavsner Exh. 15 (Memorandum Order, dated May 22, 2007); Pavsner Exh. 16 (Memorandum Opinion and Order, dated May 29, 2007). Contrary to UBSFS' assertion, a number of depositions remain to be taken, and fact discovery continues in the <u>Cook</u> case. Thus the <u>Cook</u> plaintiffs anticipate proposing an extension of the discovery deadline. Also, the <u>Cook</u> plaintiffs have moved to transfer the claims of Mr. Cook and Mr. Fleming to this District. Accordingly, given the few and limited rulings made in <u>Cook</u> and the procedural posture of that case, a delay would not result if this Court had to familiarize itself with the procedural background of the case.

The instant case stands in stark contrast to the factual pattern in <u>Devaughn</u>, 403 F. Supp. 68. There, this Court granted a transfer motion to the District of Maryland in a §1981 case brought by a plaintiff who worked at the defendant's Maryland office. <u>Id</u>. In <u>Devaughn</u>, plaintiff's employment records were located in Maryland. <u>Id</u>. at 73. Here, they are not. In <u>Devaughn</u>, plaintiff filed an administrative complaint in Maryland. <u>Id</u>. at 70. Here, there were no such filings. In <u>Devaughn</u>, plaintiff did not allege that her claim had any "meaningful connection" to the District of Columbia. <u>Id</u>. at 72. Here, plaintiffs have set forth facts showing that their claims were closely linked to this District and only tangentially linked to Maryland. In <u>Devaughn</u>, all the witnesses were Maryland residents. <u>Id</u>. at 73. Here, key witnesses, including Mr. Magruder, are residents of Washington. Pavsner Exh. 1 (Magruder Dep. Trans at 7:16-19). In <u>Devaughn</u>, all the discriminatory conduct occurred in Maryland. <u>Id</u>. Here, as demonstrated above, all of the key discriminatory decisions were made in Washington.

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

18

In summary, UBSFS has not demonstrated that the convenience of the parties and witnesses, or the interest of justice militates in favor of transferring this case to Maryland.

## III.    CONCLUSION

For these reasons, the Court should deny Defendant's motion to transfer this case.

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  ●  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

19

Dated:   June 21, 2007

Respectfully Submitted

/s/  Steven M. Pavsner_____

JOSEPH, GREENWALD & LAAKE, P.A.
Steven M. Pavsner  Bar ID#912220
Brian J. Markovitz  Bar ID#481517
6404 Ivy Lane, Suite 400
Greenbelt, Maryland  20770
Tel: 301-220-2200
Fax: 301-220-1214

BERGER & MONTAGUE, P.C.
Keino R. Robinson
Shanon J. Carson
Selim Ablo
Jonathan Stanwood
1622 Locust Street
Philadelphia, PA 19103
Tel: 215-875-3000
Fax: 215-875-4604

GARWIN, GERSTEIN & FISHER, L.L.P.
Bruce E. Gerstein
Brett Cebulash
Archana Tamoshunas
Andy Aubertine (contract)
1501 Broadway, Suite 1416
New York, NY 10036
Tel: 212-398-0055
Fax: 212-764-6620

**Attorneys for Plaintiffs**

**Joseph
Greenwald
& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane   •   Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

20

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 21 day of June, 2007, a true and correct copy of the foregoing Memorandum in Opposition to Defendant's Motion to Transfer to the District of Maryland, was electronically filed and notification of such filing was made by the Court via e- mail to all counsel electronically registered with the Court.

/s/ Steven M. Pavsner_____

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane   •   Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

21

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL BARHAM, JOHN CRAWFORD,<br>FREDDIE MOULTRIE, MONICA SMITH,<br>MARK SPRADLEY, PAUL WATKINS, and<br>SEAN WINTZ,<br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>UBS FINANCIAL SERVICES, INC.,<br><br>　　　　　Defendant. | )<br>)<br>)　Civil No. 07-CV-00853-RMU<br>)<br>)　(ECF)<br>)<br>)<br>)<br>)<br>)<br>) |

## PROPOSED O R D E R

The Court, having considered Defendant's Motion to Transfer Case to the

District of Maryland, and Plaintiffs' response thereto, it is hereby ORDERED that

Defendant's Motion is DENIED.

Dated: _____

　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　Ricardo M. Urbina
　　　　　　　　　　　　　　　　　United States District Judge

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| MICHAEL BARHAM, JOHN CRAWFORD, ) <br> FREDDIE MOULTRIE, MONICA SMITH, ) <br> MARK SPRADLEY, PAUL WATKINS, and ) <br> SEAN WINTZ, ) <br>               Plaintiffs, ) <br> ) <br>          v. ) <br> ) <br> UBS FINANCIAL SERVICES, INC., ) <br> ) <br>          Defendant. ) | Civil No. 07-CV-00853-RMU <br><br> (ECF) |

## DECLARATION OF STEVEN M. PAVSNER

I, Steven M. Pavsner, hereby declare as follows:

1.         I am one of the attorneys representing Plaintiffs in this action.  I submit true and correct copies of the following documents in support of Plaintiffs' Motion in Opposition to Defendant's Motion to Transfer to the District of Maryland:

2.         Attached hereto as Exhibit 1 are excerpts from the deposition of Coe Magruder, taken in Cook et al., v. UBS Financial Services, Inc., No. 8:06-00803-PJM (D. Md. 2006) ("Cook").

3.         Attached hereto as Exhibit 2 is the Declaration of Coe Magruder, submitted in Cook.

4.         Attached hereto as Exhibit 3 are excerpts from the deposition of William Kennedy, taken in Cook.

5.         Attached hereto as Exhibit 4 are excerpts from the deposition of Bradford Carson, taken in Cook.

**Joseph** <br> **Greenwald** <br> **& Laake**

Joseph, Greenwald & Laake, P.A. <br> 6404 Ivy Lane  ●  Suite 400 <br> Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

1

6.          Attached hereto as Exhibit 5 is the Declaration of Freddie Cook, submitted in Cook.

7.          Attached hereto as Exhibit 6 are excerpts from the deposition of David Weber, taken in Cook.

8.          Attached hereto as Exhibit 7 are excerpts from the deposition of Janice Lytle, taken in Cook.

9.          Attached hereto as Exhibit 8 are excerpts from the deposition of John Crawford, taken in Cook.

10.         Attached hereto as Exhibit 9 are excerpts from the deposition of Freddie Moultrie, taken in Cook.

11.         Attached hereto as Exhibit 10 are excerpts from the deposition of Michael Barham, taken in Cook.

12.         Attached hereto as Exhibit 11 are excerpts from the deposition of Monica Smith, taken in Cook.

13.         Attached hereto as Exhibit 12 are excerpts from the deposition of Paul Watkins, taken in Cook.

14.         Attached hereto as Exhibit 13 is an Opinion and Order of U.S. District Judge Sidney H. Stein, dated March 21, 2006.

15.         Attached hereto as Exhibit 14 is a Memorandum Order of U.S. District Judge Peter J. Messitte, dated April 23, 2007.

16.         Attached hereto as Exhibit 15 is a Memorandum Order of U.S. District Judge Peter J. Messitte, dated May 22, 2007.

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200  •  Fax 220-1214

2

17.        Attached hereto as Exhibit 16 is a Memorandum Opinion and Order of U.S.

District Judge Peter J. Messitte, dated May 29, 2007.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this 21st day of June 2007.

/s/ Steven M. Pavsner

**Joseph**
   **Greenwald**
     **& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane  •  Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 • Fax 220-1214

3

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on June 21, 2007, a true and correct copy of the foregoing Declaration of Steven M. Pavsner, was electronically filed, and notification of such filing was made by the Court via e-mail to all counsel electronically registered with the Court:

<u>/s/ Steven M. Pavsner</u>

**Joseph**
**Greenwald**
**& Laake**

Joseph, Greenwald & Laake, P.A.
6404 Ivy Lane   ●   Suite 400
Greenbelt, Maryland 20770

(301) 220-2200 ● Fax 220-1214

Pavsner Declaration

4

# EXHIBIT "1"

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF MARYLAND

 3                      Southern Division

 4     - - - - - - - - - - - - - - - X

 5     FREDDIE H. COOK, et al.,           :

 6          Plaintiffs,                   :

 7               v.                       :   Civil No.

 8     UBS FINANCIAL SERVICES,            :   8:06-cv00803-PJM

 9     INC.,                              :

10          Defendant.                    :

11     - - - - - - - - - - - - - - - X

12                         Washington, D.C.

13                         Thursday, March 22, 2007

14

15              Videotaped deposition of COE MILTON
       MAGRUDER, a witness herein, called for examination by
16     counsel for Defendant in the above-entitled matter,
       pursuant to notice, the witness being duly sworn by
17     MARY GRACE CASTLEBERRY, a Notary Public in and for
       the District of Columbia, taken at the offices of
18     Covington & Burling, 1201 Pennsylvania Avenue, N.W.,
       Washington, D.C., at 9:30 a.m., Thursday, March 22,
19     2007, and the proceedings being taken down by
       Stenotype by MARY GRACE CASTLEBERRY, RPR, and
20     transcribed under her direction.

21

22
```

Coe Milton Magruder                                                          March 22, 2007
Washington, DC

Page 7

1                    MR. STANWOOD:   Jonathan Stanwood for the

2      plaintiffs.

3                    MR. VELEZ:   Andy Velez, associate general

4      counsel, UBS Financial Services.

5                    THE VIDEOGRAPHER:   Thank you.   Will the

6      court reporter please swear in the witness.

7      Whereupon,

8                         COE MILTON MAGRUDER,

9      was called as a witness by counsel for Defendant, and

10     having been duly sworn by the Notary Public, was

11     examined and testified as follows:

12              EXAMINATION BY COUNSEL FOR DEFENDANT

13              BY MR. WILLIAMSON:

14         Q.    Good morning, Mr. Magruder.

15         A.    Good morning.

16         Q.    Would you please state your full name and

17     address?

18         A.    Coe Milton Magruder, 3200 Woodland Drive,

19     Northwest, Washington, D.C. 20008.

20         Q.    And are you currently employed?

21         A.    Yes.

22         Q.    And where are you employed?

```
 1        Q.    Was that the first full year or was that

 2   when it first got started?

 3        A.    It opened at the end of 2000, and then the

 4   first full year would have been '01.

 5        Q.    What city was that located in, did you

 6   say?

 7        A.    Largo.

 8        Q.    Were you involved in the establishment of

 9   the Largo, Maryland office of UBS?

10        A.    Yes.

11        Q.    How did the idea of opening a UBS branch

12   office in Prince George's County originally come

13   about?

14        A.    Well, I had been the manager for the

15   Washington, D.C. area since 1994 and, in doing that,

16   part of our job is to look at the demographics, look

17   at the financial demographics, the assets where the

18   clients live, where our competition is and decide

19   what opportunities we have to grow our business.

20              And in doing that, in working with the

21   people at our home office that ran these statistics

22   for us, there was a significant amount of assets and
```

Page 13

```
 1    assets growing at a rapid rate in Prince George's

 2    County, and not much competition in Prince George's

 3    County.  So the idea to open an office of some type

 4    in Prince George's County was something that started

 5    in the late '90s.

 6        Q.    Was that your idea?

 7        A.    Yes.

 8        Q.    When you referred to the home office, what

 9    office are you talking about?

10        A.    Weehawken, New Jersey.

11        Q.    To whom did you first present the idea of

12    opening an office in Prince George's County?

13        A.    The regional director, Ray McClure, and

14    the division manager, Bill Kennedy.

15        Q.    And what was their reaction --

16              MR. WHINSTON:  I'm sorry, I didn't hear

17    that last name.

18              THE WITNESS:  Bill Kennedy.

19              MR. WHINSTON:  Kennedy.

20              BY MR. WILLIAMSON:

21        Q.    And what was their reaction to your

22    proposal?
```

1       A.      Interest.

2       Q.      Who were the principal persons involved in

3   the decision to open the Largo office?

4       A.      The same -- myself, the regional director,

5   Ray McClure, Bill Kennedy, and then I would assume

6   Bill has -- well, Bill has a chain of command at our

7   home office that he works through as well.

8       Q.      Did you undertake or supervise any

9   research on the viability of opening an office in

10  Prince George's County?

11      A.      Yes.

12      Q.      I'm going to show you a document that

13  we're going to mark as Exhibit 1.

14                      (Magruder Exhibit No. 1 was

15                      marked for identification.)

16              BY MR. WILLIAMSON:

17      Q.      If you could just take a moment to peruse

18  Exhibit 1, and then I'll ask you a few questions

19  about it.  Have you seen Exhibit 1 before?

20      A.      Yes.

21      Q.      What is Exhibit 1, Mr. Magruder?

22      A.      Exhibit 1 is

                                **REDACTED**

Page 40

1    allocations, had a very close personal relationship

2    with his clients, he met with all of them face to

3    face.  He had an extensive background in compliance.

4    He had managed the compliance department of Advest

5    for something in excess of 10 years.

6         Q.    What was Mr. Carson's or what is

7    Mr. Carson's race?

8         A.    He's African-American.

9         Q.    And why did you choose him to be the

10   branch manager at Largo?

11        A.    I had nominated Brad to go into our

12   management development program.  Brad -- I knew --

13   first of all, Brad was a licensed branch manager

14   coming in.  He had that license when I hired him from

15   Merrill Lynch.  So he was one of the few people in

16   the office -- he may have been the only financial

17   advisor that had the branch manager supervisory

18   license.

19              He had all of that experience and we had

20   talked about -- since I had started running

21   demographics in Prince George's County in '97, I

22   guess, and probably had worked on it a little bit

```
 1   before that myself, before I went to Mark de Leon.

 2   So if Brad joined me in '96, within a year, we had

 3   discussed the possibility of opening an office in

 4   Prince George's County.

 5              And the discussion continued for a long

 6   period of time.  And that continued up and to the

 7   point where I knew Brad had a serious interest in

 8   being a manager, and I think the other firms on the

 9   street did as well.  And one, Morgan Stanley,

10   approached Brad and asked him if he would consider

11   going to one of their offices and becoming a branch

12   manager.

13              And he and I were friends and he told me

14   about it, which is a little bit unique.  And I told

15   Brad, I said, you know, we've -- and I think the

16   reason he told me was because we had talked about

17   Prince George's County.  And what he was saying is,

18   you know, I have a serious interest in management.  I

19   like working with advisors, I'm good with it.  He had

20   mentored brokers over the years, younger advisors.

21   He was good at it, had very strong interpersonal

22   skills and he was giving me a last shot.  He was
```

1    saying, you know, I'm serious about doing that.  If

2    you are serious about Prince George's County -- I'm

3    paraphrasing but, you know, do something.  And so I

4    said, okay, sit tight.

5        Q.    Where did Mr. Carson live, do you know?

6        A.    Yes.  He lived in Prince George's County.

7        Q.    So you told him to sit tight.  Then what

8    happened?

9        A.    Then I went back to Mark de Leon and ran

10   more current statistics so I could see the change

11   between three years prior and now.  The statistics

12   looked very good.  Brad and I talked about it and I

13   called my superiors up the chain of command and just

14   posed the idea of going through with this.

15            And they were interested and they said,

16   put together a proposal.  So actually Brad and I

17   worked on this together and put it together and sent

18   it out.  And they looked at it for a period of time

19   and came back and said, we think it's a good idea.

20       Q.    I think you had mentioned earlier that the

21   manager at Largo was a producing manager.  What does

22   that expression mean in the UBS culture?

Page 47

```
 1    asked, what is -- before we get to Ms. Pittman, I

 2    don't think I asked you, what is Ms. McGovern's race?

 3         A.    She is Caucasian.

 4         Q.    And with Ms. Pittman, what is her race?

 5         A.    Debbie Pittman is African-American.

 6         Q.    And who was she in the Largo operation?

 7    Was she someone who -- first tell me, how do you know

 8    her?  And then we can talk about her role in Largo.

 9         A.    Well, I knew her -- when I came to the

10    Washington office, I met Debbie.  She was a cashier,

11    at that point in time, in the Washington office

12    operations area.  And the cashier is the one who

13    books in checks that come in every day, cuts checks

14    that are going out for certain accounts, helps with

15    booking in and out securities, et cetera, and had

16    been -- when I got there, she had been doing that for

17    seven years.

18              And she was an extremely personable, I

19    felt, intelligent individual.  And so I talked to her

20    in conjunction with my operations manager.  And we

21    decided to nominate her for our operations manager

22    training program, which we did.  She went into the
```

Page 48

1    program.

2            And after she had completed enough of

3    that, we made her the assistant operations manager in

4    the Washington office.  We also during that time

5    period did what we call putting her out on the floor.

6    We made her a sales assistant to some advisors for a

7    brief period of time to give her cross-training, so

8    she would have direct line work with clients, and

9    then assistant ops manager in Washington.  And when

10   we decided to open the office in Prince George's

11   County, she was the natural candidate to be the

12   operations manager in Prince George's County.

13       Q.    Why do you say she was the natural

14   candidate?

15       A.    Her skills, ability, experience.  We

16   trusted her.  We knew what she could do.  She was --

17   the next step for an assistant ops manager is to

18   become the operations manager in a smaller office.

19   That's the career path.

20       Q.    Do you recall about how long she had

21   worked as an assistant operations manager before she

22   became an operations manager?

Coe Milton Magruder                                                                  March 22, 2007
Washington, DC

Page 49

1      A.     Not off the top of my head.  No, I would

2   have to go back and look.

3      Q.     Any sense of whether it would be more than

4   a year?

5      A.     Yes, I would think.

6      Q.     What was your assessment of how she

7   performed at Largo as the operations manager?

8      A.     I thought she did a good job.  She needed

9   some help initially with setting up all the filing

10  systems, et cetera, that are necessary for audits and

11  tracking things, so that when the auditors come in,

12  they have a system they want to use and know where

13  things are.  So we helped with that.  My then current

14  administrative manager, Janice Lytle, worked with her

15  quite a bit.  But she did a good job.  She did a

16  satisfactory job.

17     Q.     Do you know who Dave Webber is?

18     A.     Yes.

19     Q.     Who is he?

20     A.     Dave Webber was a financial consultant at

21  the Merrill Lynch Greenbelt office and when --

22     Q.     When was that?

1       A.     He had been there for 15 years.  When we

2    decided to open the Prince George's office, I started

3    recruiting for the Prince George's office from

4    competition.  The fastest way to grow an office is to

5    bring in experienced, quality producers from other

6    firms.

7       Q.     What year did you start that recruiting?

8       A.     That had to be the end of '99 into 2000,

9    and I don't remember when I first contacted -- I have

10   talked to people for nine years before they've joined

11   me.  I talk to a lot of people.

12              And so I talked to him and asked him if he

13   had an interest in coming in to that office and being

14   a part of it.  He did.  He was a substantial

15   producer.  He also had an interest in management.  I

16   talked to him about coming in and obtaining all the

17   necessary licenses to be a sales manager.  He agreed

18   that he wanted to do that.

19              And then he joined the firm prior to the

20   Largo office being opened, which is something I do as

21   much as possible because I want somebody --

22   particularly if they're going to be in any form of

Page 51

```
 1    management capability, even sales manager, that they

 2    come to my Washington office and work with me for a

 3    period of time before we spin them out where they're

 4    more on their own.

 5         Q.    What is Mr. Webber's race?

 6         A.    Dave Webber is Caucasian.

 7         Q.    And what position was he expected to fill

 8    at Largo?

 9         A.    Sales manager, the number two position.

10         Q.    And to be the sales manager, are you

11    supposed to have or are you required to have a

12    special license for that?

13         A.    It's something I require.  Technically, to

14    be a sales manager and share ideas, you do not have

15    to have a supervisory license if you are not directly

16    responsible for supervising the activities of

17    financial advisors.  Most sales managers are not.

18              But my practice has always been if you're

19    going to have the title manager, you're going to have

20    all the licenses, because you don't want any

21    confusion over the gray areas of who's doing what.

22    You just make sure everybody is licensed for
```

Page 52

1    everything.

2        Q.    And what license were you looking for

3    Mr. Webber to have?

4        A.    It is the licenses required for a branch

5    manager, a series 9 and series 10.  Used to be called

6    a series 8.  They split it.

7        Q.    I see.  During the time that he was

8    working in Largo, was it called a series 8 or a

9    series 9, do you remember?

10       A.    I don't remember when they changed the

11   title, but I suspect the answer is it was called the

12   9 and 10, but those of us who have been in the

13   industry a long time -- I mean, I still call it a

14   series 8 license.

15       Q.    Did Mr. Webber get his series 8 license?

16       A.    No, he did not.

17       Q.    Why not?

18       A.    I worked with him for a little over a year

19   and he had all the materials and his feeling was, at

20   that time, that he just didn't want to go through all

21   of that, and petitioned me a few times to be the

22   sales manager without a license, which he knew

Page 55

1    the ratios we typically use, would indicate that the

2    office was overstaffed.

3        Q.    And for the series 8 license people, did

4    you feel you had an adequate number of series 8

5    license people at the office when it opened?

6        A.    No.  I wanted at least one additional

7    series 8 person.

8        Q.    And why was that?

9        A.    Because if you have only one series 8

10   person, then whenever that series -- that branch

11   manager licensed person leaves the office, I have to

12   send one of the managers from the Washington office.

13   And I had enough series 8 license people to cover it

14   but I had to send somebody out to cover it.

15            And if Brad went on vacation or a trip, we

16   had to have somebody in the office.  So it's

17   coordinating.  And the other thing was I wanted to

18   help, you know, to make sure there was sufficient

19   coverage for Brad if something came up.

20       Q.    Was there a particular person at the

21   Washington office who would cover for Brad when he

22   was gone who had a series 8 license, or was that

Page 56

 1    something that various people did?

 2        A.    It was the responsibility of the

 3    administrative manager of the Washington office who

 4    would typically do it.

 5        Q.    Who was that?

 6        A.    Janice Lytle.  But on occasion, she would

 7    use one of the other managers I had in the office, if

 8    she could not make it, and I had sufficient to do

 9    that.

10        Q.    Did you ever receive complaints from FAs

11    or NFAs at Largo that there were not enough series 8

12    license holders at the Largo office?

13        A.    No, I don't remember any complaints about

14    that.

15        Q.    But it was a concern of yours based on

16    your management experience?

17        A.    Yes.

18        Q.    Who was responsible for recruiting FAs and

19    NFAs to come work at Largo?

20        A.    Brad Carson.

21        Q.    And did you play any role in that

22    recruitment process?

Page 57

1      A.    Yes.  Before the office opened, Brad and I

2   recruited more or less jointly.  We would both go in

3   different directions, and if I had somebody I wanted

4   him to meet, I would set up the second meeting with

5   Brad and the same for Brad.  Once the office was

6   opened, Brad took over the responsibility for

7   recruiting existing producers and trainees.

8            And then when he had somebody he was

9   interested in, he would -- after he had gotten a

10  number of meetings down the road and he determined

11  he's interested and they're interested, then he would

12  have me get involved.

13     Q.    Can you give us a little more detail on

14  what was involved in the process or sort of the

15  mechanics of recruiting FAs and NFAs?

16     A.    Recruiting FAs, meaning an existing

17  producer with a book from another firm, we would

18  contact -- I mean, we would do our homework first to

19  find out who in the area, what firms are known as

20  quality individuals with a good business, somebody

21  with a good reputation, somebody you would want to

22  hire.  So we would do that homework.

 1    number of African-Americans is probably in the area

 2    of 25 or 30 or something like that.  So there weren't

 3    many.

 4         Q.    I'm sorry, you say there weren't -- you

 5    mean there weren't many who were brokers for the

 6    competition?

 7         A.    Right, exactly.

 8         Q.    Were there applicants who were recruited

 9    for Largo, but indicated an interest in working in

10    the Washington, D.C. office?

11         A.    Well, the Washington -- coincidentally, I

12    had moved the Washington, D.C. office from 1300 I

13    Street to 1501 K Street, and I went from an office

14    that had a capacity for about 60 financial advisors

15    to an office that had a capacity for 107.

16         Q.    About when did that happen?

17         A.    Almost exactly the same time.

18         Q.    Late 2000?

19         A.    Right.  Maybe -- I would have to go back

20    and look.  I would say fall of 2000.  I moved from

21    1300 to K Street.  I had 40 empty offices at K

22    Street.  The deal was anybody could work anywhere.

1    by anybody's measure.

2            So it was under discussion at that point

3    in time, what are we going to try to do, the options

4    are try to fix it, close it, whatever.

5        Q.    Were you involved in the discussions about

6    whether to close the Largo office?

7        A.    Yes.

8        Q.    And what was your role?

9        A.    I was one of the central -- it was my

10   responsibility.  I built it.  I was responsible for

11   fixing it, stopping it, doing something.

12       Q.    Who else was involved in the decision

13   process?

14       A.    My regional director at that time was Mike

15   Williams.  The division manager, Bill Kennedy.  And

16   obviously Bill has his chain of command at the home

17   office.

18       Q.    You said that discussions were going on in

19   early or late 2002 or early 2003?

20       A.    Yes.  And we were looking for remedies.

21       Q.    So what was the nature of those

22   discussions?

Washington, DC

Page 122

1       A.      Well, one thing is if we could reduce the

2    expenses, then we could survive longer and hopefully

3    get out from under the -- wait for the market to come

4    back.  It historically always has and even though

5    this had been a multiple year run, we felt the market

6    would come back and we were trying to survive.

7              So I contacted our real estate department,

8    Glenn Stefke, at our home office, and talked to him

9    about the possibility of subletting some of the

10   space, either subletting a third of it or half of it

11   or we drew schematics looking at how we could divide

12   the office geographically and still meet our

13   compliance requirements.  In other words, you can't

14   have our servers in somebody else's space, our

15   computers.  So you had to balance it that way.  And

16   we looked at different ways we could divide it.

17             Then we put it on the market and we put

18   the sublet -- so what we want to do is sublet a

19   fraction of the space, something like 5,000 square

20   feet.  And if we could do that, then that would give

21   us back, let's say, $100,000 versus the rest of it.

22   We looked at moving some of the furniture out and

Coe Milton Magruder                                                March 22, 2007

Washington, DC

1   getting rid of some of the amortization/depreciation

2   on that.

3           I talked to various departments in New

4   York for any ideas that the department -- different

5   areas would have as to ways to help us or get

6   additional funding for something.  We really didn't

7   know what.  But we were brainstorming everything we

8   could do.  The primary fix had to be bringing in

9   existing producers from the competition.  And

10  trainees, while we were trying very hard with

11  numerous trainees, that's not a quick fix.

12      Q.    Was the decision to close the Largo office

13  racially motivated in any way?

14      A.    No.

15      Q.    Was there a time when you went out to the

16  Largo office and said to employees, you know, there

17  are rumors that we're going to close, but we're

18  committed to keeping the branch open?

19      A.    Yes.  Brad had been having meetings with

20  the office and I would go out periodically, you know,

21  quarterly or once every five months or something and

22  have a meeting, and talk about anything they wanted

Page 124

1    to talk about.  One of the things we talked about

2    continuously were the statistics and the performance

3    levels of the office so they were fully aware of what

4    was going on.

5              After the performance of the 2002 year,

6    everybody was aware that we had problems.

7         Q.    Did you ever tell them that the rumors

8    that you were going to close the office were false?

9         A.    No.  What I did was -- well, the first

10   thing, since we were trying to sublet space and we

11   were having people walk through the space, you know,

12   we had to make them aware of that.  But that had

13   escalated to the point in, I would say late February

14   or March of 2003 that, you know, the office was going

15   to close, it couldn't survive.  So in early spring of

16   that year, we went out -- I talked to Brad and I

17   said, we can't let this go.  We've got to talk about

18   it and tell anybody anything they want to know.

19             So I went out and conducted a meeting and

20   said, look, the decision has not been made to close

21   this office.  I know.  I'm the one who is making the

22   decision, with concurrence of New York, but it's

1  largely my call.  I said, but we've got to turn this

2  around.  We've got to do something.  We've got to

3  bring in -- if we saw statistics for new accounts, if

4  we saw statistics for new assets.  It wasn't just

5  global things like subletting the space or bringing

6  in a giant recruit from the competition.

7        The FAs on an individual basis needed to

8  produce something.  And their individual performance

9  was by and large fifth quintile across the board.  If

10  you look at the number of accounts they were opening,

11  the assets they were bringing in in relation to

12  others in the firm, while the firm across the board

13  was weak, theirs was particularly weak.  We needed

14  some effort.  We needed something.  And so that was a

15  discussion we had.

16        And then we also -- we had a cocktail

17  reception at Brad's country club in Prince George's

18  County for all the staff that night and served hors

19  d'oeuvres and had a lovely meeting.  We wanted them

20  to know the truth, we wanted them to know we cared,

21  we wanted them to be able to ask me anything they

22  wanted, just fully vet the situation.

1        Q.    So then when was the decision made to

2    close the office?

3        A.    Ballpark, mid to late May.  At that

4    point --

5        Q.    Of what year?

6        A.    Of 2003.  I'm sorry.  I called my regional

7    director, Mike Williams, and said, Mike, I haven't

8    seen new accounts coming in, we don't have any

9    recruits on the horizon, we've been trying for five

10   months to get any kind of hits on subletting the

11   space, we have nothing, I don't see the market

12   turning any time quickly.

13             As a matter of fact, by -- I think the low

14   point of the market was sometime right around the

15   '03.  I said, Mike, I don't know what to do, I don't

16   know how to fix it.  The only way -- and he, Mike's,

17   concern was you're losing $50,000 a month.  And I

18   would be contacted by him frequently, you know, I

19   can't bleed forever.  He gets paid like I do.  We get

20   paid off the bottom line.

21             So the amount of money he was losing and

22   the amount of money I was losing personally was

1    growing.  This was costing me something in excess of

2    $100,000 per year.  And so I said, I don't have a

3    fix.  Let's do this.  Let's close it.  Let's try to

4    rent the entire space, sublet it.  We're going to

5    take a hit.  Once we do that and close the office,

6    all the amortization/depreciation on the buildout,

7    the furniture and the machines is going to collapse

8    and get written off at one time so it's going to be a

9    seven-digit hit.

10         So I said, be aware.  But then what we'll

11   do is we'll move as many of the advisors and staff

12   down to my office.  My office had excess capacity, as

13   I mentioned earlier, so that will help get the --

14   that will help the Washington office shore up a

15   little bit.  I mean, it made sense at that time.

16        Q.    What did you mean by the hit or can you

17   explain the effect on your amortized costs?

18        A.    Yes.  I mean, from an accounting

19   standpoint, if you build -- let's take the buildout

20   just to keep it simple.  If you build out a space and

21   you put in that space a million and a half dollars

22   into building it out -- let's say a million to keep

1    George's existed.  So Bill Kennedy was involved at

2    the beginning.  Tim Sennatt was involved in the

3    discussions to closing.

4         Q.    Did you go out to Largo and make an

5    announcement to the employees when the decision had

6    been made to close the office?

7         A.    Yes.

8         Q.    And do you remember when that was?

9         A.    Approximately June of '03, 2003.

10         Q.    And did you explain to the employees why

11    the office was closing?

12         A.    Yes.

13         Q.    And what did you say?

14         A.    It was losing money.

15         Q.    Well, it had been losing money earlier.

16    Were there any questions raised or comments about

17    what had changed since the earlier time when you had

18    spoken to them?

19         A.    I don't remember any questions, but the

20    thrust of the presentation was that we didn't have a

21    fix that we saw coming on the horizon.  We hadn't

22    been able to sublet any space.  We didn't have

# EXHIBIT "2"

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **FREDDIE H. COOK, SYLVESTER L. FLEMING, JR. and TIMOTHY J. GANDY,** on behalf of themselves and all other similarly situated persons ) ) ) ) ) | **Case No. 05-CV-8842 (SHS) (AJP)** |
| **Plaintiffs,** ) ) | **DECLARATION OF COE M. MAGRUDER** |
| **v.** ) ) | **ECF Case** |
| **UBS FINANCIAL SERVICES INC.** ) ) | |
| **Defendant.** ) ) | |

## DECLARATION OF COE M. MAGRUDER

Coe M. Magruder declares as follows:

1.    I am currently employed by UBS Financial Services Inc. ("UBSFS") as Senior Vice President and Branch Manager of UBSFS's Washington, DC and Alexandria, Virginia offices. My business address is 1501 K Street NW, Suite 1100, Washington, DC 20005. I have personal knowledge of the facts set forth in this declaration. This declaration is prepared in connection with the motion of UBSFS to transfer this case.

2.    I began working at PaineWebber Incorporated ("PaineWebber") on September 6, 1983, and became branch manager of PaineWebber's branch office in Washington, DC in October 1994. Upon PaineWebber's merger with UBSFS in November 2000 I became an employee of UBSFS.

3.    Since the fall of 2001, I have reported to Mike Williams, Regional Director for the Mid-Atlantic Region, whose offices throughout this period have been located in Charlotte, North Carolina. Prior to reporting to Mr. Williams, I reported to Ray McClure, a former Regional Director. Mr. McClure's offices were located in the District of Columbia. Prior to Mr. McClure, I reported to a manager in Weehawken, New Jersey. None of the managers to whom I have reported while employed at UBSFS have been located in New York.

4.    With the assistance of Brad Carson, an African-American Financial Advisor whom I had recruited and hired in DC branch office, I drafted a proposal in 2000 for the opening of a new branch office in Prince George's County, Maryland.

5.    The final decision to open the new branch office was subject to the approval of my supervisors at the time, Division Manager Bill Kennedy, whose office was located in Weehawken, New Jersey, and Regional Director Ray McClure, whose office was located in Washington, DC. A committee located in Weehawken, New Jersey needed to approve any leasing of office space. After I was informed that the proposal had been approved, UBSFS leased office space in Largo, Maryland and I recommended that Mr. Carson be assigned to the Largo office as branch manager. Mr. Carson's appointment to branch office manager was approved by Mr. Kennedy and Mr. McClure.

6.    When the Largo office was opened in approximately November 2000, it was "complexed" into the DC office, and thus became part of my responsibility.

7.    As branch manager of the Largo office, Mr. Carson's responsibilities included managing support staff and recruiting and supervising Financial Advisors. Mr. Carson recruited and hired two of the named plaintiffs in this action, Freddie H. Cook and Sylvester L. Fleming, Jr.

8.      Some of the decisions made by Mr. Carson and his management team did require my approval, or the approval of managers to whom I reported. To my knowledge, none of the decisions relating to the employment of Mr. Fleming or Mr. Cook required the approval of any manager located in New York.

9.      When the office closed, each of the Financial Advisors who worked in the office was given the opportunity to transfer to any branch office in the country. Mr. Fleming and Mr. Cook elected to transfer to the DC office, as did Mr. Carson, who continues to work at the DC office. Except for one employee who elected to transfer to Texas, the other managers and employees who had worked in the Largo office with Mr. Fleming and Mr. Cook transferred to the UBSFS offices in Rockville, Maryland; Baltimore, Maryland; or the District of Columbia.

10.     After Mr. Fleming and Mr. Cook transferred to the DC office, I became their direct supervisor. Decisions regarding the assignment of client accounts, allotment of office space and support staff to them, and to all Financial Advisors , were made by me, with the assistance of my management team and, in some cases, with the approval of my managers. None of the decisions made by me or my management team relating to the employment of Mr. Fleming or Mr. Cook required the approval of any manager located in New York.

11.     I am aware of no employment records relating to Mr. Fleming or Mr. Cook that are or were maintained or administered in New York.

I declare under penalty of perjury that the foregoing is true and accurate.

_____
Coe M. Magruder

December 30, 2005

# EXHIBIT "3"

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
Civil No. 06-CV-00803-PJM

FREDDIE H. COOK, SYLVESTER L.
FLEMING, JR. and TIMOTHY J. GANDY,
on behalf of themselves and all
other similarly situated persons,

       Plaintiffs,

    v.

UBS FINANCIAL SERVICES, INC.,

       Defendants.

------------------------------------

**ORIGINAL**

DEPOSITION UNDER ORAL EXAMINATION OF

WILLIAM KENNEDY

DATE:  June 5, 2007

REPORTED BY:  CHARLENE FRIEDMAN, CSR, RPR, CRR

ESQUIRE DEPOSITION SERVICES
90 Woodbridge Center Drive
Suite 340
Woodbridge, New Jersey  07095
(732) 283-1060 or (800) 247-8366

JOB # 208583

1     it --

2         Q    I mean, can you answer the

3     question?

4         A    At the time it was, because it was

5     a satellite of Washington.

6         Q    And my next question is where did

7     the Largo office rank in terms of -- strike

8     that.

9              Was the Largo office within the

10    five smallest branches in the region during

11    your time as southern division manager?

12        A    I don't really know.  I don't

13    recall.

14        Q    Okay.  You had mentioned the term

15    "satellite office", correct?

16        A    Yes.

17        Q    And what does the term "satellite

18    office" mean?

19        A    An offshoot of a bigger office.

20        Q    Was the Largo office a satellite

21    office?

22        A    Yes.

23        Q    And which large office was the

24    Largo office a satellite office of?

25        A    Washington, D.C.

1      Q      Why was the Largo office a

2  satellite office of the Washington, D.C.

3  office?

4              MR. HUVELLE:  Object to the form of

5        the question.

6              THE WITNESS:  What do I do here?

7              MS. ABLO:  You can answer it.

8              MR. HUVELLE:  You can answer, if

9        you can.

10             THE WITNESS:  Okay.

11     A      It was a satellite because it was a

12  small branch, and the way -- I'm not speaking

13  specifically about Washington, but the way

14  you start a new branch in a lot of cases is

15  that you support it through a bigger branch,

16  and that's what was happening in Washington.

17     Q      Okay.

18     A      Financial support.

19     Q      Who made the determination that the

20  Largo office would be a satellite of the

21  Washington, D.C. branch?

22     A      I don't recall, frankly, whether it

23  was me or Coe that wanted to do it that way.

24     Q      But it was definitely yourself or

25  either Mr. Magruder that made that

1    determination?

2         A     Yes.

3         Q     You told me some of the factors

4    that went into the classification of a branch

5    as a satellite branch, one of them being

6    financial support from the larger office; is

7    that correct?

8         A     That's correct.

9         Q     Typically, what kind of financial

10   support would the larger office provide to a

11   satellite office?

12        A     Pay the rent, pay the salaries, pay

13   the benefits.

14        Q     Anything else?

15        A     Those are the -- those were the

16   biggest expenses.

17        Q     And what do you mean by rent?

18        A     The cost to rent an office.

19        Q     So in the case of the Largo office

20   and the Washington, D.C. office, would the

21   Washington office have paid the rent for the

22   space for the Largo office?

23        A     Yes.

24        Q     How about salaries, how would that

25   have worked in that case?

1           was the same as to the one that I

2           objected to, so I reiterate my

3           objection.

4               Q       Do you know who, at UBS, came up

5       with the idea to open an office in Largo,

6       Maryland?

7               A       Yes.

8               Q       And who was that person?

9               A       Coe Magruder.

10              Q       And when did you first learn of

11      Mr. Magruder's idea of opening an office in

12      Largo, Maryland?

13              A       I don't remember the dates.   I

14      don't even know the date the office opened,

15      frankly.

16              Q       Do you recall approximately when

17      Mr. Magruder conveyed the idea of opening the

18      Largo office to you?

19              A       Approximately 1999 some time,

20      perhaps 2000.

21              Q       And did Mr. Magruder convey the

22      idea to you in terms of a written or oral

23      proposal?

24              A       I don't recall.

25              Q       Did Mr. Magruder, in fact, propose

W. Kennedy

57

1    to you that UBS open an office in Largo,

2    Maryland?

3           A      Yes.

4           Q      Do you recall if he made that

5    proposal to you in person?

6           A      I don't.

7                  MR. HUVELLE:   Asked and answered.

8           Q      What was the proposal that

9    Mr. Magruder made to you about opening an

10   office in Largo?

11          A      I don't remember.

12          Q      You don't remember any of the

13   details of the proposal?

14          A      Not details, no.   I mean, it's been

15   six years since I retired.   There was 125 or

16   130 branches.   I just don't remember.

17          Q      Do you recall the reasons why

18   Mr. Magruder wanted to open an office in

19   Largo?

20          A      Yes, pretty much.

21          Q      What were they?

22          A      Washington, D.C. was and is still

23   one of the top ten markets in the country.

24   If you look at Washington, the suburban

25   Washington area, we had Virginia, Montgomery

W. Kennedy

58

1    County and Baltimore, and there was a gap in

2    Prince George's county, and add to that the

3    fact that Prince George's County was a county

4    of wealthy -- with a wealthy minority

5    population, it just reinforced the reason why

6    we ought to be there.

7        Q     What was the minority population

8    that existed in Prince George's County at the

9    time?

10       A     I don't remember the detail.

11       Q     Do you recall if the minority

12   population in Prince George's County was

13   primarily African American?

14       A     I don't know for sure.

15       Q     Do you know who at UBS made the

16   decision to open the Largo office?

17             MR. HUVELLE:  Object to the form of

18       the question.

19       A     I guess I don't understand what

20   you're asking me.

21       Q     At some point, after Mr. Magruder

22   proposed the idea of a Largo office, did UBS

23   decide to go ahead and open that office?

24       A     I gave them the go-ahead to go

25   ahead and do it.

# EXHIBIT "4"

Page 1

1

2            IN THE UNITED STATES DISTRICT COURT

3              FOR THE DISTRICT OF MARYLAND

4                    SOUTHERN DIVISION

5    FREDDIE H. COOK, et al.,    )

                                 )

6        Plaintiffs              )

                                 )

7            vs.                 )Civil No.

                                 )8-06-cv-00803-PJM

8    UBS FINANCIAL SERVICES,     )

     INC.,                       )

9                                )  ORIGINAL

         Defendant               )

10

11

12

13

14

15    Videotaped Deposition of Bradford Carson

16               Washington, D.C.

17                April 17, 2007

18

19

20

21    Reported by:  Bonnie L. Russo

22    JOB NO. 206568

Page 33

1    Q.    Okay.  Was it before or after you

2  entered the MDP program, if you can put those

3  two events together?

4    A.    It was before.  I mean it wasn't a

5  grand presentation or anything, but I would say

6  it was before.  I wouldn't have gone otherwise.

7    Q.    You wouldn't have gone to the MDP

8  program?

9    A.    Right.

10    Q.    Who presented you -- or strike that.

11        Who made the offer to you to head up

12  the PG County office?

13    A.    It was Coe Magruder.

14    Q.    Okay.  And was that done in

15  Washington?

16    A.    In Washington, yes, sir.

17    Q.    Do you know if he had received

18  approval from anyone else to make that offer to

19  you?

20    A.    No, I don't.

21    Q.    Did he tell you that he needed --

22  that he had gotten approval from Mr. Kennedy?

Page 47

1      Q.    And that is -- what was the total

2   number of financial advisors working there, if

3   you recall?

4      A.    I am guessing again, but it's

5   something on the order of 150.

6      Q.    Did you meet with Mr. Walker about

7   the possibility of him coming over to UBS?

8      A.    I did, yes.

9      Q.    Was anyone else involved in that

10  process on the UBS side?

11     A.    Carl Zagorin was, to my knowledge.

12  No one else I can recall.

13     Q.    Okay.  Did someone from UBS

14  eventually extend an offer of employment to

15  Mr. Walker?

16     A.    I did.

17     Q.    Did you obtain anyone's approval to

18  do that?

19     A.    I had to get Coe Magruder's

20  approval.

21     Q.    Now, with regard to Mr. Edmonds, did

22  you meet with him in connection with the

Page 48

```
 1    possibility of offering him a position with

 2    UBS?

 3       A.    Yes, I did.

 4       Q.    Did anyone else from UBS participate

 5    in that process?

 6       A.    Carl Zagorin.

 7       Q.    Did you offer Mr. Edmonds a position

 8    with UBS?

 9       A.    I did, yes.

10       Q.    And that was to work in the Largo

11    office?

12       A.    In the Largo office, yes.

13       Q.    The same thing with Mr. Walker, the

14    position offered to him was to work in the

15    Largo office?

16       A.    That's correct.

17       Q.    Did anyone authorize you to make the

18    offer of employment to Mr. Edwards?

19       A.    Mr. Magruder.

20       Q.    How long did Mr. Walker remain as a

21    financial advisor in the Largo office?

22       A.    Until the very end.
```

Page 58

```
 1      A.      African American.

 2      Q.      How did he come to be employed as a

 3   financial advisor at the Largo office?

 4      A.      He was referred to me by his sister.

 5      Q.      And who is his sister -- strike

 6   that.

 7              How do you know his sister?

 8      A.      I played golf with her.

 9      Q.      Was he working at a brokerage firm?

10      A.      He was employed with Prudential.

11      Q.      Did you extend an offer of

12   employment to him on behalf of UBS?

13      A.      I did, yes.

14      Q.      And were you authorized to do so by

15   Mr. Magruder?

16      A.      Yes.

17      Q.      And was your offer specifically for

18   the Largo office?

19      A.      It was, yes.

20      Q.      Was he at the Largo office from the

21   beginning?

22      A.      No.  He came probably a year into
```

Page 59

1    our being out there.

2        Q.    Did he stay at the Largo office

3    until it closed?

4        A.    Until May of 2003 also, I believe.

5        Q.    And what were the circumstances of

6    his departure?

7        A.    Lack of production.

8              MR. WHINSTON:  We have been going

9    for about an hour.  Why don't we take a break.

10             THE VIDEOGRAPHER:  Going off the

11   record at 11:04:49.  Off the record.

12             (A short recess was taken.)

13             THE VIDEOGRAPHER:  Going back on the

14   record at 11:13:32.

15             Counsel may proceed.

16             MR. WHINSTON:  Thank you.

17             We are back on the record,

18   Mr. Carson.

19             BY MR. WHINSTON:

20       Q.    You talked earlier about a financial

21   advisor by the name of Jay Walker.

22             Is that the same as Jule Walker?

Page 60

1      A.      Yes, it is.

2      Q.      Do you know David Weber?

3      A.      Yes, I do.

4      Q.      I believe we mentioned him in

5    testimony -- you have mentioned him in

6    testimony already.

7            How did he come to -- strike that.

8            He was a financial advisor at the

9    Largo office; is that correct?

10     A.      Yes.  Yes.

11     Q.      How did he come to work at the Largo

12   office?

13     A.      He was actually working at

14   Washington and I am not sure under what

15   circumstances, but when Coe and I began to talk

16   about Largo, he advised me that Dave Weber

17   wished to go as assistant manager or sales

18   manager, in some management capacity.

19     Q.      So am I correct that you were not

20   involved in the assignment of Mr. Weber to the

21   Largo office?

22     A.      No, I was not.

Page 61

```
 1      Q.     What is Mr. Weber's race?

 2      A.     He is white.

 3      Q.     Do you know Andre Gudger?

 4      A.     Yes.

 5      Q.     If I pronounced that correctly?

 6      A.     Gudger.

 7      Q.     And he was a financial advisor

 8   trainee at the Largo office?

 9      A.     Yes, he was.

10      Q.     Were you involved in his assignment

11   to the Largo office?

12      A.     Yes.

13      Q.     Can you describe what your role was?

14      A.     I actually recruited him.

15      Q.     How did he come to your attention?

16      A.     He was an engineer with AT&T on a

17   special project that my wife worked on.  She

18   thought that he would be a good prospect for

19   me.

20      Q.     So he was not a financial advisor

21   previous to his employment with UBS?

22      A.     No, he wasn't.
```

Page 62

```
 1        Q.     Did you extend the offer of

 2   employment to Mr. Gudger?

 3        A.     Yes, I did.

 4        Q.     And did you have any authorization

 5   to do that?

 6        A.     Mr. Magruder.

 7        Q.     What is Mr. Gudger's race?

 8        A.     He is African American.

 9        Q.     How long did he remain at the Largo

10   office?

11        A.     He was actually there until the end.

12        Q.     Did he transfer to another office

13   when Largo closed?

14        A.     He went off and started his own

15   investment firm.

16        Q.     Do you know Charles Hayward?

17        A.     Yes.

18        Q.     Was he a financial advisor trainee

19   at the Largo office?

20        A.     Yes, he was.

21        Q.     What was his race?

22        A.     He was African American.
```

Page 63

1          Q.      How did he come to be employed at

2     the Largo office?

3          A.      He was referred to me by one of the

4     other brokers.  And I'm not quite sure who, but

5     it was one of the current -- at that time

6     current brokers.

7          Q.      He came -- did he come to the Largo

8     office after it had opened?

9          A.      Yes, he did.

10         Q.      How long did he remain there?

11         A.      I believe he left in early 2003.

12    I'm not sure of the month.

13         Q.      What were the circumstances of his

14    departure?

15         A.      He resigned and was about to be let

16    go for nonproduction.

17         Q.      Do you know where he is currently

18    working?

19         A.      No, I do not.

20         Q.      Do you know Monica Smith?

21         A.      Yes.

22         Q.      Was she a financial advisor trainee

Page 64

1    at the Largo office?

2        A.      Yes, she was.

3        Q.      How did she come to be employed

4    there?

5        A.      She was referred I believe by Fred

6    Moultrie.

7        Q.      Did she have a financial advisor

8    background?

9        A.      No, she didn't.

10       Q.      Did you extend an offer of

11   employment to Ms. Smith?

12       A.      Yes, I did.

13       Q.      Did you have any authorization to do

14   that?

15       A.      Coe Magruder.

16       Q.      How long did Ms. Smith remain at the

17   Largo office?

18       A.      I believe early 2003.

19       Q.      Was she there from the beginning?

20       A.      A few months after we started.

21       Q.      What were the circumstances of her

22   departure?

Page 65

1      A.    I believe she resigned and was close

2  to being let go for nonproduction also.

3      Q.    What is her race?

4      A.    She is African American.

5      Q.    Do you know Paul Watkins?

6      A.    Yes.

7      Q.    Was he a financial advisor trainee

8  at the Largo office?

9      A.    Yes, he was.

10      Q.    What is his race?

11      A.    African American.

12      Q.    How did he come to be employed at

13  the Largo office?

14      A.    He was referred by his uncle.

15      Q.    Who is his uncle?

16      A.    I don't remember his last name.  He

17  is a pastor of a fairly sizable church in the

18  district that I went to speak to.  And he

19  suggested I talk with his nephew who was

20  working at ironically J.C. Bradford in

21  Nashville.

22      Q.    What is so ironic about that?

Page 66

1      A.      Because we were in the process of

2    buying J.C. Bradford.

3      Q.      Okay.  Did you extend an offer of

4    employment to Mr. Watkins?

5      A.      Yes, I did.

6      Q.      Did you have any authorization to do

7    that?

8      A.      Mr. Magruder.

9      Q.      Okay.  When did he come to work at

10   Largo?

11     A.      I am guessing now, but I would say

12   mid 2001.  Maybe a little later in the year.

13     Q.      And how long did he stay?

14     A.      He left probably early 2003.

15     Q.      What were the circumstances of his

16   departure?

17     A.      Low production.  He resigned.

18     Q.      Do you know Dion or Diane Watson?

19     A.      Yes.  Dion.

20     Q.      Dion.  Okay.

21             Is that a woman?

22     A.      Woman, yes.

Page 88

 1      A.      Yes, we were.

 2      Q.      And there were -- there has been

 3  some testimony that UBS -- that the Largo

 4  office was complexed into the Washington, D.C.

 5  office.

 6              Is that your understanding?

 7      A.      That's my understanding, yes.

 8      Q.      What does that mean?

 9      A.      That just means that you report

10  through the regional -- I mean one person other

11  than the regional manager.  That's really all.

12              And to me what it means is I am tied

13  to someone else's budget for approval until

14  somebody feels I am free to roam alone.  That's

15  all it means to me.

16      Q.      So you were tied to the Washington,

17  D.C. branch office budget?

18      A.      Yes.

19      Q.      And rather than -- a branch office

20  manager would report to a regional?

21              MR. WILLIAMSON:  Objection.  That's

22  a mischaracterization of prior testimony.

Page 89

```
 1                BY MR. WHINSTON:

 2       Q.    A branch office manager would report

 3   to a regional director?

 4       A.    That's normally the way it is.  I

 5   mean that's the way it's set up.

 6       Q.    And because Largo was complexed, you

 7   reported to Mr. Magruder?

 8       A.    Yes.

 9       Q.    Were there -- by the way, for those

10   folks that you hired from -- strike that.

11                You testified earlier about some

12   names that were referred to you from Merrill

13   Lynch.  Do you recall that?

14       A.    Yes.

15       Q.    Did you specifically ask that you be

16   referred names of minority brokers?

17       A.    No.  I didn't ask.  I pretty much

18   asked all the people in the office to anyone

19   that they knew that might consider working for

20   us to give me their names.  That's how I got

21   the Merrill people.

22                But I actually knew them personally
```

Page 94

```
 1    the staffing in terms of numbers of financial

 2    advisors and trainees?

 3        A.    Probably nine or ten that were

 4    actually seated at that point, yeah.

 5        Q.    And Mr. Weber, was he there at the

 6    start?  I don't remember if I asked you that.

 7        A.    He was, yes.

 8        Q.    Was he the only Caucasian broker

 9    there at the start?

10        A.    Yes.

11        Q.    So were you satisfied with the

12    quality of the people that you hired?

13        A.    Before or after?

14        Q.    No.  At the time of hiring.

15        A.    Well, at the time of hiring I was.

16    I mean most of the people were new, raw talent.

17             I made a misstatement before, by the

18    way.  I want to clarify that.

19             We were talking to some people at

20    Merrill that Dave Weber knew and I don't

21    remember their names.  He might have mentioned

22    them. ' There were people that began to come
```

Page 101

1          And Fulwood for options, but I

2    wasn't hardly encouraging options so.

3      Q.    Why not?

4      A.    Well, these guys were just learning

5    how to write tickets, so they were not really

6    into options strategy.  That would have been

7    suicide.

8      Q.    In light of the experience levels of

9    the brokers hired for the Largo office, did you

10   think it was important to have an experienced

11   sales manager there?

12          MR. WILLIAMSON:  Objection.

13   Argumentative.

14          THE WITNESS:  No, I don't think so.

15          BY MR. WHINSTON:

16     Q.    Was there an administrative manager

17   for the Largo office?

18     A.    We had an ops manager.

19     Q.    Who was that?

20     A.    Debbie Pittman.

21     Q.    Was she there when the office

22   opened?

Page 102

```
 1      A.      Yes.

 2      Q.      And how long did she stay?

 3      A.      Right through the end.

 4      Q.      Did she have any previous experience

 5   as an operations manager?

 6      A.      She had been assistant ops manager

 7   for D.C. for about three years is my

 8   recollection.

 9      Q.      But no experience as an operations

10   manager?

11      A.      Actual ops, no.

12      Q.      Were you what is known as a

13   producing manager?

14      A.      Yes.

15      Q.      What is a producing manager?

16      A.      It's just somebody who is actually

17   managing but also has a book of business to

18   maintain.

19      Q.      And was your compensation based in

20   part on your book of business and in part based

21   on your role as manager?

22      A.      Yes.
```

# EXHIBIT "5"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

|  |  |
|---|---|
| FREDDIE COOK, et al. | CIVIL ACTION NO. PJM 06-803 (CBD) |
| Plaintiffs, | |
| v. | ECF CASE |
| UBS FINANCIAL SERVICES, INC., | |
| Defendant. | |

## <u>DECLARATION OF FREDDIE COOK</u>

I, Freddie Cook, declare as follows:

1.    I was employed by UBS Financial Services, Inc. ("UBSFS"), as a Financial
      Advisor (also known as a "Broker") from June 4, 2001 to July 23, 2004.

2.    During my employment, I worked at two UBSFS branch offices, one in Largo,
      Maryland ("Largo"), and the other in Washington, D.C. ("Washington").

3.    During my employment, I experienced discrimination by UBSFS with respect to
      hiring, job assignment, compensation and professional support, among other
      things, as set forth in more detail below.

4.    Specifically, in November 2000, UBSFS opened a "diversity" branch office in
      Largo, and staffed it nearly entirely with African American employees.
      Approximately twenty out of the twenty-five Financial Advisors at the Largo
      office were African American.

5.    When I was hired by UBSFS, my starting annual salary of $50,000 was lower
      than the starting salaries of similarly situated Caucasian employees at UBSFS.

6.    The Largo office was explicitly established as a "diversity" office and was tasked
      with generating new business from the surrounding Prince George's County
      community, which was predominantly African American.

7.    Rather than giving Largo independent office status, it was set up as a "satellite" of
      UBSFS' large Washington office. The Largo office was "complexed" into the
      Washington office, which was managed by Branch Office Manager, Coe
      Magruder (Caucasian), and thus was part of his responsibility.

2

Case 1:07-cv-00853-RMU    Document 11-7    Filed 06/21/2007    Page 4 of 10

Case 8:06-cv-00803-PJM    Document 85-6    Filed 05/24/2007    Page 4 of 10 ........

Case 8:06-cv-00803-PJM    Document 76-3    Filed 04/09/2007    Page 4 of 10

8.    The entire managerial staff of the Washington office, and nearly all of its Financial Advisors, were Caucasian.

9.    UBSFS appointed Brad Carson, an African American Financial Advisor with no branch management experience, as the Largo office Resident Manager. Although Mr. Carson had the title of manager, he reported to Mr. Magruder and was given little independent authority. Instead, all significant decisions were made by Caucasian managers in the Washington Office.

10.   Mr. Carson was expected to maintain his own book of business rather than being devoted exclusively to managing the office, therefore, he was known as a "producing" manager.

11.   Furthermore, for part of my employment at the Largo office, Mr. Carson was also the only individual at the Largo office with a NASD Series 8 license, meaning he was the only individual who could approve certain securities transactions before they could be finalized.

12.   Numerous daily transactions, including business letters and faxes leaving the branch office, required the prior written approval of a Series 8 holder. When Mr. Carson was not available, the documents would either have to be sent to the Washington office for approval, or a Series 8 holder would have to be sent from Washington to the Largo office on a temporary basis to approve transactions. Typically, UBSFS would assign an office the size of the Largo office two or three Series 8 license holders. UBSFS' failure to permanently assign enough Series 8 holders to the Largo office resulted in delayed transaction approvals and/or

further limitations on the time that Mr. Carson was able to devote to manage the
Largo office and be available to assist me and other Financial Advisors.

13.     Similarly situated Caucasian Financial Advisors in other UBSFS offices were not
faced with the lack of support caused by the fact that Mr. Carson was a producing
manager and the only person in the office with a Series 8 license.

14.     Also, UBSFS appointed a sales manager to the Largo Office, David Webber, who
had no sales management experience, lacked a Series 8 license, and failed to
provide adequate sales support to me and other Financial Advisors. This
adversely impacted me as a new Financial Advisor/Trainee and deprived me the
training and valuable assistance routinely provided to Caucasian Financial
Advisors in UBSFS' other offices.

15.     Suzanne McGovern, Administrative Manager, was supposed to advise me and
other Financial Advisors on managing our clients and business, however, she also
had no sales management experience, was unable to approve certain transactions,
including insurance transactions on which I worked, and was ineffective. Here
again, when Mr. Carson was not available, my insurance-related paperwork had to
be sent in to the Washington office for approval, resulting in delays.

16.     UBSFS appointed an Operations Manager to the Largo office, Debbie Pittman,
who lacked previous experience as an Operations Manager and, as a result, failed
to provide adequate support for me and other Financial Advisors. Her lack of
experience had a particularly negative effect in light of the staffing of the Largo
Office by newly hired Financial Advisors/Trainees. Similarly situated Caucasian

4

Financial Advisors in other UBSFS offices were provided with adequate office support services.

17. Furthermore, UBSFS failed to provide the Largo office with adequate funds for marketing activities. On at least two occasions, my requests for marketing funds to increase my business opportunities were rejected by UBSFS. I personally spent at least $6,000 out of my own pocket to conduct promotional events. However, UBSFS paid for similar events conducted by similarly situated Caucasian employees.

18. In light of the minimal salary provided to me, the absence of adequate marketing funds severely impacted my ability to generate new business and revenue. Similarly situated Caucasian Financial Advisors were not treated in this fashion.

19. UBSFS failed to assign an adequate number of competent Client Service Associates ("CSA's") to the Largo office to assist me and other Financial Advisors in carrying out our business.

20. CSA's performed clerical and paperwork tasks for Financial Advisors and were routinely provided to Caucasian Financial Advisors.

21. In early 2003, me and Sylvester Fleming had to locate our own CSA and pay out of our own pockets for her services. Similarly situated Caucasian employees were not treated in this fashion.

22. Further, UBSFS management and employees frequently ridiculed the Largo Office and its staff, and referred to us as a "diversity" office. As a result, a negative stigma attached to me due to my employment at the Largo office.

5

23.     In sum, UBSFS failed to support, fund and operate the Largo office in a manner comparable to its other offices. The company discriminated me by denying me the compensation and professional support provided to Caucasian Financial Advisors in its other offices. Staffing and operating the Largo office in this manner was a prescription for failure, and I suffered as a result.

24.     In approximately April 2003, Mr. Magruder, informed the Financial Advisors at the Largo office that UBSFS was fully committed to the office, that rumors to the contrary were false, and that the office would not close. Mr. Magruder reassured us that UBSFS had signed a ten-year lease on the Largo office building through 2010.

25.     However, the next month, Mr. Magruder returned to the Largo office and announced that UBSFS was permanently closing the office effective June 2003.

26.     I transferred to the Washington office, Mr. Carson was demoted and a number of African American Financial Advisors were terminated.

27.     In the Washington office, however, the discrimination in compensation, professional support and stigma continued.

28.     For example, I observed that Caucasian employees dominated upper-level and higher compensated positions within the company.

29.     I discovered the existence of a network of Caucasian Financial Advisors, who UBSFS favored over African American Financial Advisors with training and business opportunities. For example, Mr. Magruder often distributed the larger unassigned accounts to his favorite Caucasian Financial Advisors. Also,

Caucasian Financial Advisors were given opportunities for training (e.g. through partnerships/teams with seasoned brokers), advancement and increased compensation that were denied to me.

30.    Upon my arrival at the Washington office, UBSFS assigned a CSA to me and Mr. Fleming, however, within only days, UBSFS switched this CSA for someone who was still in college and had no securities license, Chastity Hicks. Ms. Hicks remained our CSA for the remainder of our employment. She refused to perform tasks that CSAs routinely performed for Caucasian Financial Advisors such as answering telephones and doing work that would assist us in obtaining clients. I frequently complained about this to Janice Lytle, the Administrative Manager and to Mr. Magruder. They reassured me that they were attempting to remedy the problem.

31.    However, I lost potential and existing business due to the discriminatory working conditions, compounded with the difficulty of doing business in the Washington office, as well as the lack of proximity to my clients in suburban Maryland.

32.    My production fell steeply between June 2003 and July 2004. My total compensation for this period was approximately $44,154, and had declined to a point where I was forced to use my savings to support myself and my family.

33.    In May or June 2004, UBSFS transferred me from an office to the "bullpen," which was humiliating. However, Mr. Magruder informed me that my placement in the bullpen was temporary until my production increased.

7

34.  The stigma of my having worked at the Largo office continued to affect me. Caucasian employees at the Washington office treated me and other African Americans as second-class individuals.

35.  When I complained to my supervisors concerning the oppressive conditions under which I was working, they reassured me that they were working to fix the problems, and I relied on these assurances throughout my employment. However, they allowed the above conditions to continue un-remedied.

36.  As a result of the above-mentioned discrimination, my working conditions became so intolerable that I was forced to resign.

37.  On July 23, 2004, I submitted a letter of resignation to Mr. Magruder, formally notifying him that I was resigning my position, effective immediately. See Resignation Letter.

38.  May 17, 2005, I filed a charge of discrimination with the EEOC. See EEOC Charge.

I declare under penalty of perjury that the foregoing is true and accurate.

April 8, 2007

Freddie Cook

# EXHIBIT "6"

Page 1

1

2            IN THE UNITED STATES DISTRICT COURT

3               FOR THE DISTRICT OF MARYLAND

4                    SOUTHERN DIVISION

5    FREDDIE H. COOK, et al.,    )

                                 )

6       Plaintiffs              )

                                 )

7          vs.                  ) Civil No.

                                 ) 8:06-cv-00803-PJM

8    UBS FINANCIAL SERVICES,     )

     INC.,                       )

9                                )  ORIGINAL

        Defendant               )

10

11

12

13

14

15       Videotaped Deposition of David R. Weber

16                  Washington, D.C.

17                   April 13, 2007

18

19

20

21    Reported by:  Bonnie L. Russo

22    JOB NO. 180479

**David R. Weber**

Page 43

```
 1      Q.      Okay.  And which one was that?

 2      A.      Largo.

 3      Q.      Are you aware of any other satellite

 4   branches at UBS other than Largo?

 5      A.      No.

 6      Q.      Are you aware of any complexed

 7   branch offices at UBS?

 8      A.      I know we have offices around

 9   Baltimore.  I have never been there.

10      Q.      And which offices are those?

11      A.      I think there is one in Hunt Valley.

12      Q.      Just going back to your employment

13   at the Largo office and the questions I asked

14   with respect to your supervisory functions, do

15   you recall that discussion?

16      A.      Yes.

17      Q.      Did anyone ask you to supervise

18   financial advisors in the Largo office?

19      A.      Yes.

20      Q.      Who?

21      A.      Coe Magruder.

22      Q.      And when did Mr. Magruder ask you to
```

**David R. Weber**

Page 44

1    do that?

2        A.    Originally when I was considering

3    employment, at the time Paine Webber, he told

4    me that he was going to be opening a new branch

5    office and that he would like to have me as a

6    sales manager.

7        Q.    And did he say that he would like to

8    have you as a sales manager in the Largo

9    office?

10        A.    Yes.

11        Q.    And were you open to that

12    suggestion?

13        A.    Yes.

14        Q.    What was your response to Mr.

15    Magruder at that time?

16        A.    It was understood that I was going

17    to be the sales manager at the office, if I

18    chose to be.

19        Q.    Okay.  And did you choose to be?

20        A.    Yes.

21        Q.    Have you ever heard of the -- strike

22    that.

# EXHIBIT "7"

Page 1

1

2                IN THE UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF MARYLAND

4                       SOUTHERN DIVISION

5    FREDDIE H. COOK, et al.,      )

                                   )

6        Plaintiffs                )

                                   )

7            vs.                   ) Civil No.

                                   ) 8-06-cv-00803-PJM

8    UBS FINANCIAL SERVICES,       )

     INC.,                         )

9                                  )                COPY

         Defendant                )

10

11

12

13

14

15        Videotaped Deposition of Janice Lytle

16                   Washington, D.C.

17                   April 11, 2007

18

19

20

21    Reported by:  Bonnie L. Russo

22    JOB NO. 180332

**Janice Lytle**

Page 71

1    finished one notebook, going on to another

2    notebook.

3         Q.    How many financial advisors were

4    employed in the D.C. office during your tenure

5    there as administrative manager?

6         A.    60 to 70 or so.  I don't remember

7    the exact number.

8         Q.    And approximately how many

9    administrative staff?

10        A.    Approximately 25 to 30.

11        Q.    To whom did you report as

12   administrative manager in the D.C. office?

13        A.    Coe Magruder.

14        Q.    Were there any other managers, other

15   than yourself and Mr. Magruder, located in the

16   D.C. office during your tenure there?

17        A.    Yes.

18        Q.    Who were they?

19        A.    There was a sales manager.

20        Q.    Who was that?

21        A.    Tim Thompson.

22        Q.    And what is Mr. Thompson's race?

**Janice Lytle**

Page 75

1       Q.      And who was that?

2       A.      Robert Clark.

3       Q.      When did Mr. Magruder leave?

4       A.      That would have been the spring of

5    2006.

6       Q.      What is Mr. Clark's race?

7       A.      He is Caucasian.

8       Q.      After the administrative manager

9    position in the D.C. office, what was the next

10   position that you held?

11      A.      Regional administrative officer.

12      Q.      And where was that located?

13      A.      Washington, D.C.

14      Q.      Were you located in the D.C. branch

15   office?

16      A.      It is located within the D.C. branch

17   office.

18      Q.      When did you begin in the regional

19   administrative officer position?

20      A.      In the end of July, beginning of

21   August of 2006.

22      Q.      Why did you leave the administrative

Page 82

```
 1              The projects vary.  There are not
 2   any specific projects.
 3              BY MS. ABLO:
 4      Q.     Have you held the regional
 5   administrative office position through to the
 6   present?
 7      A.     Correct.
 8      Q.     Do you recall in 2002 approximately
 9   how many client services associates were
10   employed in the D.C. office?
11      A.     No.
12      Q.     Do you know if it was more than one?
13      A.     Yes.
14      Q.     More than ten?
15      A.     Yes.
16      Q.     More than 20?
17      A.     Most likely more than 20.
18      Q.     More than 30?
19      A.     Probably not more than 30.
20      Q.     Do you recall their names?
21      A.     In the office at that time, no.
22      Q.     Do you know approximately how many
```

**Janice Lytle**

Page 125

1       A.      Finance.  I don't know exact titles,

2   but he is the individual that handles the

3   finances for the division.

4       Q.      Does the Alexandria branch fall

5   within the eastern division?

6       A.      Yes.

7       Q.      Who in the D.C. office was

8   responsible for maintaining personnel files of

9   employees during your tenure there as

10  administrative manager?

11      A.      When you say "maintain," I mean

12  management had access to put information in

13  them.

14              We also had a branch office

15  administrator who when she would complete what

16  is called an HRMS form, that would be if an FA

17  wanted to pay supplemental comp, she would

18  complete a form, she would put that into the

19  file.

20      Q.      Where would the files, personnel

21  files be kept?

22      A.      In an office.

Page 126

```
 1         Q.      Was it a particular individual's

 2    office?

 3         A.      Yes.

 4         Q.      Who was that?

 5         A.      They were kept in the office that is

 6    right next to the branch manager.  The

 7    compliance officer was located in that office.

 8         Q.      And were those files the files of

 9    both financial advisors as well as other staff

10    in the D.C. office?

11         A.      Yes.

12         Q.      I may have asked you this before.

13         A.      Okay.

14         Q.      As administrative manager in the

15    D.C. office, did you have any oversight of

16    Largo administrative staff in 2002?

17         A.      Oversight of what?

18         Q.      Largo.

19         A.      Of Largo?

20         Q.      Administrative staff that were based

21    in Largo?

22         A.      Okay.  Say the question one more
```

**Janice Lytle**

Page 137

1     Q.     Did he have any managerial position

2     there?

3     A.     No.   None that I'm aware of.

4     Q.     During the existence of the Largo

5     office, did you ever perform Series 8 approvals

6     for any of the correspondence or transactions

7     in that office?

8     A.     Yes.

9     Q.     Can you describe when you did that?

10    A.     When Brad Carson was not in the

11    office or able to be in the office, I would go

12    to help cover for supervision.

13    Q.     And would you go to -- would you

14    physically take yourself to the Largo office --

15    A.     Uh-huh.

16    Q.     -- in order to do that?

17    A.     Yep.  Uh-huh.

18    Q.     Approximately how many times do you

19    think that you went to the Largo office to

20    Series 8 approve transactions?

21    A.     More than 20.  I don't remember how

22    many times, but anytime Brad could not be

**Janice Lytle**

Page 138

1    there.   Maybe a few occasions when he was there

2    I would go by also.   But it was any and every

3    time that Brad would be out of the office I

4    would go.

5         Q.    And if Mr. Carson was in the Largo

6    office, why would you still go to approve

7    Series 8 transactions?

8         A.    Just to supervise.   Maybe hadn't

9    been there in a while.   Just to see how

10   everything is going.   Check in with everybody.

11        Q.    Were you going at Mr. Carson's

12   request or was it just you --

13        A.    It could have been at his request.

14        Q.    -- on your own initiative?

15        A.    But also probably more so my own

16   because I hadn't been in the office in a while.

17   If I hadn't been there in a while.

18        Q.    How often would you make the trips

19   on your own initiative to review what is going

20   on in the Largo office?

21        A.    Maybe every quarter.

22        Q.    When you made those trips on your

Page 146

1      Q.    Were you required by securities

2   industry rules to approve -- give Series 8

3   approval in person or could you do it by fax or

4   e-mail, electronic signature?

5      A.    You can do it by fax.  As long as

6   there is evidence of a manager reviewing it and

7   approving it, you can do it by fax also.

8      Q.    Were there instances in which you

9   did Series 8 approved transactions from the

10  Largo office via fax?

11     A.    Yes.

12     Q.    About how many times did you do

13  that?

14     A.    I mean a fair amount.  I don't

15  remember the exact amount.  It is daily.  It

16  could be daily work and, you know, if it's --

17  anytime a client sends in a letter requesting

18  something to be done, that has to be approved.

19  So it's hard to say.

20            A lot.  It could be a lot.

21     Q.    Do you know if it happened if you

22  approved Series 8 approved transactions in the

**Janice Lytle**

Page 147

1    Largo office by fax more than 30 times during

2    your employment as administrative manager?

3         A.    Uh-huh.   Probably.

4         Q.    More than 80?

5         A.    I don't know.   That is so hard to

6    say.  I don't know.

7         Q.    Okay.   I think I did ask you this

8    before, but about how many times do you think

9    you actually went over physically to the Largo

10   office to approve --

11        A.    That I don't know.  It was anytime

12   Brad was not there.  If he was on vacation or

13   out of the office and knew about it.  And then

14   occasionally just to go over if I hadn't been

15   there in a while.  And I don't know how many

16   times that ended up being.

17        Q.    Do you know if it was more than

18   20 times?

19        A.    All in total, yes.  Definitely more

20   than 20.

21        Q.    More than 40?

22        A.    I don't know.  I do not know.

**Janice Lytle**

Page 149

1    call and make sure that there was someone there

2    to receive it to let us know it's coming.

3              So there would have been no delays.

4         Q.    And you said you did most of the

5    Largo Series 8 approvals when Brad Carson was

6    not available, correct?

7         A.    When I was in the office, I would.

8    If it was a situation where Brad went to lunch

9    and they needed something, then they could fax

10   it to any one of the managers in the Washington

11   office.

12        Q.    Are you aware of any delay that

13   occurred with respect to the requests for

14   Series 8 approval that was directed to you?

15        A.    No.

16        Q.    How about the requests that were

17   directed by the Largo FAs to any of the other

18   Series 8 holders in the D.C. office?

19        A.    Not that I am aware of.  None that I

20   remember.

21        Q.    Did you ever receive any complaints

22   about delays in the Largo office being able to

# EXHIBIT "8"

1

1    UNITED STATES DISTRICT COURT

2    FOR THE DISTRICT OF MARYLAND

3

4    - - - - - - - - - - - - - - x        COPY

5    FREDDIE COOK, ET AL.,            :

6                                     :

7         Plaintiffs,                 :

8                                     :    Civil Action No.

9         v.                          :

10                                    :    06 CV 803 (PJM)

11   UBS FINANCIAL SERVICES, INC.,    :

12                                    :

13        Defendant.                  :

14   - - - - - - - - - - - - - - x

15

16                      Washington, D.C.

17                      Monday, April 9, 2007

18        The video deposition of JOHN CRAWFORD,

19   called for examination by counsel for Defendant in the

20   above-entitled matter, pursuant to notice, in the

21   offices of Covington & Burling, 1201 Pennsylvania

22   Avenue, Northwest, Washington, D.C., convened at 9:52

23   a.m., before Judy Brown, a notary public in and for

24   the District of Columbia, when were present on behalf

25   of the parties:

6

1  UBS Financial Services.

2              MR. STANWOOD:   Jonathan Stanwood on

3  behalf of the plaintiff.

4              THE VIDEOGRAPHER:   Would the court

5  reporter, Judy Martin, please swear in the

6  witness.

7                     JOHN CRAWFORD

8  called for examination by counsel for the

9  Defendant, and having been duly sworn by the

10 Notary Public, was examined and testified as

11 follows:

12          EXAMINATION BY COUNSEL FOR THE DEFENDANT

13              BY MR. WILLIAMSON:

14    Q     Mr. Crawford, would you please state

15 your full name and address.

16    A      John Crawford.  Address is 1280 21st

17 Street, Northwest, Apartment 710, Washington, D.C.

18 20036.

19    Q     Okay.  My name is Tom Williamson and

20 I'm one of the lawyers representing UBS Financial

21 Services this morning.  I'm with law firm of

22 Covington & Burling.  So I'm acting as outside

23 counsel on behalf of the company, and we've asked

24 you to appear for this deposition so that we could

25 ask you some questions about litigation that's

77

1  from assistant operations manager at the D.C.

2  office to operations manager at the Largo office

3  in late 2000?

4       A     Could you repeat that, please.

5       Q     Do you know if Ms. Pitman was promoted

6  from assistant operations manager at the D.C.

7  office to operations manager at the Largo office

8  in late 2000?

9       A     No.

10      Q     How often did you interact with Ms.

11 Pitman when she was operations manager at Largo?

12      A     Sometimes daily.

13      Q     What was the nature of the interaction?

14      A     Probably transactional, whatever type

15 of transactions I needed, new accounts, that type

16 of thing.

17      Q     And what did you think of Ms. Pitman's

18 performance as operations manager at Largo?

19      A     I had some problems with it.

20      Q     What were your problems with it?

21      A     It seemed that lots of times things

22 would, I felt, would be unnecessarily delayed like

23 new accounts, annuity tickets would be processed

24 at the end of the day that may have been put in

25 the operations area first thing in the morning,

78

1    those type of things.  Basically that's it.

2        Q      Did that cause you to lose any

3    business?

4        A      No.

5        Q      In her role as operations manager at

6    Largo, what -- what did Ms. Pitman do to help

7    Mr. Cook and Mr. Fleming perform their job

8    responsibilities as financial advisors?

9        A      I don't know.

10       Q      Okay.  Do you know whether Ms. Pitman

11   ever treated Mr. Cook in a racially discriminatory

12   manner?

13       A      No.

14       Q      Well, let me ask the question -- did --

15   to your knowledge, did Ms. Pitman ever treat

16   Mr. Cook in a racially discriminatory manner?

17       A      No.

18       Q      What about Mr. Fleming, did she ever

19   treat Mr. Fleming in a racially discriminatory

20   manner?

21       A      No.  That I'm aware of, no.

22       Q      Okay.  What is a client service

23   associate at a UBS branch office?

24       A      They act as administrative assistants.

25       Q      To whom?

1     A     That I don't know.

2     Q     Do you know if anyone else in the Largo

3 office had a Series 8 license during your time

4 there?

5     A     I believe that Susie -- Susan McGovern

6 had one.

7     Q     And prior to Ms. McGovern's joining the

8 Largo office, did any Series 8 license holders

9 from the D.C. office come to cover the Largo

10 office at times when Mr. Carson was not physically

11 present at the office?

12     A     Yes.

13     Q     Was -- who was that?

14     A     Janice Lytle and on one occasion I

15 remember Coe Magruder.

16     Q     Could any financial advisor at Largo

17 also fax documents to the D.C. branch office to

18 get the approval of a Series 8 license holder

19 there?

20     A     I have no awareness of that.

21     Q     Do you know if anyone else in the Largo

22 office had a Series 8 license besides Ms. McGovern

23 and Mr. Carson?

24     A     No.

25     Q     Did you say that after a time Freddie

# EXHIBIT "9"

1

1    IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF MARYLAND

3  FREDDIE H. COOK, et al.,        )    COPY

4            Plaintiffs,          )

5        v.                        )    Civil Action No.

6  UBS FINANCIAL SERVICES, INC., )    06 CV 803 (PJM)

7            Defendant.            )

8

9                        Washington, D.C.

10                       Thursday, April 5, 2007

11  The video deposition of

12                  FREDDY MOULTRIE,

13  called for oral examination by Counsel for the

14  Defendant, pursuant to notice, held in the law

15  offices of Covington & Burling, 1201 Pennsylvania

16  Avenue, N.W., Washington, D.C., beginning at 9:42

17  a.m., before Carol J. Robinson, Registered

18  Professional Reporter and a Notary Public, when

19  were present:

20

21

22

23

```
 1        Q      Where did you -- how long did you
 2    stay there?
 3        A      I stayed a little over two years.
 4        Q      And where did you work next?
 5        A      UBS.
 6        Q      We'll come back to that.  UBS
 7    Financial Services?
 8        A      That's correct.
 9        Q      Are you currently employed?
10        A      Yes, I am.
11        Q      Where is that?
12        A      Citibank.
13        Q      What is your job?
14        A      I'm a financial center manager for
15    Citibank.
16        Q      Where do you work?
17        A      The area is called Palisades in
18    Washington, D.C. right outside of Georgetown.
19        Q      What are your job duties there?
20        A      I manage the center including
21    tellers, personal bankers and soon to be mortgage
22    consultants.  My job is to manage the branch,
```

31

1  Tyson's Corner.  They called me in.  One of the

2  tests was still there.  So, I just had to do

3  another test.

4       Q      Now, when you sent it in -- why were

5  you sending something into D.C.?

6       A      I wasn't getting a response at the

7  Tyson's Corner branch.

8       Q      And so why didn't you call somebody

9  at the Tyson's Corner branch and ask them --

10      A      I know there are multiple branches

11 around, and my real focus was just to get into

12 UBS and I wasn't concerned about the office.

13      Q      I see.  Were you ever offered a

14 position at the Tyson's Corner office?

15      A      Once I finished my test in the D.C.

16 office, they did give me the option of possibly

17 going to Tyson's Corner.

18      Q      And who made that offer to you?

19      A      I believe it was Coe Magruder.

20      Q      Did he make that offer to you

21 personally, in a letter?

22      A      I don't recall exact I exactly how

32

1   the offer was made.  I believe it was verbal.

2         Q      And what was your response to his

3   saying you could either work in the Tyson's

4   Corner office in Virginia or the D.C. office?

5         A      At that time, I told him it didn't

6   matter, and he also gave me the option of the

7   Largo office.

8         Q      So, you were --

9         A      Talking to the manager at the Largo

10  office.

11        Q      So, Mr. Magruder gave you three

12  options in terms of where you could start with

13  UBS, is that right?

14        A      That's correct, yes.

15        Q      And how did you respond to those

16  three options?

17        A      He responded that you will be hired

18  out of the D.C. office and I would like you to

19  meet Mr. Carson, Mr. Brad Carson who will be the

20  manager of the Largo office.

21        Q      He told you -- I'm sorry.  You are

22  saying that he decided for you?  Is that because

1  you said it didn't matter to you?

2      A      Right, and he indicated that I would

3  be hired out of the D.C. office and that he

4  wanted me also to speak to Mr. Brad Carson.

5      Q      Did you actually start working then

6  at the D.C. office?

7      A      That's correct.  Yes.

8      Q      Now, were there other African

9  Americans working in the D.C. office at the time

10  as a financial advisor when you were hired in --

11  was this the summer of 2000?

12      A      Yes.  I think my official hire date

13  was September.  I started the interview process

14  in July or August but my official start date was

15  September.

16      Q      Let me restate the question.  In

17  September of 2000 when you were hired in the D.C.

18  office, were there other African American

19  financial advisors working in the D.C. office at

20  that time?

21      A      Yes, there were.

22      Q      Do you remember how many?

34

1     A     No, I do not.

2     Q     Do you remember the names of any of

3  them?

4     A     Yes, I do.

5     Q     Can you tell me the names you

6  remember?

7     A     Of the names I remember, Mark

8  Spradley, Sean Wintz, those are the only names I

9  can remember.  I know there were other

10  individuals.

11          MR. AUBERTINE:  Counsel, do you mind

12  we get a spelling on Mr. Wintz's last name?

13  That's usually a tough one.

14          MR. WILLIAMSON:  I do not mind that

15  at all.  I think it is W-I-N-T-Z is the way I've

16  got it in my notes here.

17          MR. AUBERTINE:  I think that's

18  correct.  Thank you.

19          BY MR. WILLIAMSON:

20     Q     What about Brad Carson?  Was he

21  working there?

22     A     Yes, he was.

1      Q      Gerald Chen Young?

2      A      I don't recall the name.

3      Q      Was Carl Racine working there?

4      A      I'm not sure -- was he also in the

5 Largo office, the same Carl?

6      Q      I'm talking about the D.C. office.

7      A      Right.  Right, if it's the Carl that

8 I'm thinking of, yes, but I can't confirm that

9 last name.

10     Q      Timothy States?

11     A      Yes.

12     Q      What about Noel Yamiego?  Was he

13 another African American who working in the D.C.

14 office at the time you were hired there?

15     A      I don't recall him.

16     Q      About how long did you work in the

17 D.C. office?

18     A      From September until November, I

19 believe, somewhere around November.

20     Q      Do you remember if there were any

21 African American individuals who were hired as

22 financial advisors in the D.C. office during the

73

 1        Q       To your knowledge, did the

 2   compensation plan for financial advisors apply to

 3   all financial advisors regardless of whether they

 4   were white or black?

 5        A       From what I remember, yes, it was a

 6   general plan for everyone.

 7        Q       So, did it apply to all the financial

 8   advisors in both the D.C. and the Largo branch

 9   offices?

10              MR. AUBERTINE:   Objection to form.

11              THE WITNESS:   I believe so.

12              BY MR. WILLIAMSON:

13        Q       Do you know if Mr. Carson had

14   completed the training to be a branch office

15   manager at the time UBS opened the Largo office

16   in late 2000?

17        A       I don't know.

18        Q       Do you consider Mr. Carson a friend?

19        A       Yes.

20        Q       And did you consider Mr. Carson a

21   mentor for you when you worked at the Largo

22   office?

74

```
 1        A      Yes.

 2        Q      What did you think of his performance

 3  as branch manager?

 4        A      Compared to --

 5        Q      In terms of -- compared to what you

 6  felt you needed to assist you to get your job

 7  done.

 8        A      I think he lacked assistance to do it

 9  effectively.

10        Q      And what is it that he lacked?

11        A      Support.

12        Q      What support did he lack?

13        A      Staff and also support from the D.C.

14  office.

15        Q      When you say he lacked staff, what

16  staff was he lacking?

17        A      A qualified sales manager, a

18  receptionist.

19        Q      Is it -- was it your understanding

20  that an office of this size would normally have a

21  receptionist?

22        A      I believe an office of that nature
```

75

1    should have a receptionist.

2          Q      But I'm asking, do you know whether

3    in the UBS system -- first of all, do you know

4    how staff were allocated to offices under the UBS

5    system?

6          A      No.

7          Q      Do you know what standards were used

8    to determine whether a receptionist would be put

9    into an office?

10         A      No.

11         Q      Were there any efforts to provide a

12   sales manager at the Largo office, to your

13   knowledge?

14         A      There was a sales manager there.

15         Q      Who was the sales manager?

16         A      Suzie McGovern.

17         Q      And was there anybody before Suzie

18   McGovern who was -- tell me, before I ask that,

19   what was were the responsibilities of the sales

20   manager?

21         A      From my understanding, her job was to

22   help sales for the financial advisors inside the

76

1  office.

2       Q      How did the sales manager do that?

3       A      Through marketing, through training,

4  development of each of the financial advisors.

5       Q      Before Ms. -- well, was Ms. McGovern

6  there the whole time that you were there?

7       A      I don't remember exactly when she got

8  there, but I think I was there before she was.

9  I'm not exactly sure.

10      Q      And --

11      A      I think there was a time when we

12 didn't have her, I believe, yes.

13      Q      Before she came, was there anybody

14 else who was designated to play the sales manager

15 role at the Largo office?

16      A      You mean designated officially?

17      Q      Designated by UBS management.

18      A      Not to my knowledge, no, other than

19 Brad Carson doing it.

20      Q      Did you say that you did or did not

21 remember whether there was an individual named

22 Dave Weber who worked at the Largo office?

77

     A     I do remember.

     Q     And was Mr. Weber someone who had
sales experience as a financial advisor?

     A     Yes, he did.

     Q     And did Mr. Weber provide any support
or assistance for helping other FAs and trainees
to drive sales at the Largo office when he was
employed there?

     A     I know he had conversations with
individuals.  I was not one of them.

     Q     So, you don't know what kind of
support he was providing?

     A     No, other than he didn't have a
license to be a sales manager, no.

     Q     Do you know whether he was -- do you
know if it is required that you have a license to
be a sales manager?

     A     To my understanding, yes, you needed
a license.

     Q     Is it something that's required?

     A     That I don't know.

     Q     Was there any other area -- well,

106

1       Q       Were you just talking about support

2   for him or were you talking about support for the

3   financial advisors when you made that earlier

4   comment?

5       A       When I made the comment earlier, I

6   was talking about support for the office as a

7   whole which would, of course, include him, yes.

8       Q       That would include the financial

9   advisors as well, is that right?

10      A       Yes.

11      Q       What standard were you using to say

12  that there was not enough support?

13      A       Based on conversations I had with him

14  and based on what I saw of how the D.C. office

15  was run.

16      Q       What was it that you saw in the D.C.

17  office that indicated to you that it was not

18  enough support in the Largo office?

19      A       I would say financially and also from

20  the -- directly from the sales manager, the

21  experience that he had versus the experience we

22  had and Suzie.

107

1      Q      When you say financially --

2      A      Uh-huh.

3      Q      What do you mean by that?

4      A      A number of things he paid for out of

5  pocket, and I'm not even aware if we had a

6  marketing budget, but I know a lot of the things

7  he paid for out of pocket.

8      Q      Who paid for out of pocket?

9      A      Brad Carson.

10     Q      Do you know whether there were things

11 like that that managers at similar size UBS

12 offices paid for out of pocket themselves?

13     A      No, I'm not aware of any other

14 office, no.

15     Q      So, you don't have any basis for

16 comparison with any other UBS office, do you?

17            MR. AUBERTINE:  Objection, vague.

18 I'm sorry.  Objection as to form.  Excuse me.

19            THE WITNESS:  Just based on the

20 conversations that we had.

21            BY MR. WILLIAMSON:

22     Q      The conversations between you and

132

1    while at UBSFS?

2         A      No, not that I remember, no.

3         Q      Did you have conferences with

4    Mr. Carson regarding the support that had been

5    provided by the Washington, D.C. office to assist

6    the Largo office?

7         A      Yes.

8         Q      Do you recall approximately how many

9    conversations roughly that you had with

10   Mr. Carson?

11        A      I don't remember a specific number.

12        Q      Was it more than just a couple or

13   three?

14        A      Most likely, yes.

15        Q      All right.  Do you recall Mr. Carson

16   making statements regarding the support levels

17   that he was receiving or the Largo branch was

18   receiving from Washington, D.C.?

19        A      Yes.

20        Q      What did Mr. Carson say about that?

21        A      I don't remember the specifics but

22   that he felt he wasn't getting a lot of support

133

 1  from the D.C. office.

 2       Q       In what type -- in what ways are you

 3  referring to support?

 4       A       Support from marketing dollars to do

 5  events, to, you know, other types of support that

 6  I can't recollect right now.

 7       Q       Training?

 8       A       Training, yes, uh-huh.

 9       Q       What about additional support staff

10  workers?

11               MR. WILLIAMSON:  Objection.  Leading.

12               BY MR. AUBERTINE:

13       Q       I'll rephrase it.  Did Mr. Carson

14  discuss concerns with you about support staff

15  resources coming from the Washington, D.C.

16  office?

17               MR. WILLIAMSON:  Objection.  Leading.

18               BY MR. AUBERTINE:

19       Q       You may answer.

20       A       We did have conversations about

21  qualified personnel being at the Largo office,

22  yes.

134

```
 1        Q      All right.  Did Mr. Carson indicate

 2   to you approximately how many financial advisors

 3   he wanted to have in the Largo office when it

 4   first opened?

 5        A      Yes.

 6        Q      And what number did he indicate he

 7   wanted?

 8        A      I believe it was ten or under.

 9        Q      Do you -- in your personal

10   observations and in your discussions with

11   Mr. Carson while working at the UBSFS office, do

12   you have an opinion as to whether the Washington,

13   D.C. office played a role in the policies and

14   practices of the Largo office?

15              MR. WILLIAMSON:  Objection as to

16   form.  Calls for speculation, opinion.

17              BY MR. AUBERTINE:

18        Q      You may go ahead and answer.

19        A      Can you repeat the question?

20        Q      Yes.  Based on your experience at the

21   Largo office and your conversations with

22   Mr. Carson, do you have an understanding as to
```

135

1    the role that the Washington, D.C. office played

2    in the policies and practices of the Largo

3    office?

4         A    Yes.

5         Q    All right.  What is your

6    understanding?

7         A    That some decisions did come from the

8    Washington, D.C. office.

9         Q    What types of decisions?

10        A    Different types in terms of equipment

11   ordering, everything from equipment to hiring

12   individuals, to a number of other things.

13        Q    Budget?

14        A    Yes, yes.

15        Q    The budgeting decisions would come

16   from the Washington, D.C. office?

17        A    From what I understand, he did

18   communicate with the Washington, D.C. office

19   about budget issues, yes.

20        Q    And when you're referring to he, are

21   you referring to Mr. Carson?

22        A    Yes, Mr. Carson.

136

1    Q    Did Mr. Carson ever express concerns

2 to you about the lack of responsibility that he

3 was given in managing the Largo branch office?

4          MR. WILLIAMSON:  Objection.  Leading.

5          THE WITNESS:  The lack of

6 responsibility?

7          BY MR. AUBERTINE:

8    Q    Yes.

9    A    Can you rephrase it?

10   Q    Yes.  Did Mr. Carson express concerns

11 to you -- strike that.

12          Did Mr. Carson express any statements

13 to you regarding the division of management

14 responsibilities between himself and Coe

15 Magruder?

16   A    We did have some conversations about

17 decision making in regards to the D.C. office and

18 his ability to manage the office effectively,

19 yes.

20   Q    And what were those conversations

21 relating to?

22   A    His decision making ability.

137

1       Q       What specifically do you mean by

2    that?

3       A       And once again, I don't remember the

4    specifics, but when he wanted to sometimes make a

5    decision or put into motion certain things, it

6    had to be run through the D.C. office for

7    approval or at least communicated to them.

8       Q       And when you say for approval, in

9    your understanding, who would have to approve

10   that?

11      A       I know he was in communication with

12   Coe Magruder at the Washington, D.C. office.

13      Q       All right.  Was Mr. Carson sometimes

14   out of the Largo office handling his

15   responsibilities as a producer?

16      A       Yes.

17      Q       And were there times when -- strike

18   that.

19              Was Mr. -- in your opinion -- strike

20   that too.

21              You had previously testified to

22   certain points about the lack of support that

# EXHIBIT "10"

1

1           UNITED STATES DISTRICT COURT

2              DISTRICT OF MARYLAND

3   - - - - - - - - - - - - - - - x

4   FREDDIE H. COOK, et al.,        :

5                   Plaintiffs,    :

6           vs.                    : Civil Action No.

7   UBS FINANCIAL SERVICES, INC., : 06-CV-803 (RJM)

8              Defendant.          :

9   - - - - - - - - - - - - - - - x

10          Deposition of MICHAEL S. BARHAM, a

11  witness herein, called for examination by counsel

12  for Defendant in the above-entitled matter, pursuant

13  to notice, the witness being duly sworn by Robert M.

14  Jakupciak, a Notary Public in and for the District

15  of Columbia, taken at the offices of Covington &

16  Burling, L.L.P., 1201 Pennsylvania Avenue, N.W.,

17  Washington, D.C.  20004, at 1:38 p.m., on April 10,

18  2007, and the proceedings being taken down by

19  Stenotype by Robert M. Jakupciak, RPR.

20

21

22

23

24

25

25

1      Q.    Are you aware that UBS requested that you

2  produce certain documents in this case?

3      A.    Yes.

4      Q.    Did you search for documents in response

5  to the subpoena that UBS issued to you?

6      A.    Yes.

7      Q.    What documents did you look for?

8      A.    Anything that was relevant to UBS.

9      Q.    Did you provide those documents to your

10  counsel?

11      A.    Yes.

12      Q.    Besides the documents that you've already

13  provided to your counsel, do you have any other

14  documents that are relevant to this case?

15      A.    No.

16      Q.    What is your home address, Mr. Barham?

17      A.    5819 Fifth Street, Northwest, Washington,

18  D.C.  20011.

19      Q.    How long have you lived there?

20      A.    Since August of '06.

21      Q.    Where did you live in August of 2002?

22      A.    521 Dartmouth Avenue, Silver Spring,

23  Maryland  20910.

24      Q.    And did you live at that address --

25  strike that.

# EXHIBIT "11"

1

·1          UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF MARYLAND

3

4  - - - - - - - - - - - - - - x

5  FREDDIE COOK, ET AL.,           :

6          Plaintiffs,             :

7                                  : Civil Action No.

8     v.                           :

9                                  : 06 CV 803 (PJM)

10  UBS FINANCIAL SERVICES, INC., :

11          Defendant.             :

12  - - - - - - - - - - - - - - x

13

14          Washington, D.C.

15          Monday, April 9, 2007

16          The video deposition of MONICA SMITH, called

17  for examination by counsel for Defendant in the

18  above-entitled matter, pursuant to notice, in the

19  offices of Covington & Burling, 1201 Pennsylvania

20  Avenue, Northwest, Washington, D.C., convened at 1:37

21  p.m., before Judy Brown, a notary public in and for

22  the District of Columbia, when were present on behalf

23  of the parties:

24

25

1   was a bridge basically.

2       Q       How long did you stay at IC -- is it

3   ICMMA?

4       A       ICMA.

5       Q       ICMA, how long did you stay there?

6       A       A year.

7       Q       And where did you go next?

8       A       I'm currently with TIAA Cref.

9       Q       And what is your job title there?

10      A       Individual consultant.

11      Q       What does an individual consultant do

12  at TIAA Cref?

13      A       An individual consultant is assigned

14  institutions, primarily higher education, medical

15  nonprofit organizations, and we help their

16  participants with retirement planning.

17      Q       And what is your pay at TIAA?

18      A       60,000.

19      Q       That's where you're currently employed?

20      A       Yes.

21      Q       And where -- where do you go to work?

22      A       Across the street, 1101 Pennsylvania

23  Avenue.

24      Q       Nice neighborhood.  Now, I'm going to

25  ask you some questions about your employment at

# EXHIBIT "12"

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3   FREDDIE H. COOK, et al.,        )

4              Plaintiffs,          )

5                 v.                 )    Civil Action No.

6   UBS FINANCIAL SERVICES, INC., )    06 CV 803 (PJM)

7              Defendant.           )

8

9                          Washington, D.C.

10                         Thursday, April 5, 2007

11  The video deposition of

12                      PAUL WATKINS,

13  called for oral examination by Counsel for the

14  Defendant, pursuant to notice, held in the law

15  offices of Covington & Burling, 1201 Pennsylvania

16  Avenue, N.W., Washington, D.C., beginning at 1:50

17  p.m., before Carol J. Robinson, Registered

18  Professional Reporter and a Notary Public, when

19  were present:

20

21

22

# EXHIBIT "13"

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3 21 06 (a)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

FREDDIE H. COOK, SYLVESTER L.　　　　　:
FLEMING, JR. and TIMOTHY J. GANDY,　　:
on behalf of themselves and all other similarly　:
situated persons,　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Plaintiffs,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　-against-　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
UBS FINANCIAL SERVICES, INC.,　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　Defendant.　　　　　:

----------------------------------------------------------------x

05 Civ. 8842 (SHS)

OPINION & ORDER

SIDNEY H. STEIN, U.S. District Judge.

　　　　Defendant UBS Financial Services, Inc. ("UBSFS") has moved for an order

transferring this action to the United States District Court for the District of Maryland

pursuant to 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a).  After reviewing the

submissions of the parties and hearing oral argument, the Court finds that because venue

does not lie in the Southern District of New York for plaintiffs' Title VII claim, that

claim should be transferred to the District of Maryland pursuant to 28 U.S.C. § 1406(a);

because the District of Maryland is clearly a more appropriate forum for the resolution of

this dispute than is the Southern District of New York, plaintiffs' remaining claim should

be transferred to the District of Maryland as well, but pursuant to 28 U.S.C. § 1404(a),

not section 1406(a).  Cf. Baron Philippe de Rothschild, S.A. v. Paramount Distillers, Inc.,

923 F. Supp. 433, 437-38 (S.D.N.Y. 1996).

1

**A. Background**

Plaintiffs Freddie H. Cook, Sylvester L. Fleming, Jr. and Timothy J. Gandy are former employees of UBSFS who are African-American. They bring this action on their own behalf and on behalf of all other persons similarly situated and assert claims based on race discrimination in violation of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended by the Civil Rights Act of 1991, and (2) the Civil Rights Act of 1866, 42 U.S.C. § 1981.

Fleming and Cook are residents of Maryland. (Compl. ¶¶ 6-7). Most of their allegations of racial discrimination concern their former employment in the Largo, Maryland office of UBSFS. (See id. ¶¶ 37-48). The complaint alleges that Fleming and Cook were lured into taking positions at the Largo office, which was staffed almost entirely with African-Americans, on the promise that "the Largo branch office would provide a significant opportunity for business growth and that UBSFS was committed to the success of the Largo branch office." (Id. ¶¶ 37, 44). Yet, according to the complaint, UBSFS "failed to support, fund and operate the Largo branch in a manner comparable to UBSFS's other predominantly Caucasian branch offices." (Id. ¶ 39). Specifically, the complaint alleges that the Largo office was referred to derisively as a "diversity" office; was not given an adequate marketing budget; did not have the proper number of client service associates or employees with the appropriate regulatory licenses; and had a sales manager with no sales experience and an operations manager with no previous experience as an operations manager. (Id. ¶¶ 40, 45). Fleming and Cook also assert that

2

they were discriminated against while employed at UBSFS's office in Washington, D.C. (Id. ¶¶ 49-50).

The complaint's assertions concerning the third named plaintiff, Timothy J. Gandy, all involve alleged discrimination at various UBSFS offices in California, where Gandy resides. (Id. ¶¶ 8, 51-63). None of the named plaintiffs was ever employed by UBSFS in New York, where the company's headquarters are located. (See id. ¶¶ 9, 37-63). Nor did any of the allegedly unlawful actions concerning any of the named plaintiffs occur in New York. (See Compl. ¶¶ 37-63).

Plaintiffs, however, present a declaration from Major Khan, a former employee at UBSFS who worked in the company's Weehawken office, stating that branch office policy decisions "had to be approved by senior management in the New York Headquarters Office before being disseminated to the field" and that the "final decisions" in regard to hiring personnel to staff a new office "were made in either New York or Weehawken." (See Decl. of Major Khan dated Jan. 23, 2006 ("Khan Decl.") ¶¶ 10, 12). Khan also asserts that "[m]ost [of UBSFS's] personnel records are maintained in the Weehawken office," and speculates that "[p]ersonnel records for Plaintiffs Freddie Cook and Sylvester Fleming would be kept in New York or in Weehawken." (Id. ¶ 19).

However, the only evidence or allegations before the Court pertaining specifically to the named plaintiffs shows that neither plaintiffs' direct supervisors, nor those to whom these supervisors reported, were located in New York and that plaintiffs' personnel records also are not located in New York. Coe M. Magruder, who oversaw UBSFS's Largo office and who became Fleming's and Cook's direct supervisor when

3

they were transferred to the Washington, D.C. office, was located in Washington, D.C. throughout Fleming's and Cook's employment. (See Decl. of Coe M. Magruder dated Dec. 30, 2005 ("Magruder Decl.") ¶¶ 1-3, 6, 10). Magruder attests that "[n]one of the managers to whom I have reported while employed at UBSFS have been located in New York"; the final decision to open the branch office in Largo was subject to the approval of supervisors in Washington, D.C. and Weehawken; and, to his knowledge, "none of the decisions relating to the employment of Mr. Fleming or Mr. Cook [in the Largo office] required the approval of any manager located in New York" and "[n]one of the decisions made by me or my management team relating to the employment of Mr. Fleming or Mr. Cook [in the D.C. office] required the approval of any manager located in New York." (Id. ¶¶ 3, 5, 8, 10). Magruder also states that "I am aware of no employment records relating to Mr. Fleming or Mr. Cook that are or were maintained or administered in New York." (Id. ¶ 11).

As for Gandy, defendant presents the declaration of a UBSFS human resources manager who reviewed Gandy's personnel records and found that during his employment with UBSFS, in which Gandy "worked in branch offices located solely in California," he "reported to a branch manager, who in turn reported to a Regional Director, who, in turn, reported to a Division Manager" – and that "[n]one of these managers was located in New York." (Decl. of Jennifer Nies dated Dec. 30, 2005 ¶ 2). The declaration also states that "[n]one of the employment records relating to Mr. Gandy are or were maintained or administered in New York." (Id. ¶ 4).

4

Fleming is currently the only named plaintiff to have received a "right to sue"

letter from the Equal Employment Opportunity Commission; as a result, only Fleming

has met the prerequisites to filing suit pursuant to Title VII.  Plaintiffs assert that since

the complaint was filed, Cook received his right to sue letter and thus "it is anticipated

that Plaintiffs will seek to amend the Complaint to assert a Title VII claim on behalf of

Mr. Cook." (Pls.' Mem. of Law in Opp. to Defs.' Motion to Transfer at 2 n.2).

**B. Venue Does Not Lie in this District for Plaintiffs' Title VII Claim**

There is no dispute that venue is proper in the Southern District of New York for

plaintiffs' section 1981 claim because venue over this claim is governed by the general

venue statute, 28 U.S.C. § 1391, which provides that venue is proper in any judicial

district in which a defendant resides.  See 28 U.S.C. § 1391(b).  The existence of

UBSFS's corporate headquarters in New York thus confers venue over plaintiffs' section

1981 claim.

Venue over the Title VII claim, on the other hand, is not determined by the

general venue statute, but rather is "strictly governed" by 42 U.S.C. § 2000e-5(f)(3).

Templeton v. Veterans Admin., 540 F. Supp. 695, 696 (S.D.N.Y. 1982); see also Bolar v.

Frank, 938 F.2d 377, 378-79 (2d Cir. 1991).  Section 2000e-5(f)(3) provides that a Title

VII action

> may be brought in any judicial district in the State in which the unlawful
> employment practice is alleged to have been committed, in the judicial
> district in which the employment records relevant to such practice are
> maintained and administered, or in the judicial district in which the
> aggrieved person would have worked but for the alleged unlawful
> employment practice, but if the respondent is not found within any such
> district, such an action may be brought within the judicial district in which

5

the respondent has his principal office.

42 U.S.C. § 2000e-5(f)(3).

In analyzing these potential bases for venue, the Court looks only at those allegations that concern discrimination against Fleming, as he is the only named plaintiff asserting a Title VII claim. See Quarles v. General Inv. & Dev. Co., 260 F. Supp. 2d 1, 13 (D.D.C. 2003) (Title VII does not permit "a class representative to bring suit in a jurisdiction where he cannot personally satisfy the venue requirements of the statute."); 7A Wright, Miller & Kane, Fed. Prac. & Proc. Civ.3d § 1757 ("The general rule [for class actions] is that only the residence of the named parties is relevant for determining whether venue is proper."); Hsin Ten Enterprise USA, Inc. v. Clark Enterprises, 138 F. Supp. 2d 449, 462 (S.D.N.Y. 2000) ("Generally, venue must be established for each separate claim in a complaint."). None of the allegations concerning Fleming meets the criteria for any of the four bases of venue provided for in section 2000e-5(f)(3).

First, all of the unlawful employment practices alleged in the complaint involving Fleming occurred in Maryland and Washington, D.C., not New York. (See Compl. ¶¶ 37-50). Plaintiffs attempt to get around this fact through the Khan declaration, which, as noted above, asserts that UBSFS develops its policies and procedures for its branch offices "either in the New York Headquarters Office or the Weehawken office or jointly by personnel working in those two offices" and that "[n]o matter where the policy was developed, it had to be approved by senior management in the New York Headquarters Office before being disseminated to the field." (Khan Decl. ¶ 10). Khan also asserts that

6

the "final decisions" in regard to hiring personnel to staff a new office "were made in either New York or Weehawken." (Id. ¶ 12).

Khan's statements, however, are wholly untethered to the allegations in the complaint. At most they establish that broad-based personnel policies had to be approved by UBSFS's Manhattan headquarters. It does not necessarily follow, however, that any of the specific personnel decisions affecting Fleming or the Largo office were made in New York. Therefore, neither the complaint nor the facts asserted in the Khan declaration are sufficient to establish that the unlawful employment practices complained of were committed in New York. See Robinson v. Potter, No. Civ. A 04-0890, 2005 WL 1151429, *4 (D.D.C. May 16, 2005) ("Mere speculation of principal office involvement does not counter the fact that in the plaintiff's complaint, the acts committed occurred [in a different district]").

Moreover, Khan's generalized assertions are specifically contradicted by the Magruder declaration, which, as described above, states that none of the decisions relating to the employment of Fleming or Cook required the approval of any managers in New York. (See Magruder Decl. ¶¶ 5-10). Magruder's declaration is carefully worded – he does not state explicitly that no decisions with regard to Fleming or the Largo office were ever made in New York, attesting only that no such decisions were *required* to be made in New York – but that does not alter the fact that plaintiffs do not make any specific allegation that any of the employment practices complained of resulted from decisions made in New York. Such an omission distinguishes this case from Hoffman v. United Telecommunications, Inc., 575 F. Supp. 1463, 1484 (D. Kan. 1983), in which a

7

district court found Title VII venue based on the location of the parent company's headquarters. In that case, plaintiffs had submitted substantial evidence that the policies complained of were directly "established and implemented" by the parent company. Hoffman, 575 F. Supp. at 1484. The district judge ruled that venue was proper because the parent company exercised such "control" over the "development and enforcement of its personnel policies and practices" that "the alleged unlawful employment practice" could be considered to have taken place in the parent company's district. Id. Here, on the other hand, plaintiffs have presented no such evidence of control or decisionmaking by UBSFS's New York headquarters. Accordingly, plaintiffs do not satisfy the first basis for venue pursuant to 42 U.S.C. § 2000e-5(f)(3).

Nor do plaintiffs satisfy any of the other three bases for Title VII venue. With regard to the second basis, the complaint does not allege that employment records relevant to Fleming are maintained or administered in New York. (See Compl. ¶¶ 37-50). Moreover, Khan's declaration only speculates that based on his familiarity with "UBSFS's practices regard[ing] record storage ... [p]ersonnel records for Plaintiffs Freddie Cook and Sylvester Fleming would be kept in New York or Weehawken." (Khan Decl. ¶ 19) (emphasis added). The conditional nature of this assertion is insufficient on its own to establish venue, see Hsin Ten Enterprise USA, Inc., 138 F. Supp. 2d at 457 ("plaintiff bears the burden of proving that venue is proper"), and is contradicted by Magruder's statement that he is unaware of any employment records relating to Fleming or Cook that are maintained or administered in New York (see Magruder Decl. ¶¶ 11). The third basis for Title VII venue is inapplicable because Fleming never applied to work

8

in New York. And the final basis – venue based on location of principal office – applies only when none of the other three bases is satisfied by any other district. See Minnette v. Time Warner, 997 F.2d 1023, 1026 (2d Cir. 1993) ("the judicial district where the employer's principal office is located is a proper place for venue only if venue cannot be laid in one of the other three possible districts specified by the statute"); Arrocha v. Panama Canal Comm'n, 609 F. Supp. 231, 234 (E.D.N.Y. 1985) (the principal office provision of Title VII "was enacted to cover the 'rare case' when the employer could not be found in one of the other three districts."). Here, venue would properly lie in the District of Maryland pursuant to the first statutory basis for venue because, as described above, "the unlawful employment practice is alleged to have been committed" in Maryland. Cf. 42 U.S.C. § 2000e-5(f)(3). Thus, the "principal office" provision of the Title VII venue statute does not assist plaintiffs.

Because plaintiffs are unable to satisfy any of the bases for venue pursuant to 42 U.S.C. § 2000e-5(f)(3),[1] the Court can only hear plaintiffs' Title VII claim if it exercises its discretion to find pendent venue over that claim. Courts have generally used two approaches in determining whether to recognize pendent venue, one in which the more "specific" venue provision controls, and the other in which the venue provision applicable to the "primary" claim asserted controls. See Garrel v. NYLCare Health Plans, Inc., No. 98 Civ. 9077, 1999 WL 459925, *5 (S.D.N.Y. Jun. 29, 1999). Under either approach, however, pendent venue over plaintiffs' Title VII claim would not apply

---

[1] The Court notes that even if plaintiffs amend their complaint so that Cook, in addition to Fleming, asserts a Title VII claim, venue still would not lie in this district for this claim because neither the complaint, nor the Khan declaration, alleges that Cook was situated any differently than Fleming in terms of the location of the alleged unlawful employment practices or the location of the relevant employment records. See Compl. ¶¶ 37-50; Khan Decl. ¶ 10.

9

because Title VII has the "more specific" venue provision than does section 1981, see James v. Booz-Allen & Hamilton, Inc., 227 F. Supp. 2d 16, 21 (D.D.C. 2002), and Title VII is considered to be the "primary" claim when joined with a section 1981 claim, see Bragg v. Hoffman Homes, Inc., No. 04-CV-4984, 2005 WL 272966, *2 (E.D. Pa. Feb. 3, 2005). See McNeill v. James, No. Civ. CCB-04-1807, 2004 WL 2538400, *2 (D. Md. Nov. 9, 2004) (declining to find pendent venue over a Title VII claim pursuant to either the "specific provision" approach or the "primary claim" approach). Accordingly, the Court declines to exercise its discretion to recognize pendent venue over the Title VII claim.

Rather, the Court will transfer this claim to the District of Maryland pursuant to 28 U.S.C. § 1406(a) because the interests of justice are furthered by transferring the claim as opposed to dismissing it – as the claim may prove to be meritorious and defendant does not oppose transfer – and the claim could have been brought originally in the District of Maryland because, as noted above, most of the alleged unlawful employment practices concerning Fleming occurred in Maryland, satisfying the first basis of Title VII's venue requirement. See 42 U.S.C. § 2000e-5(f)(3); 28 U.S.C. § 1406(a). This is true for Cook's allegations as well, assuming he amends the complaint to assert a Title VII claim on his own behalf, as his attorney has represented he will.

## C. Plaintiffs' Section 1981 Claim Should Be Transferred Pursuant to 28 U.S.C. § 1404(a)

As explained above, venue in this district is proper for plaintiffs' section 1981 claim based on the location of UBSFS's corporate headquarters in New York. However, the Court finds that, pursuant to 28 U.S.C. § 1404(a), the interests of justice and the

10

convenience of the parties and witnesses would be far better served by also transferring the section 1981 claim to the District of Maryland.

"The determination whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court." Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 520 (2d Cir. 1989); see also Anadigics, Inc. v. Raytheon Co., 903 F. Supp. 615, 617 (S.D.N.Y. 1995). The moving party bears the burden of establishing that (1) the case could have been brought in the alternate forum; and (2) the convenience of parties and witnesses and the interest of justice will be better served by transfer to another forum. See United States v. Nature's Farm Products, Inc., No. 00 Civ. 6593, 2004 WL 1077968, *3 (S.D.N.Y. May 13, 2004). "That burden is heavy: unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Id. (internal citations and quotation marks omitted).

Plaintiffs' section 1981 claim could have been brought in the District of Maryland because defendant has multiple offices there (see Magruder Decl. ¶¶ 9) and because "a substantial part of the events or omissions giving rise to the claim occurred" there. See 28 U.S.C. § 1391(b)(1) and (2).

In evaluating the appropriateness of transfer, courts are to consider the following factors: plaintiffs' choice of forum; location of the operative facts; convenience of the parties and witnesses; location of documents and ease of access to sources of proof; the forum's familiarity with the governing law; the availability of process to compel the attendance of unwilling witnesses; the relative means of the parties; and trial efficiency.

11

See Anadigics, 903 F. Supp. at 617; Bristol-Myers Squibb Co. v. Andrx Pharmaceuticals, LLC, No. 03 Civ. 2503, 2003 WL 22888804, *2 (S.D.N.Y. Dec. 5, 2003); Pilates, Inc. v. Pilates Inst., Inc., 891 F. Supp. 175, 183 (S.D.N.Y. 1995). Applied here, the Court finds that these factors weigh heavily in favor of transferring the case to the District of Maryland.

To begin with, Maryland has a much more substantial connection to the dispute than does New York because most of the events at issue occurred there. Even if the Court considers the allegations pertaining to the putative class as a whole, as opposed to only the named plaintiffs,[2] the alleged discriminatory actions at issue occurred in Maryland, Washington, D.C. and California. The only connection to the Southern District of New York is that UBSFS's corporate headquarters is located here and that, according to Khan, some of the decisions relating to personnel and the operation of branch offices were made either here or in Weehawken, New Jersey. (See Khan Decl. ¶ 10-13). By comparison, plaintiffs reference Largo, Maryland 27 times in their complaint and Largo, by any fair reading of the allegations, constitutes the locus of the allegedly unlawful actions undertaken by defendant.

Trial efficiency and the convenience of the parties and witnesses also weigh heavily in favor of transfer. Because this Court is transferring plaintiffs' Title VII claim

---

[2] The law is clear that in determining whether venue for a putative class action is proper, courts are to look only at the allegations pertaining to the named representatives. See 7A Wright, Miller & Kane, Fed. Prac. & Proc. Civ.3d § 1757; United States ex rel. Sero v. Preiser, 506 F.2d 1115, 1129 (2d Cir. 1974) (venue pursuant to 28 U.S.C. § 1391 "may be satisfied if only the named parties to a class action meet its requirements"). Once the propriety of venue has been established, however, some courts have considered allegations pertaining to the class as a whole in determining whether to transfer venue pursuant to 28 U.S.C. § 1404(a). See Ellis v. Costco Wholesale Corp., 372 F. Supp. 2d 530, 539, 543 (N.D. Cal. 2005); Berenson v. Nat'l Fin. Servs., LLC, 319 F. Supp. 2d 1 (D.D.C. 2004).

to the District of Maryland pursuant to 28 U.S.C. § 1406(a), retaining venue over the

section 1981 claim would require the parties to prosecute two actions simultaneously in

two different districts and would require witnesses to appear in both locations. This

would be a substantial waste of both judicial and litigant resources. Transferring the

section 1981 claim to Maryland would allow the entire case to proceed in a single district.

See Vinson v. Seven Seventeen HB Philadelphia Corp., No. Civ. A. 00-6334, 2001 WL

1774073, *30 (E.D. Pa. Oct. 31, 2001) ("in cases involving claims under Title VII and

another claim governed by the general venue statute of § 1391, courts have consistently

transferred the entire action to the district where venue is proper for both claims");

McNeill, 2004 WL 2538400, at *2 ("Generally, in cases involving Title VII and ADEA

claims where venue is proper for one claim, but not the other, courts have transferred

both claims to the district where venue is proper for both.").

The only significant factor weighing against transfer is plaintiff's choice of forum.

But while this factor is normally entitled to considerable deference, see Seagoing

Uniform Corp. v. Texaco, Inc., 705 F. Supp. 918, 936 (S.D.N.Y. 1989), this presumption

does not apply where there is "little material connection" between the chosen forum and

the facts or issues of the case. Bordiga v. Directors Guild of America, 159 F.R.D. 457,

462 (S.D.N.Y. 1995); see also Anadigics, Inc., 903 F. Supp. at 617; Tomchuck v. Union

Trust Co., 875 F.Supp. 242, 245 (S.D.N.Y. 1995); De Jesus v. National R.R. Passenger

Corp., 725 F. Supp. 207, 208 (S.D.N.Y. 1989).

The remaining factors are not dispositive. In regard to the location of documents,

Khan's declaration states that while some personnel records were maintained in New

13

York, "[m]ost personnel records are maintained in the Weehawken office, including contracts, job postings, yearly reviews, licenses and certifications." (Khan Decl. ¶ 19.) The ability to compel testimony cuts both ways because the Court presumes that the parties will seek to call witnesses from both New York and Maryland. Familiarity with the governing law is not a factor because the complaint asserts only federal claims. (See Compl. ¶¶ 64-70). Finally, the relative means of the parties is inconsequential in regard to venue because two of the three defendants reside in Maryland and the third, who resides in California, would experience no additional economic hardship if the case were resolved in Maryland as opposed to New York.

Balancing all of the material circumstances of this case in light of the factors set forth above, the Court finds that for the convenience of parties and witnesses, in the interest of justice, plaintiffs' section 1981 claim should be transferred to the District of Maryland.

Accordingly, UBSFS's motion pursuant to 28 U.S.C. § 1404(a) and 28 U.S.C. § 1406(a) to transfer this action to the United States District Court for the District of Maryland is granted.

Dated: New York, New York
       March 21, 2006

                                      SO ORDERED:

                                      _____
                                      Sidney H. Stein, U.S.D.J.

14

# EXHIBIT "14"

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

**PETER J. MESSITTE**
**UNITED STATES DISTRICT JUDGE**

**6500 CHERRYWOOD LANE**
**GREENBELT, MARYLAND   20770**
**301-344-0632**

# M E M O R A N D U M

TO:      Counsel of Record

FROM:   Judge Peter J. Messitte

RE:      <u>Cook, et al. v. UBS Financial Services, Inc.</u>
           Civil Case No. PJM 06-803

DATE:   April 23, 2007

******

Before the Court is Plaintiffs' Motion for Leave to Amend Complaint [Paper No. 70]. After filing the Motion to Amend, Plaintiffs submitted the proposed Amended Complaint, which has been docketed separately as Paper No. 72. Defendant does not oppose the amendment in substance, but does ask that the dismissal of the class claims be with prejudice.

The Court cannot dismiss a putative class action case with prejudice, thereby cutting off the claims of non-parties who never had the chance to assert claims. Accordingly, the Court **GRANTS** the Motion for Leave to Amend Complaint [Paper No. 70]. The dismissal of the class action claims is without prejudice. The Amended Complaint that had been docketed as Paper No. 72 **SHALL BE DEEMED FILED**.

With regard to the other issues raised by the Defendant, namely Defendant's reservation of rights to move for fees and costs and request for the return of all Confidential Materials, Defendant is hereby given leave to file a motion for the fees and costs that resulted from litigating the class claims. Moreover, each party **SHALL** promptly return to the other party all Confidential Materials produced pursuant to the Protective Order entered in this case that were relevant only to Plaintiffs' class allegations. The parties are not to retain copies of these materials.

Despite the informal nature of this ruling, it shall constitute an Order of the Court, and the Clerk is directed to docket it accordingly.

                                    /s/
                           PETER J. MESSITTE
                 UNITED STATES DISTRICT JUDGE

# EXHIBIT "15"

# UNITED STATES DISTRICT COURT
# DISTRICT OF MARYLAND

**PETER J. MESSITTE**
UNITED STATES DISTRICT JUDGE

6500 CHERRYWOOD LANE
GREENBELT, MARYLAND   20770
301-344-0632

## M E M O R A N D U M

TO:         Counsel of Record

FROM:    Judge Peter J. Messitte

RE:         Cook, et al. v. UBS Financial Services, Inc.
               Civil Case No. PJM 06-803

DATE:     May 22, 2007

                                        ******

    The Court considers Plaintiffs' Objection to Magistrate Judge Day's Letter Order of April 12, 2007 [Paper No. 78] and the Opposition thereto.

    In reviewing a Magistrate Judge's ruling on a non-dispositive motion, this Court may set aside the ruling only "where it has been shown that [it] is clearly erroneous or contrary to law." *Neighborhood Dev. Collaborative v. Murphy*, 233 F.R.D. 436, 438 (D. Md. 2005). Plaintiffs have failed to show such error here.

    The Court notes as an initial matter that Plaintiffs failed to respond to the Motion to Compel in the more than six months that it was pending before Judge Day. They cannot now argue grounds that they failed to raise below. *See Giganti v. Gen-X Strategies, Inc.,* 222 F.R.D. 299, 308 (E.D. Va. 2004) ("this objection must be denied because it was not argued before the magistrate judge and cannot be raised for the first time as part of plaintiffs' Rule 72 motion").

    That defect aside, the Court is satisfied that the tax returns are discoverable because they are relevant to the broad range of remedies sought by Plaintiffs.

    For the reasons set forth in Magistrate Judge Day's three-page letter (which the Court adopts as its own), the objection is **OVERRULED**.

    Despite the informal nature of this ruling, it shall constitute an Order of Court and the Clerk is directed to docket it accordingly.

                                                        /s/
                                            PETER J. MESSITTE
                                     UNITED STATES DISTRICT JUDGE

# EXHIBIT "16"

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **FREDDIE COOK, et al.,** | * | |
| **Plaintiffs,** | * | |
| v. | * | **Civil Action No.: PJM 06-803** |
| **UBS FINANCIAL SERVICES, INC.,** | * | |
| **Defendant.** | * | |

\*\*\*\*\*\*

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this **29th** day of

**May, 2007,** hereby **ORDERED**:

1. That Plaintiffs' First Motion to Compel Discovery (Docket Item No. 55) is

**DISMISSED WITHOUT PREJUDICE** to file an amended version of such motion; and

2. Before filing any amended version of such motion, the parties are **ORDERED** to

participate in another discovery conference pursuant to Local Rule 104.8 .

         /s/
Charles B. Day
United States Magistrate Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **FREDDIE COOK, et al.,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **Civil Action No.: PJM 06-803** |
| **UBS FINANCIAL SERVICES, INC.,** | * | |
| **Defendant.** | * | |

**\*\*\*\*\*\***

## MEMORANDUM OPINION

Pursuant to the referral of this case to me for resolution of discovery disputes, the Court

has received Plaintiffs' First Motion to Compel Discovery ("Plaintiffs' Motion") (Docket Item

No. 55). Plaintiff has also filed a supplement to Plaintiffs' Motion, withdrawing certain aspects

of such pursuant to their decision to no longer seek class-wide discovery ("Plaintiffs'

Supplement") (Docket Item No. 79). The Court has reviewed these and other relevant

documents. At this time, no hearing is deemed necessary. Local Rule 105.6 (D. Md.). For the

following reasons, the Court hereby DISMISSES WITHOUT PREJUDICE Plaintiffs' Motion.

A large portion of the introduction and argument in Plaintiffs' Motion addresses

Plaintiffs' need for certain discovery related to class certification. The issue is pervasive

throughout Plaintiffs' Motion. Plaintiffs' Supplement attempts to amend Plaintiffs' Motion by

specifying (1) those requests for production of documents that are no longer relevant in their

entirety, and (2) those requests that Plaintiffs maintain, either in their entirety or in some

-1-

amended fashion. The Court finds the latter requests, for which Plaintiffs argue to be maintained in some amended form, to be problematic.

For example, with respect to Plaintiffs' First Request for Production of Documents, Request No. 1, Plaintiffs' Supplement states that "Plaintiffs maintain their motion to the extent that it seeks transactional as opposed to year end snapshot information . . . and to the extent that it seeks additional categories of information." Plaintiffs' argument on those issues still includes contentions interwoven with the class certification issue. Some of the arguments are meant to address Defendant's objections to the overly burdensome nature of the discovery as requested on a national basis, which clearly relates to the issue of class certification. Other similar argument and discussion is evident throughout Plaintiffs' Motion and, in addition to making an unclear read for the Court, it does not permit the Court to fairly rule on the topic. Plaintiffs' Supplement simply does not sufficiently amend Plaintiffs' Motion for proper ruling by this Court.

Further, because Plaintiffs' Motion overwhelmingly addresses the class certification issue, a great deal of Defendant's Memorandum in Opposition to Plaintiffs' First Motion to Compel Discovery ("Defendant's Opposition") (Docket Item No. 57) is dedicated to the same issue. Plaintiffs assert that Defendant's objections should be rejected as mere attempts "to limit the class in the guise of its discovery objections." Plaintiffs add that Defendant "has adopted the tactic of using general discovery objections to significantly narrow the scope of proposed Class as defined in Plaintiffs' Complaint." Accordingly, Defendant's Opposition dedicates at least eight of the first eleven pages to a discussion relating to class. The class issue pervades the remainder of Defendant's Opposition. To rule on Plaintiffs' Motion now, without permitting Defendant sufficient time to reorient its arguments to address Plaintiffs' amended position, is not

in the interest of justice. Further, if Defendant was in fact simply employing "tactics" to narrow the scope of the proposed class, then Plaintiffs' withdrawal of the class allegation may encourage more discovery to be produced. In essence, the Court is in need of a better elaboration of Plaintiffs' current position, as well as Defendant's response, if any, to such position. Likewise, due to the passage of time since filing of Plaintiffs' Motion and the change in direction of this case, it is worthwhile for the parties to engage in another discovery conference pursuant to Local Rule 104.8 (D. Md.) in attempt to resolve outstanding issues, and the Court therefore orders such.

The Court will not engage in the detailed, exhaustive, and inefficient act of parsing the parties' filings and interpreting what either party would have intended to argue absent the overbearing class issue. In addition to being a poor use of this Court's limited resources, it calls for speculation by the Court, which is not fair to Plaintiffs or Defendant. Thus, the Court DISMISSES Plaintiffs' Motion, WITHOUT PREJUDICE to file an amended motion that captures Plaintiffs' present concerns regarding Defendant's production of discovery. The Court is aware of the scheduling deadlines in this case and will entertain any reasonable request by the parties to extend the discovery deadline.

_____/s/_____

Charles B. Day
United States Magistrate Judge
May 29, 2007

-3-